Exhibit C

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

**Proxy Statement Pursuant to Section 14(a) of**
**the Securities Exchange Act of 1934 (Amendment No.          )**

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐     Preliminary Proxy Statement

☐     **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒     Definitive Proxy Statement

☐     Definitive Additional Materials

☐     Soliciting Material under §240.14a-12

**Airbnb, Inc.**

_____

(Name of Registrant as Specified In Its Charter)

_____

(Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)

Payment of Filing Fee (Check all boxes that apply):

☒     No fee required

☐     Fee paid previously with preliminary materials

☐     Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11

Table of Contents

**AIRBNB, INC.**

888 Brannan Street
San Francisco, California 94103

**NOTICE OF 2024 ANNUAL MEETING OF STOCKHOLDERS**

To Be Held Virtually on June 5, 2024

To Our Stockholders:

NOTICE IS HEREBY GIVEN that the 2024 Annual Meeting of Stockholders of Airbnb, Inc. (the "Annual Meeting") will be held on June 5, 2024, at 10:00 a.m., Pacific Daylight Time, virtually via a live webcast. Please visit www.proxydocs.com/ABNB and enter your control number included in your Notice Regarding the Availability of Proxy Materials, on the instructions accompanying your proxy materials, or on your proxy card for details on how to attend the Annual Meeting. At the Annual Meeting, stockholders will consider and vote on the following matters:

1. To elect Brian Chesky, Angela Ahrendts and Kenneth Chenault as Class I Directors to serve until the 2027 Annual Meeting of Stockholders, and until their respective successors are duly elected and qualified;

2. To ratify the appointment of PricewaterhouseCoopers LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2024;

3. To approve, on an advisory (non-binding) basis, the compensation of our named executive officers;

4. To approve the amendment and restatement of our Restated Certificate of Incorporation to provide for the exculpation of officers; and

5. To consider one stockholder proposal, if properly presented at the Annual Meeting.

The stockholders will also act on any other business that may properly come before the Annual Meeting or any postponement, continuation or adjournment thereof.

Stockholders of record at the close of business on April 8, 2024 are entitled to notice of, and to vote at, the Annual Meeting or any postponement, continuation, or adjournment thereof. A complete list of such stockholders will be open to the examination of any stockholder for a period of ten days prior to the Annual Meeting for a purpose germane to the meeting and will be open to the examination of any stockholder during the whole time of the meeting.

Your vote is very important to us, and it is important to us that your shares are represented regardless of the number of shares you may hold. Whether you choose to participate in the Annual Meeting online or not, you can be sure your shares are represented at the meeting if you are a stockholder of record by promptly voting electronically over the internet or via the toll-free telephone number provided, or, if you request to receive paper copies of these materials by mail, by returning your completed proxy card in the pre-addressed, postage-paid return envelope. If your shares are held in street name, you may return your completed voting instruction card to your broker. If, for any reason, you desire to revoke or change your proxy, you may do so at any time before it is exercised, such that submitting your proxy now will not prevent you from voting your shares at the Annual Meeting. The proxy is solicited by the board of directors of Airbnb, Inc.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting**

Our proxy materials, including the Proxy Statement for the Annual Meeting and Annual Report on Form 10-K for the fiscal year ended December 31, 2023, are being made available on our website at https://investors.airbnb.com, as well as at the following website: www.proxydocs.com/ABNB. We are providing access to our proxy materials over the internet under the rules adopted by the U.S. Securities and Exchange Commission.

By Order of the Board of Directors,

Brian Chesky
Chairperson of the Board of Directors
Chief Executive Officer

April 19, 2024

**TABLE OF CONTENTS**

| | Page |
|---|---|
| PROXY STATEMENT | 1 |
|     2024 Annual Meeting of Stockholders | 1 |
|     Registering for and Attending the Annual Meeting | 1 |
|     Proxy Materials are Available on the Internet | 2 |
|     Householding Procedures | 2 |
|     Inspector of Election | 2 |
|     Proxy Solicitation Costs | 2 |
|     Quorum for the Annual Meeting | 3 |
|     Voting | 3 |
|     How to Vote | 3 |
|     How to Revoke or Change your Vote | 4 |
|     Uninstructed Shares | 4 |
|     Proposals to be Submitted to Stockholders | 5 |
|     Vote Required to Approve a Proposal | 5 |
|     Abstentions | 5 |
|     Broker-Non Votes | 6 |
|     Confidentiality of Votes | 6 |
|     Matters for Inclusion in the Proxy Materials for the 2025 Annual Meeting of Stockholders | 6 |
|     Director Nominations for the 2025 Annual Meeting of Stockholders | 6 |
|     Matters for Consideration at the 2025 Annual Meeting of Stockholders, but not for Inclusion in the Proxy Materials | 6 |
| PROPOSAL NO. 1 — ELECTION OF DIRECTORS | 8 |
|     Recommendation of Board of Directors | 8 |
|     Our Board of Directors | 8 |
|     Director Biographies | 8 |
|     Family Relationships | 11 |
|     Vote Required | 11 |
| CORPORATE GOVERNANCE | 12 |
|     Director Independence | 12 |
|     Lead Director | 12 |
|     Classified Board of Directors | 12 |
|     Leadership Structure of the Board of Directors | 12 |
|     Role of the Board of Directors in Risk Oversight Process | 13 |
|     Meetings of Board of Directors and Attendance | 13 |
|     Committees of the Board of Directors | 13 |
|     Serving our Stakeholders | 17 |
|     Identifying and Evaluating Director Nominees | 17 |
|     Board Diversity | 18 |
|     Nominating Agreement | 19 |
|     Founder Voting Agreement | 19 |
|     Leadership Development, Belonging and Compensation Committee Interlocks and Insider Participation | 19 |
|     Airbnb Code of Ethics and Related Policies | 19 |
|     Company Policies Regarding Hedging and Pledging | 20 |
|     Communications with our Board of Directors | 20 |
|     Our Executive Officers | 20 |
| PROPOSAL NO. 2—RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC | 22 |
|     Recommendation of Board of Directors | 22 |
|     Principal Accountant Fees and Services | 22 |
|     Pre-Approval Policies and Procedures | 22 |
|     Report of the Audit, Risk and Compliance Committee | 22 |
|     Vote Required | 23 |

Table of Contents

|  | Page |
|---|---|
| PROPOSAL NO. 3—APPROVAL, ON AN ADVISORY (NON-BINDING) BASIS, OF THE COMPENSATION OF OUR NAMED EXECUTIVE OFFICERS ("SAY-ON-PAY VOTE") | 24 |
| Background | 24 |
| Recommendation of Board of Directors | 24 |
| Vote Required | 24 |
| COMPENSATION DISCUSSION AND ANALYSIS | 25 |
| Overview | 25 |
| Executive Summary | 25 |
| Executive Compensation Philosophy and Objectives | 26 |
| Compensation and Governance Practices | 27 |
| Determination of Compensation | 28 |
| Elements of Our Executive Compensation Program | 29 |
| Report of the Leadership Development, Belonging and Compensation Committee | 36 |
| EXECUTIVE COMPENSATION TABLES | 37 |
| EQUITY COMPENSATION PLAN | 53 |
| PROPOSAL NO. 4—APPROVAL OF AMENDMENT AND RESTATEMENT OF OUR RESTATED CERTIFICATE OF INCORPORATION (THE "CHARTER") TO PROVIDE FOR THE EXCULPATION OF OFFICERS | 55 |
| Background | 55 |
| Recommendation of Board of Directors | 55 |
| Vote Required | 55 |
| PROPOSAL NO. 5—STOCKHOLDER PROPOSAL FOR POLITICAL DISCLOSURE | 56 |
| Background | 56 |
| Supporting Statement | 56 |
| Recommendation of Board of Directors | 57 |
| Vote Required | 57 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 58 |
| Investors' Rights Agreement | 58 |
| Nominating Agreement | 58 |
| Indemnification Agreements | 58 |
| Employment Arrangement with an Immediate Family Member of Our Director | 58 |
| Asset Purchase Agreement | 59 |
| Policies and Procedures for Related Party Transactions | 59 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 60 |
| OTHER MATTERS | 64 |
| Delinquent Section 16(a) Reports | 64 |
| Annual Report on Form 10-K | 64 |
| Other Business | 64 |

Table of Contents



**AIRBNB, INC.**

888 Brannan Street
San Francisco, California 94103

**PROXY STATEMENT**

**2024 Annual Meeting of Stockholders**

Date: June 5, 2024

Time: 10:00 a.m. Pacific Daylight Time

Place: 2024 Annual Meeting of Stockholders (the "Annual Meeting") to be held virtually via a live webcast – please visit www.proxydocs.com/ABNB for more details. To attend the Annual Meeting, you must register in advance at www.proxydocs.com/ABNB. Upon completing your registration, you will receive further instructions via email, including your unique link that will allow you to access the meeting and provide you with the ability to submit questions. Please be sure to follow the instructions found on the Notice Regarding the Availability of Proxy Materials (the "Notice of Internet Availability"), proxy card and/or voting instruction card, as well as any subsequent instructions that will be delivered to you via email.

The Record Date for the Annual Meeting is April 8, 2024. Only stockholders of record as of the close of business on this date, or holders of a valid proxy, are entitled to notice of and to vote at the Annual Meeting and any postponement, continuation, or adjournment thereof.

On or about April 19, 2024, we expect to mail to stockholders entitled to vote the Notice of Internet Availability containing instructions on how to access our Proxy Statement for the Annual Meeting and our Annual Report on Form 10-K for the year ended December 31, 2023.

If you requested printed versions by mail, your printed proxy materials also include the proxy card or voting instruction form for the Annual Meeting.

In this proxy statement, "Airbnb," "Company," "our," "us," and "we," refer to Airbnb, Inc.

**Registering for and Attending the Annual Meeting**

We look forward to welcoming our stockholders to the Annual Meeting. We are holding a virtual Annual Meeting to provide our stockholders the opportunity to access and experience the Annual Meeting in a consistent and convenient manner across the globe. We believe hosting the Annual Meeting virtually is essential for a consistent experience. Moreover, we also believe a virtual meeting will reduce the environmental impact associated with hosting an in-person meeting. We have designed the virtual meeting to provide the same rights and opportunities to participate as stockholders would have at an in-person meeting, including the right to vote and ask questions during the meeting through the virtual meeting platform.

To attend the Annual Meeting, you must register in advance at www.proxydocs.com/ABNB. You will need the unique control number included in your proxy materials to register for the Annual Meeting. Upon completing your registration, you will receive further instructions via email, including your unique link that will allow you to access the meeting and provide you with the ability to submit questions. Please be sure to follow the instructions found on the Notice of Internet Availability, proxy card and/or voting instruction card, as well as any subsequent instructions that will be delivered to you via email. If you do not comply with the procedures outlined above, you may not be admitted to the virtual Annual Meeting.

Online access to the webcast will open approximately 15 minutes prior to the start of the Annual Meeting so that you may log in and test the computer audio system. Any recording of the Annual Meeting will not be allowed, including audio and video recording or photography; however, a replay of our Annual Meeting will be available for viewing following the meeting at our Investor Relations website at https://investors.airbnb.com.

1

Table of Contents

We highly encourage you to vote your shares in advance using one of the methods described in this proxy statement to ensure that your vote will be represented at the Annual Meeting even if you plan to attend the Annual Meeting. We will have in place rules of conduct for the meeting and request the respectful conduct of all attendees at the Annual Meeting.

Our intent is to answer as many stockholder-submitted questions as time permits, so long as those questions comply with the rules of conduct. We may combine or group together substantially similar questions to avoid repetition. We reserve the right to edit profanity or other inappropriate language, as well as exclude questions that are not pertinent to meeting matters or Company business.

**Proxy Materials are Available on the Internet**

Airbnb uses the internet as the primary means of furnishing proxy materials to stockholders. We are sending a Notice of Internet Availability to our stockholders with instructions on how to access the proxy materials online or request a printed copy of the materials.

Stockholders may follow the instructions in the Notice of Internet Availability to elect to receive any future proxy materials in print by mail or electronically by email. We highly encourage stockholders to take advantage of the availability of the proxy materials online as it is more convenient, helps reduce the environmental impact of this and future annual meetings, and would reduce Airbnb's printing and mailing costs. Airbnb proxy materials are also available at https://investors.airbnb.com.

**Householding Procedures**

Airbnb has adopted "householding" procedures. Under these householding procedures, Airbnb will deliver one single copy of the Notice of Internet Availability and, if printed versions are requested by mail, this proxy statement and the Annual Report on Form 10-K for the year ended December 31, 2023 to multiple stockholders who share the same address. This procedure will greatly reduce the environmental impact of our annual meetings and reduces Airbnb's printing and mailing costs. Stockholders who participate in householding will continue to receive separate proxy cards. Upon written or oral request, Airbnb will promptly deliver a separate copy of the Notice of Internet Availability and, if printed versions are requested by mail, copies of this proxy statement and the Annual Report on Form 10-K for the year ended December 31, 2023 to any stockholder that elects not to participate in householding.

You may email, call, or write to Airbnb at the following email address, phone number, or address to request and receive, free of charge, a separate copy of the Notice of Internet Availability, this proxy statement or the Annual Report on Form 10-K for the year ended December 31, 2023, or separate copies of any future notices, proxy statements, or annual reports:

Airbnb, Inc.
Investor Relations
888 Brannan Street
San Francisco, California 94103
Phone: (415) 510-4027
Email: ir@airbnb.com

We encourage you to contact the bank, broker, or other organization that holds your shares to elect into the householding procedures if you are receiving more than one copy of the proxy materials at a single address.

**Inspector of Election**

A representative of Mediant Communications will serve as the inspector of election during the Annual Meeting.

**Proxy Solicitation Costs**

We pay the entire cost of preparing, assembling, printing, mailing, and distributing these proxy materials. In addition, we may reimburse banks, brokers, and other custodians, nominees, and fiduciaries representing beneficial owners of shares for their expenses in forwarding solicitation

Table of Contents

materials to such beneficial owners. Proxies may be solicited by certain of our directors, officers, and employees, personally or by mail, telephone, facsimile, email, or other means of communication (electronic or otherwise). No additional compensation will be paid for such services.

**Quorum for the Annual Meeting**

The holders of a majority in voting power of the stock issued and outstanding and entitled to vote, present in person, or by remote communication, if applicable, or represented by proxy, will constitute a quorum for the transaction of business at all meetings of the stockholders. A quorum, once established at the Annual Meeting, will not be broken by the withdrawal of enough votes to leave less than a quorum. If, however, a quorum is not present or represented at the Annual Meeting, then either (i) the person presiding over the meeting or (ii) a majority in voting power of the stockholders, present in person, or by remote communication, if applicable, or represented by proxy, will have power to recess the meeting or adjourn the meeting from time to time.

As such, your shares will be counted for purposes of determining if there is a quorum if:

- You are entitled to vote and you are present virtually at the Annual Meeting; or
- You have properly voted by proxy prior to the meeting online, by phone, or by mail.

Broker non-votes and abstentions are counted for purposes of determining whether a quorum is present.

**Voting**

Each share of Airbnb's Class A common stock is entitled to one vote on each matter, each share of Class B common stock is entitled to twenty votes on each matter, and each share of Class C or Class H common stock is entitled to no votes on each matter. Stockholders do not have cumulative voting rights. Only "stockholders of record" as of the close of business on the Record Date, or holders of a valid proxy, are entitled to vote at the Annual Meeting. As of the Record Date, there were 441,988,651 shares of Airbnb's Class A common stock issued and outstanding and 193,343,397 shares of Airbnb's Class B common stock issued and outstanding. "Beneficial owners of shares held in street name" as of the Record Date can vote using the methods described below.

A list of the names of stockholders entitled to vote at the Annual Meeting will be available to stockholders for ten days prior to the Annual Meeting for any purpose germane to the Annual Meeting. Please contact our Secretary, c/o Airbnb, Inc., 888 Brannan Street, San Francisco, California 94103, if you wish to examine the list prior to the Annual Meeting. The stockholder list will also be available during the virtual Annual Meeting for examination by any stockholder.

**Stockholders of Record.** You are a stockholder of record with respect to your shares if your shares are registered directly in your name with Airbnb's transfer agent, Computershare Trust Company, N.A.

**Beneficial Owners of Shares Held in Street Name.** If your shares are held in an account at a bank, broker, or other organization, then you are a "beneficial owner of shares held in street name." As a beneficial owner, you have the right to instruct the person or organization holding your shares how to vote your shares. Most individual stockholders are beneficial owners of shares held in street name.

**How to Vote**

There are four ways to vote:

- **Online Prior to the Annual Meeting.** You may vote by proxy by visiting www.proxydocs.com/ABNB and entering the unique control number found in your Notice of Internet Availability. Availability of online voting may depend on the voting procedures of the organization that holds your shares.

- **Online During the Annual Meeting.** To attend the Annual Meeting, you must register in advance at www.proxydocs.com/ABNB. Upon completing your registration, you will receive further instructions via email, including your unique link that will allow you to

3

Table of Contents

access the meeting and vote during the meeting, and you will have the ability to submit questions. The Annual Meeting will begin promptly at 10:00 a.m. Pacific Daylight Time, and access will open approximately 15 minutes prior to the start of the Annual Meeting so that you may log in and test the computer audio. You may call the number provided in the email you receive approximately one hour prior to the start of the meeting if you experience technical difficulties during the check-in process or during the meeting. If you hold your shares through a broker, bank or other nominee (that is, in street name), you may be instructed to obtain a legal proxy from your broker, bank or other nominee and to submit a copy in advance of the meeting. Further instructions will be provided to you as part of your registration process.

- **Phone.** You will receive a proxy card or voting instruction form by mail if you requested printed copies of the proxy materials, and you may vote by proxy by calling the toll-free number found on the card or form. The availability of phone voting may depend on the voting procedures of the organization that holds your shares.

- **Mail.** You will receive a proxy card or voting instruction form by mail if you requested printed copies of the proxy materials, and you may vote by proxy by filling out the card or form and returning it in the envelope provided.

All shares represented by valid proxies received prior to the vote at the Annual Meeting will be voted in accordance with the instructions and choice of stockholders with respect to any matter to be acted upon. We highly encourage you to vote your shares in advance online, by phone, or by mail to ensure that your vote will be represented at the Annual Meeting, even if you plan to attend the Annual Meeting.

**How to Revoke or Change your Vote**

You may revoke your proxy and change your vote at any time before the vote is formally held during the Annual Meeting.

- **Online Prior to the Annual Meeting.** You may change your vote using the online voting method described above, in which case only your latest internet proxy submitted prior to the Annual Meeting will be counted.

- **Online During the Annual Meeting.** You may change your vote by attending the Annual Meeting virtually and voting at the Annual Meeting. Attendance at the meeting will not cause your previously granted proxy to be revoked unless you specifically so request.

- **Phone.** You may change your vote using the phone voting method described above, in which case only your latest telephone proxy submitted prior to the Annual Meeting will be counted.

- **Mail**. You may revoke your proxy and change your vote by signing and returning a new proxy card or voting instruction form dated as of a later date, in which case only your latest proxy card or voting instruction form received prior to the Annual Meeting will be counted.

**Uninstructed Shares**

**Stockholders of Record.** If you are a stockholder of record and you:

- Indicate when voting online or by phone that you wish to vote as recommended by the board of directors; or

- Sign and return a proxy card without giving specific voting instructions,

then the persons named as proxy holders by the Company, Brian Chesky, Elinor Mertz and Ronald A. Klain, will vote your shares in the manner recommended by the board of directors on all matters presented in this Proxy Statement and as they may determine in their best judgment with respect to any other matters properly presented for a vote at the Annual Meeting.

**Beneficial Owners of Shares Held in Street Name.** If you are a beneficial owner of shares held in street name and do not provide the bank or broker that holds your shares with specific voting

4

Table of Contents

instructions, then such bank or broker may generally vote your shares in their discretion on "routine" matters, but cannot vote on "non-routine" matters. The ratification of PricewaterhouseCoopers LLP as our independent registered public accounting firm is a routine matter – all other proposals to be voted on at the Annual Meeting are non-routine matters. A "broker non-vote" will occur when these shares are not voted with respect to a particular proposal because the bank or broker does not receive voting instructions from you and does not have discretionary voting power over those shares.

**Proposals to be Submitted to Stockholders**

At the Annual Meeting, stockholders will consider and vote on the following matters:

1. To elect Brian Chesky, Angela Ahrendts and Kenneth Chenault as Class I Directors to serve until the 2027 Annual Meeting of Stockholders, and until their respective successors are duly elected and qualified;

2. To ratify the appointment of PricewaterhouseCoopers LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2024;

3. To approve, on an advisory (non-binding) basis, the compensation of our named executive officers ("Say-on-Pay Vote");

4. To approve the amendment and restatement of our Restated Certificate of Incorporation ("Charter") to provide for the exculpation of officers; and

5. To consider one stockholder proposal, if properly presented at the Annual Meeting.

The stockholders will also act on any other business that may properly come before the Annual Meeting or any postponement, continuation or adjournment thereof.

**Vote Required to Approve a Proposal**

| Proposal | Votes Required | Effect of Votes Withheld / Abstentions and Broker Non-Votes |
|---|---|---|
| Proposal 1 – Election of Directors | The plurality of the votes cast. Stockholders will be given the choice to vote "FOR" or "WITHHOLD" votes for each nominee. Thus, the two nominees receiving the highest number of votes "FOR" their election will be elected. | Votes withheld and broker non-votes will have no effect. |
| Proposal 2 – Ratification of Appointment of Independent Registered Public Accounting Firm | The affirmative vote of the holders of a majority in voting power of the votes cast (excluding abstentions and broker non-votes). | Abstentions will have no effect. We do not expect any broker non-votes on this proposal. |
| Proposal 3 – Say-on-Pay Vote | The affirmative vote of the holders of a majority in voting power of the votes cast (excluding abstentions and broker non-votes). | Abstentions and broker non-votes will have no effect. |
| Proposal 4 – Charter Amendment | The affirmative vote of the holders of a majority in voting power of the outstanding shares of stock of the Company entitled to vote at the Annual Meeting. | Abstentions and broker non-votes will have the same effect as a vote against this proposal. |
| Proposal 5 – Stockholder Proposal – Political Disclosure | The affirmative vote of the holders of a majority in voting power of the votes cast (excluding abstentions and broker non-votes). | Abstentions and broker non-votes will have no effect. |

Preliminary voting results will be announced during the Annual Meeting, and final results will be tallied by the inspector of election after the taking of the vote at the Annual Meeting. Airbnb will publish the final voting results in a Current Report on Form 8-K filed with the U.S. Securities and Exchange Commission (the "SEC") within four business days following the Annual Meeting.

**Abstentions**

An "abstention," in the case of the proposals to be voted on at the Annual Meeting, represents a stockholder's affirmative choice to decline to vote on a proposal. Abstentions are counted for

Table of Contents

purposes of determining whether a quorum is present. Abstentions have no effect on Proposals 1, 2, 3 or 5 to be voted upon at the Annual Meeting. An abstention on Proposal 4 will have the same effect as a vote against this proposal.

**Broker-Non Votes**

Generally, broker non-votes occur when shares held by a broker in "street name" for a beneficial owner are not voted with respect to a particular proposal because the broker (1) has not received voting instructions from the beneficial owner and (2) lacks discretionary voting power to vote those shares. A broker is typically entitled to vote shares held for a beneficial owner on routine matters, such as the ratification of the appointment of our independent registered public accounting firm, without instructions from the beneficial owner of those shares. On the other hand, absent instructions from the beneficial owner of such shares, a broker is not entitled to vote shares held for a beneficial owner on non-routine matters, such as the election of directors, the Say-on-Pay Vote, the Charter amendment and the stockholder proposal. Broker non-votes are counted for purposes of determining whether a quorum is present.

**Confidentiality of Votes**

Airbnb highly respects your voting privacy. Any instructions, ballots, tabulations or material that identify individual stockholders are handled in a manner that protects your voting privacy. Airbnb will not disclose the proxy instructions or ballots of individual shareholders, except:

- To allow for the tabulation and certification of votes;
- To facilitate a successful proxy solicitation;
- To assert claims for Airbnb;
- To defend claims against Airbnb; and
- As necessary to meet applicable legal requirements.

If you write comments on your proxy card or ballot, the proxy card or ballot may be forwarded to Airbnb's management and the board of directors to review your comments.

**Matters for Inclusion in the Proxy Materials for the 2025 Annual Meeting of Stockholders**

Matters for inclusion in the proxy materials for the 2025 annual meeting of stockholders, other than nominations of directors, must be received at 888 Brannan Street, San Francisco, California 94103 on or before December 20, 2024. All proposals must comply with Rule 14a-8 under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

**Director Nominations for the 2025 Annual Meeting of Stockholders**

Airbnb's amended and restated bylaws require advanced notice of any stockholder proposal for nomination of candidates for election as a director. Any stockholder considering a proposal for nomination of candidates for election as a director should carefully review Airbnb's amended and restated bylaws, which describe the timing, procedural and substantive requirements for such proposal. The proposals for director nominations must be received no earlier than February 5, 2025 and no later than March 7, 2025. The proposal for director nominations must be delivered to, or mailed and received by, the Company's Secretary at the principal executive offices of the Company, in writing and in proper form, and must set forth the information required by Airbnb's amended and restated bylaws.

In addition to satisfying the foregoing requirements under Airbnb's amended and restated bylaws, to comply with the universal proxy rules, stockholders who intend to solicit proxies in support of director nominees other than Airbnb's nominees must provide notice that sets forth the information required by Rule 14a-19 under the Exchange Act.

**Matters for Consideration at the 2025 Annual Meeting of Stockholders, but not for Inclusion in the Proxy Materials**

Airbnb's amended and restated bylaws also require advanced notice of any stockholder proposal to be proposed other than the nomination of candidates for election as a director. Any stockholder

Table of Contents

considering such a proposal should carefully review Airbnb's amended and restated bylaws, which describe the timing, procedural and substantive requirements for such proposal. Matters for consideration at the 2025 annual meeting of stockholders, but not for inclusion in the proxy materials, must be received no earlier than February 5, 2025 and no later than March 7, 2025. The proposal must be delivered to, or mailed and received by, the Company's Secretary at the principal executive offices of the Company, in writing and in proper form, and must set forth the information required by Airbnb's amended and restated bylaws.

In connection with the 2025 annual meeting of stockholders, we intend to file a proxy statement and a WHITE proxy card with the SEC in connection with our solicitation of proxies for that meeting.

7

Table of Contents

## PROPOSAL NO. 1 — ELECTION OF DIRECTORS

Our board of directors has nominated Brian Chesky, Angela Ahrendts and Kenneth Chenault as Class I director nominees for election at the Annual Meeting to hold office until the annual meeting of stockholders to be held in 2027, and until their respective successors are duly elected and qualified. If a nominee ceases to be a candidate for election by the time of the Annual Meeting (a contingency that the board does not expect to occur), such proxies may be voted by the proxy holders in accordance with the recommendation of our board of directors.

### Recommendation of Board of Directors

***Our board of directors recommends that you vote "FOR" the election of each of Messrs. Chesky and Chenault and Ms. Ahrendts.***

### Our Board of Directors

Our business and affairs are managed under the direction of our board of directors. The number of directors is fixed by our board of directors, subject to the terms of our restated certificate of incorporation and amended and restated bylaws. Our board of directors currently consists of nine directors. In accordance with our restated certificate of incorporation, our board of directors is divided into three classes with staggered three-year terms. At each annual meeting of stockholders, a class of directors is elected for a three-year term to succeed the directors of the same class whose terms are then expiring. The term of the Class I directors elected at our Annual Meeting will begin at the Annual Meeting and end at our 2027 annual meeting of stockholders, or, if later, when such director's successor has been elected and has qualified.

The following table provides certain information regarding each of our directors as of April 19, 2024.

| Name | Age | Class | Independent | Audit, Risk and Compliance Committee | Leadership Development, Belonging and Compensation Committee | Nominating and Corporate Governance Committee | Stakeholder Committee |
|------|-----|-------|-------------|--------------------------------------|-------------------------------------------------------------|-----------------------------------------------|-----------------------|
| Brian Chesky | 42 | I | | | | | Member |
| Angela Ahrendts | 63 | I | Yes | | Chair | | Member |
| Kenneth Chenault | 72 | I | Yes | | Member | Member | |
| Amrita Ahuja | 44 | II | Yes | Member | | | |
| Joseph Gebbia | 42 | II | | | | | Member |
| Jeffrey Jordan | 65 | II | Yes | Member | | Chair | |
| Nathan Blecharczyk | 40 | III | | | | | Member |
| Alfred Lin | 51 | III | Yes | Chair | Member | | |
| James Manyika | 58 | III | Yes | | | | Chair |

### Director Biographies

*Class I Directors*

**Brian Chesky.** Mr. Chesky co-founded our Company in 2008 and serves as our Chief Executive Officer. Mr. Chesky is also a member of our board of directors. Mr. Chesky received a Bachelor of Fine Arts in Industrial Design from the Rhode Island School of Design. We believe that Mr. Chesky is qualified to serve as a member of our board of directors because of the perspective and experience he brings as our co-founder and Chief Executive Officer.

**Angela Ahrendts.** Ms. Ahrendts joined our board of directors in May 2019. Ms. Ahrendts served as Senior Vice President, Retail at Apple Inc. ("Apple"), a publicly-held technology company, from May 2014 to May 2019. Prior to joining Apple, Ms. Ahrendts served as a director and Chief Executive Officer of Burberry plc, a global luxury fashion company, from July 2006 to April 2014. Ms. Ahrendts also previously served as Executive Vice President at Liz Claiborne Inc. and President of Donna Karan International, both then publicly-held global fashion companies. Ms. Ahrendts has served as a director of the Ralph Lauren Corporation, a publicly-held fashion company, since August 2018.

8

**Table of Contents**

Ms. Ahrendts has served as a director of WPP plc, a publicly-held creative transformation company with expertise in communications, experience, commerce and technology, since June 2020. Ms. Ahrendts also serves on non-profits boards, including Chairperson of Save the Children International, Saïd Business School at the University of Oxford, The HOW Institute for Society, and Charity: Water. Ms. Ahrendts received a Bachelor of Arts in Marketing and Merchandising from Ball State University. We believe that Ms. Ahrendts is qualified to serve as a member of our board of directors because of her extensive experience advising technology companies and other public companies as both a director and executive.

**Kenneth Chenault.** Mr. Chenault joined our board of directors in January 2018. Since February 2018, Mr. Chenault has served as Chairman and Managing Director of General Catalyst, a venture capital firm. Mr. Chenault has served on the board of directors of Catalyst Partners Acquisition Corp., a publicly-held investment company, since May 2021. Prior to that, Mr. Chenault held roles of increasing responsibility at the American Express Company, a publicly-held diversified financial services company, joining American Express in 1993 and serving as Chairman and Chief Executive Officer from April 2001 through January 2018. Mr. Chenault has served on the board of directors of Berkshire Hathaway Inc., a publicly-held multinational conglomerate holding company, since May 2020. Mr. Chenault also served on the board of directors of International Business Machines Corporation, a publicly-held multinational technology company, from October 1998 to February 2019, The Procter & Gamble Company, a publicly-held global consumer goods company, from April 2008 to February 2019, and Meta Platforms, Inc. (formerly Facebook, Inc.), a publicly-held global technology company, from February 2018 to May 2020. Mr. Chenault received a Bachelor of Arts in History from Bowdoin College and a Juris Doctor from Harvard Law School. We believe that Mr. Chenault is qualified to serve as a member of our board of directors because of his extensive experience advising public companies as both a director and executive.

*Class II Directors*

**Amrita Ahuja.** Ms. Ahuja joined our board of directors in December 2021. Ms. Ahuja has served as the Chief Financial Officer of Block, Inc. (formerly known as Square, Inc.), a publicly-held financial services and digital payments company, since January 2019, and as the Chief Operating Officer of Block, Inc. since February 2023. From March 2018 to January 2019, Ms. Ahuja served as the Chief Financial Officer of Blizzard Entertainment, Inc., a division of Activision Blizzard, Inc. Beginning in June 2010, Ms. Ahuja served in various positions at Activision Blizzard, Inc., including as Senior Vice President of Investor Relations from January 2015 to May 2018, Vice President, Finance and Operations from August 2012 to January 2015 and Vice President, Strategy and Business Development from June 2010 to August 2012. Prior to that, Ms. Ahuja was a Director of Business Development at Fox Networks Group, served in strategic planning at the Walt Disney Company from 2003 to 2005 and worked in investment banking at Morgan Stanley from 2001 to 2003. Ms. Ahuja has served as a member of the board of directors of Discord, Inc., a privately held voice, video and text platform, since January 2022. Ms. Ahuja received a Bachelor of Arts from Duke University and a Master of Business Administration from Harvard Business School. We believe that Ms. Ahuja is qualified to serve as a member of our board of directors because of her extensive operating experience at technology companies.

**Joseph Gebbia.** Mr. Gebbia co-founded our Company in 2008 and serves as a member of our board of directors and on the board of Airbnb.org. Mr. Gebbia received dual degrees in Graphic Design and Industrial Design from the Rhode Island School of Design, where he currently serves on the institution's Board of Trustees. Since September 2022, Mr. Gebbia has served on the board of directors of Tesla, Inc., a publicly-held automotive and clean energy company. We believe that Mr. Gebbia is qualified to serve as a member of our board of directors because of the perspective and experience he brings as our co-founder and board member of Airbnb.org.

**Jeffrey Jordan.** Mr. Jordan joined our board of directors in August 2011. Mr. Jordan serves as a general partner of Andreessen Horowitz, a venture capital firm, which he joined as a general partner in July 2011. Prior to that, Mr. Jordan served as the Chief Executive Officer of OpenTable, Inc., the online restaurant-reservation service company, from 2007 to 2011. From 2004 to 2006, Mr. Jordan served as President of PayPal, Inc., a digital payments company, which was then owned by eBay, Inc. For five years prior to that, Mr. Jordan served as Senior Vice President and General Manager for

9

Table of Contents

eBay North America. Prior to that, Mr. Jordan served as Chief Financial Officer for Hollywood Entertainment Corporation, a video rental company, and then President of its subsidiary, Reel.com. Previously, Mr. Jordan served in various capacities at The Walt Disney Company for eight years, most recently as Senior Vice President and Chief Financial Officer of the Disney Store Worldwide. Before that he worked for The Boston Consulting Group. Mr. Jordan served as a member of the boards of directors of publicly-traded companies, including OpenTable, Inc. from 2007 until 2013 (then a publicly-traded company), Pinterest, Inc. since October 2011, Accolade, Inc. since July 2016 and Maplebear Inc. (d/b/a Instacart) since June 2014. Mr. Jordan is also a member of the board of directors for several private companies. Mr. Jordan received a Bachelor of Arts from Amherst College and a Master of Business Administration from the Stanford Graduate School of Business. We believe that Mr. Jordan is qualified to serve as a member of our board of directors because of his significant managerial experience at global technology companies.

*Class III Directors*

**Nathan Blecharczyk.** Mr. Blecharczyk co-founded our Company in 2008 and serves as our Chief Strategy Officer and Chairman of Airbnb China. Mr. Blecharczyk is also a member of our board of directors. Mr. Blecharczyk received a Bachelor of Arts in Computer Science from Harvard University and held several engineering positions before co-founding Airbnb. We believe that Mr. Blecharczyk is qualified to serve as a member of our board of directors because of the perspective and experience he brings as our co-founder and Chief Strategy Officer.

**Alfred Lin.** Mr. Lin joined our board of directors in November 2012. Since October 2010, Mr. Lin has been a partner at Sequoia Capital Operations LLC ("Sequoia"), a venture capital firm. Mr. Lin represents Sequoia on our board as well as several other companies, including DoorDash, a publicly-held food-delivery and local logistics platform, since 2014, and Houzz Inc., a privately-held online home designs and furnishings platform, since 2011. From 1996 to 1998, Mr. Lin served as Vice President of Finance and Administration of LinkExchange, a banner advertising exchange acquired by Microsoft Corporation ("Microsoft"). From June 1999 to December 2014, Mr. Lin served as Co-Founder and General Manager at Venture Frogs, LLC, a seed fund that invested in companies such as Ask Jeeves, OpenTable, Inc., Tellme Networks, Inc., and Zappos.com Inc. ("Zappos"). From January 2001 to June 2005, Mr. Lin served as Vice President of Finance and Business Development of Tellme Networks, a voice recognition services and platform company acquired by Microsoft. From January 2005 to December 2010, Mr. Lin served as Chairman of the Board and Chief Operating Officer of Zappos, an online retailer acquired by Amazon.com, Inc. Mr. Lin holds a Bachelor of Arts in Applied Mathematics from Harvard University and a Master of Science in Statistics from Stanford University. We believe that Mr. Lin is qualified to serve as a member of our board of directors because of his extensive experience in the venture capital industry, his business and leadership experience, and his knowledge of scaling technology companies.

**James Manyika.** Mr. Manyika joined our board of directors in September 2023. Mr. Manyika has served as the Senior Vice President of Research, Technology and Society at Google LLC, a subsidiary of Alphabet Inc., since January 2022. Mr. Manyika has also served as a senior partner emeritus at McKinsey & Company, a global management consulting firm ("McKinsey") since January 2022, and Chairman and Director Emeritus of McKinsey Global Institute. Prior to that, he was a senior partner at McKinsey from 2006 to January 2021, a member of McKinsey's Shareholders Council (its board of directors) from 2016 to January 2022 and Chairman and director of McKinsey Global Institute from 2009 to 2021. Mr. Manyika has served on the Executive Advisory Board of General Atlantic LLC since 2021. In addition, Mr. Manyika previously served as Vice Chair of the Global Development Council at the White House under President Barack Obama from December 2012 to January 2017 and has served on several national and international task forces, including currently as Vice Chair of the National AI Advisory Committee to advise the President and White House on AI. Mr. Manyika serves on the board of several research institutes and philanthropic foundations. Mr. Manyika is a Rhodes Scholar and received a Doctor of Philosophy in AI and Robotics, Master of Science in Mathematics and Computer Science, and Master of Arts from Oxford University, and a Bachelor of Science first class in electrical engineering from the University of Zimbabwe. We believe that Mr. Manyika is qualified to serve as a member of our board of directors because of his extensive experience advising technology companies, his knowledge and research of technology's impact on business, and his business and leadership experience.

10

Table of Contents

**Family Relationships**

There are no family relationships among any of our directors or executive officers.

**Vote Required**

Each director is elected by a plurality of the votes cast. Votes withheld and broker non-votes will have no effect.

11

Table of Contents

## CORPORATE GOVERNANCE

### Director Independence

Our board of directors has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment, and affiliations, our board of directors has determined that Messrs. Chenault, Jordan, Lin and Manyika and Mses. Ahrendts and Ahuja qualify as independent directors in accordance with the Listing Rules (the "Nasdaq Listing Rules") of The Nasdaq Stock Market LLC. Under the Nasdaq Listing Rules, the definition of independence includes a series of objective tests, such as that the director is not, and has not been for at least three years, one of our employees and that neither the director nor any of his or her family members has engaged in various types of business dealings with us. Our board of directors has made a subjective determination as to each independent director that no relationships exist that, in the opinion of our board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. Messrs. Blecharczyk and Chesky are not considered independent by virtue of their positions as our executive officers and for Mr. Gebbia, as a former executive officer. In making these determinations, our board of directors reviewed and discussed information provided by the directors and us with regard to each director's relationships as they may relate to us and our management, including the beneficial ownership of our capital stock by each director, and the transactions involving them described in the section titled "Certain Relationships and Related Party Transactions."

### Lead Director

Our corporate governance guidelines provide that one of our independent directors will serve as the lead director at any time when the Chair of our board of directors is a member of management or is otherwise not independent. Our board of directors has appointed Mr. Chenault to serve as our lead director. As lead director, Mr. Chenault presides over all meetings of the board of directors at which the Chair is not present, including any executive sessions of the independent directors, approves board of directors meeting schedules and agendas, and acts as the liaison between the independent directors and our Chief Executive Officer and the Chair of the board of directors.

### Classified Board of Directors

In accordance with our restated certificate of incorporation, our board of directors is divided into three classes with staggered three-year terms. At each annual general meeting of stockholders, the successors to directors whose terms then expire will be elected to serve for the time of election and qualification until the third annual meeting following election. Our directors are divided among the three classes as follows:

- the Class I directors are Messrs. Chesky and Chenault, and Ms. Ahrendts, and their terms will expire at this Annual Meeting;

- the Class II directors are Messrs. Gebbia and Jordan, and Ms. Ahuja, and their terms will expire at the annual meeting of stockholders to be held in 2025; and

- the Class III directors are Messrs. Blecharczyk, Lin, and Manyika, and their terms will expire at the annual meeting of stockholders to be held in 2026.

We expect that any additional directorships resulting from an increase in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the directors.

### Leadership Structure of the Board of Directors

Our board of directors recognizes that one of its key responsibilities is to evaluate and determine its optimal leadership structure so as to provide effective oversight of management. Our amended and restated bylaws and corporate governance guidelines provide our board of directors with flexibility to combine or separate the positions of Chairperson of the board of directors and chief executive officer. Our board of directors currently believes that our existing leadership structure,

12

Table of Contents

under which our Chief Executive Officer, Mr. Chesky, serves as Chairperson of our board of directors and Mr. Chenault serves as lead director, is effective. Our board of directors will continue to periodically review our leadership structure and may make such changes in the future as it deems appropriate.

**Role of the Board of Directors in Risk Oversight Process**

Risk assessment and oversight are an integral part of our governance and management processes. Our board of directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management and the audit, risk and compliance committee review these risks with the board of directors at regular board meetings as part of management presentations that focus on particular business functions, operations, or strategies, and present the steps taken by management to mitigate or eliminate such risks.

Our board of directors administers this oversight function directly, as well as through various standing committees of our board of directors that address risks inherent in their respective areas of oversight. While our board of directors is responsible for monitoring and assessing strategic risk exposure, our audit, risk and compliance committee is responsible for overseeing our major financial and operational risk exposures and the steps our management has taken to monitor and control these exposures, including, but not limited to, oversight of management's implementation of our cybersecurity risk management program. The Chair of the audit, risk and compliance committee also approves or disapproves any related party transactions, and all such approved transactions must be ratified by the audit, risk and compliance committee during the meetings held at least once during each fiscal quarter. Our nominating and corporate governance committee monitors the effectiveness of our corporate governance guidelines. Our leadership development, belonging and compensation committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

**Meetings of Board of Directors and Attendance**

Members of our board of directors are expected to regularly prepare for and attend meetings of the board of directors and committees on which they sit. A director who is unable to attend a meeting of the board of directors or a committee of the board of directors is expected to notify the Chairperson of the board of directors or the Chairperson of the appropriate committee in advance of such meeting, and, whenever possible, participate in such meeting via teleconference in the case of an in-person meeting. Our board of directors met ten times during the fiscal year ended December 31, 2023. During 2023, all of our directors attended at least 75% of the aggregate of the total number of board of directors meetings and committee meetings on which he or she then served, other than Ms. Ahrendts who attended over 70% but less than 75%. Members of our board of directors are encouraged to attend annual meetings of stockholders; however, we do not maintain a formal policy regarding director attendance at annual meetings. All of our then-serving directors attended the 2023 annual meeting of stockholders.

**Committees of the Board of Directors**

Our board of directors has established an audit, risk and compliance committee, a leadership development, belonging and compensation committee, a nominating and corporate governance committee, and a stakeholder committee. Our board of directors may establish other committees to facilitate the management of our business. The composition and functions of each committee are described below. Members serve on these committees until their resignation or until otherwise determined by our board of directors. Each of our audit, risk and compliance committee, leadership development, belonging and compensation committee, and nominating and corporate governance committee have adopted a written charter that satisfies the applicable rules and regulations of the SEC and the Nasdaq Listing Rules, which are available on our website at https://investors.airbnb.com under "Governance."

Table of Contents

### Audit, Risk and Compliance Committee

Our audit, risk and compliance committee oversees our corporate accounting and financial reporting process as well as reviews our risk management and exposures. Among other matters, the audit, risk and compliance committee:

- appoints and oversees our independent registered public accounting firm;

- evaluates the independent registered public accounting firm's qualifications, independence, and performance;

- determines the engagement, compensation, and retention of the independent registered public accounting firm;

- reviews and approves the scope of the annual audit and pre-approves the audit and non-audit fees and services;

- reviews and discusses the design, implementation, adequacy and effectiveness of internal control over financial reporting with management and the independent registered public accounting firm;

- the Chair of the audit, risk and compliance committee reviews and approves all related party transactions on an ongoing basis and all such approved transactions must be ratified by the audit, risk and compliance committee during the meetings held at least once during each fiscal quarter;

- reviews procedures for the receipt, retention, and treatment of any complaints received by us regarding accounting, internal accounting controls, or auditing matters;

- discusses with management and the independent registered public accounting firm the results of the annual audit and the review of our quarterly financial statements;

- approves the retention of the independent registered public accounting firm to perform any proposed permissible non-audit services;

- discusses with management on a periodic basis, or as appropriate, policies and procedures with respect to risk assessment and risk management;

- establishes processes with respect to risk assessment, risk management and risk oversight, including responsibility for oversight of risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure, internal control over financial reporting, investment guidelines and credit and liquidity matters, programs, plans and policies relating to legal and regulatory compliance and strategy, and operational infrastructure, particularly reliability, business continuity, capacity, security, and data privacy, including cybersecurity;

- is responsible for reviewing our financial statements and our management's discussion and analysis of financial condition and results of operations to be included in our annual and quarterly reports, including the audit, risk and compliance committee report for inclusion in the annual proxy statements, to be filed with the SEC;

- reviews earnings press releases, as well as financial information and earnings guidance;

- reviews reports regarding ethics and compliance matters and volumes and trends related thereto and reports to the board of directors periodically with respect to significant matters received through the ethics helpline and any related investigations and requests any additional information from our Chief Legal Officer or Chief Ethics Officer;

- oversees our internal audit department;

- reviews and discusses with management and the independent registered public accounting firm critical accounting policies;

14

Table of Contents

- reviews the chief executive officer and chief financial officer disclosure and certifications under Section 302 and 906 of the Sarbanes-Oxley Act;

- reviews, evaluates and recommends to our board of directors, if appropriate, any contemplated waivers of provisions of the code of ethics involving our executive officers and directors; and

- reviews the audit, risk and compliance committee charter and the audit, risk and compliance committee's performance on an annual basis.

Our audit, risk and compliance committee consists of Ms. Ahuja and Messrs. Jordan and Lin. Our board of directors has determined that all members of our audit committee are independent under the Nasdaq Listing Rules and Rule 10A-3(b)(1) of the Exchange Act. The Chair of our audit, risk and compliance committee is Mr. Lin. Our board of directors has determined that each of Ms. Ahuja and Messrs. Jordan and Lin is an audit committee financial expert as such term is currently defined in Item 407(d)(5) of Regulation S-K. Our board of directors has also determined that each member of our audit, risk and compliance committee can read and understand fundamental consolidated financial statements, in accordance with applicable requirements.

Our audit, risk and compliance committee met eight times during 2023.

### Leadership Development, Belonging and Compensation Committee

Our leadership development, belonging and compensation committee oversees policies relating to the compensation and benefits of our executive officers and directors, and reviews policies, programs, and initiatives focusing on leadership development and belonging. Among other matters, the leadership development, belonging and compensation committee:

- reviews and approves the corporate goals and objectives relevant to compensation of our Chief Executive Officer, evaluates the performance of our Chief Executive Officer in light of these goals and objectives and, based upon this evaluation (either alone or, if directed by the board of directors, in conjunction with a majority of the independent directors), approves our Chief Executive Officer's compensation;

- reviews and sets or makes recommendations to the board of directors regarding the compensation of our executive officers other than our Chief Executive Officer;

- reviews and makes recommendations to the board of directors regarding director compensation;

- reviews and approves or makes recommendations to our board of directors regarding our incentive compensation plans and arrangements, retirement plans, and equity-based plans;

- reviews and discusses with management the Compensation Discussion and Analysis in our annual report on Form 10-K or annual proxy statement;

- reviews and discusses annually with management and our board of directors our compensation philosophy and practices, including incentive and employee incentive compensation plans and arrangements, to determine whether they are aligned with our goal of serving all stakeholders over the long term;

- reviews and discusses annually with management the risks arising from our compensation philosophy and practices to determine whether they encourage excessive risk-taking;

- reviews policies, programs, and initiatives focusing on leadership development and belonging; and

- reviews the leadership development, belonging and compensation committee charter and the leadership development, belonging and compensation committee's performance on an annual basis.

15

Table of Contents

Our leadership development, belonging and compensation committee consists of Ms. Ahrendts and Messrs. Chenault and Lin. Our board of directors has determined that all members of our leadership development, belonging and compensation committee are independent under the Nasdaq Listing Rules and are "non-employee directors" as defined in Rule 16b-3 promulgated under the Exchange Act. The Chair of our leadership development, belonging and compensation committee is Ms. Ahrendts.

The leadership development, belonging and compensation committee has engaged Semler Brossy Consulting Group ("Semler Brossy") to provide guidance regarding the amount and types of compensation that we provide to our executives. Semler Brossy reports directly to the leadership development, belonging and compensation committee and did not provide any services to us other than the services relating to executive and director compensation. For additional information on the role of the compensation consultant and management in the determination of compensation, please see "Compensation Discussion and Analysis – Determination of Compensation."

The leadership development, belonging and compensation committee met six times during 2023.

### Nominating and Corporate Governance Committee

The nominating and corporate governance committee is responsible for making recommendations to our board of directors regarding candidates for directorships and the size and composition of our board of directors. In addition, the nominating and corporate governance committee is responsible for overseeing our corporate governance policies and making recommendations to our board of directors concerning governance matters. Among other matters, the nominating and corporate governance committee:

- reviews and makes recommendations to our board of directors regarding director independence determinations;

- reviews, evaluates, and, as applicable, proposes and approves, stockholder recommended nominees for election to our board of directors;

- reviews annually the nominating and corporate governance committee structure and membership;

- oversees the annual self-evaluations of our board of directors and management;

- reviews and makes recommendations to our board of directors regarding Section 16 officer determinations; and

- reviews the nominating and corporate governance committee charter and the nominating and corporate governance committee's performance on an annual basis.

Our nominating and corporate governance committee consists of Messrs. Chenault and Jordan. Our board of directors has determined that all members of the nominating and corporate governance committee are independent under the Nasdaq Listing Rules. The Chair of our nominating and corporate governance committee is Mr. Jordan.

The nominating and corporate governance committee met two times during 2023.

### Stakeholder Committee

The purpose of the stakeholder committee is to assist our board of directors in considering and monitoring the interests of our key stakeholders, which include Hosts, guests, the communities within which we operate, employees, and shareholders. The stakeholder committee carries out its responsibilities in a manner that it determines is appropriate given the needs and circumstances of the Company and the board of directors as they may exist from time to time. Among other matters, the stakeholder committee's responsibilities include:

- engaging with management regarding our stakeholders;

- reviewing our progress and performance with respect to our principles for serving our stakeholders;

16

Table of Contents

- advising management and the board regarding initiatives or matters pertaining to our stakeholders;

- reviewing our stakeholder principles and recommending to the board any changes the committee deems appropriate;

- engaging with our stakeholders from time to time;

- advising the board regarding administration of our Host endowment fund, which was established in October 2020 and funded with 9.2 million shares of our Class H common stock, and is intended to be a long-term investment in the future of the Host community (the "Host Endowment Fund");

- providing advice, reports, and recommendations to the board regarding these matters; and

- reviewing the stakeholder committee charter and the stakeholder committee's composition and performance on a periodic basis.

Our stakeholder committee is advisory in nature. It consists of Messrs. Blecharczyk, Chesky, Gebbia and Manyika and Ms. Ahrendts. The Chair of our stakeholder committee is Mr. Manyika.

The stakeholder committee met two times during 2023.

**Serving our Stakeholders**

Airbnb aspires to operate as a true 21st century company — to us, that means that in the long run, and when approached with creativity, we can benefit all of our stakeholders — our Hosts, our guests, the communities in which we operate, our employees and our shareholders. These are the ideas at the core of Airbnb:

- Our community is based on connection and belonging.

- Our creativity allows us to imagine new possibilities for people.

- Our responsibility is to all of our stakeholders.

In the end, they share a common thread—a fundamental belief that people are good and we're in this together. This is what makes Airbnb, Airbnb.

From time to time, we make available on our Investor Relations website information about our commitment to serving all of our stakeholders, including our approach to certain environmental, social and governance topics (at https://investors.airbnb.com under "Governance — Sustainability"). Neither this information, nor any other information contained on, or that can be accessed through, our website is incorporated by reference into, or constitutes a part of, this proxy statement.

**Identifying and Evaluating Director Nominees**

Our nominating and corporate governance committee is responsible for identifying individuals qualified to become members of our board of directors and ensuring that our board of directors has the requisite expertise and that its membership consists of persons with sufficiently diverse and independent backgrounds. Our nominating and corporate governance committee, in recommending director candidates for election to our board of directors, and our board of directors, in nominating director candidates, is expected to consider candidates who have a high level of personal and professional integrity, strong ethics and values, and the ability to make mature business judgments. In evaluating director candidates, our nominating and corporate governance committee and the board of directors may also consider the following criteria as well as any other factor that they deem to be relevant:

- the candidate's experience in corporate management, such as serving as an officer or former officer of a publicly-held company;

- the candidate's experience as a board member of another publicly-held company;

17

Table of Contents

- the candidate's professional and academic experience relevant to our Company's industry;

- the strength of the candidate's leadership skills;

- the candidate's experience in finance and accounting and/or executive compensation practices;

- whether the candidate has the time required for preparation, participation, and attendance at meetings of our board of directors and committee meetings, if applicable; and

- the candidate's background, gender, age, and ethnicity.

Other than the foregoing, there are no stated minimum criteria for director nominees, although our nominating and corporate governance committee may also consider such other factors as it may deem, from time to time, are in our and our stockholders' best interests. Our board of directors evaluates each individual in the context of the board of directors as a whole, with the objective of assembling a group that can best maximize the success of the business and represent stockholder interests through the exercise of sound judgment using its diversity of experience in these various areas. Although the nominating and corporate governance committee may consider whether nominees assist in achieving a mix of board members that represents a diversity of background and experience, which is not only limited to race, gender or national origin, we have no formal policy regarding board diversity.

Stockholders may recommend individuals to our nominating and corporate governance committee for consideration as potential director candidates by submitting the names of the recommended individuals, together with appropriate biographical information and background materials, to the Nominating and Corporate Governance Committee, c/o Airbnb, Inc., 888 Brannan Street, San Francisco, California 94103. In the event there is a vacancy, and assuming that appropriate biographical and background material has been provided on a timely basis, our nominating and corporate governance committee will evaluate stockholder-recommended candidates by following substantially the same process, and applying substantially the same criteria, as it follows for candidates submitted by others.

### Board Diversity

The following table presents diversity statistics of our board of directors as self-disclosed by our directors.

**Board Diversity Matrix (As of April 19, 2024)**

**Total Number of Directors: 9**

| | Female | Male | Non-Binary | Did Not Disclose Gender |
|---|---|---|---|---|
| **Part I: Gender Identity** | | | | |
| Directors | 2 | 7 | — | — |
| **Part II: Demographic Background** | | | | |
| African American or Black | — | 2 | — | — |
| Alaskan Native or Native American | — | — | — | — |
| Asian | 1 | 1 | — | — |
| Hispanic or Latinx | — | — | — | — |
| Native Hawaiian or Pacific Islander | — | — | — | — |
| White | 1 | 4 | — | — |
| Two or More Races or Ethnicities | — | — | — | — |
| LGBTQ+ | | | — | |
| Did Not Disclose Demographic Background | | | — | |

18

Table of Contents

**Nominating Agreement**

The Company and Messrs. Blecharczyk, Chesky, and Gebbia, referred to in this proxy statement as our founders, have entered into a Nominating Agreement, dated November 27, 2020 ("Nominating Agreement"), under which we and the founders are required, upon the terms set forth in the Nominating Agreement, to (i) include our founders in the slate of nominees nominated by our board of directors for the applicable class of directors for election by our stockholders, and (ii) include such nomination of our founders in our proxy statement. In addition, we must use reasonable efforts to, and the founders must take all necessary action to, recommend in favor of each founder's election as a director, and to solicit proxies or consents in favor of their election. The obligations with respect to each founder will terminate upon the earliest to occur of (1) such founder's resignation from our board of directors, (2) such founder's death or disability, (3) such founder's removal from our board of directors for cause, (4) the expiration of such founder's term if such founder has given notice of his intention not to stand for re-election, and (5) the date upon which the number of shares of our common stock beneficially owned by such founder falls below ten percent of the number of shares of common stock beneficially owned by such founder as of September 30, 2020. The Nominating Agreement will remain in effect until the earliest of (a) the date on which our and the founders' obligations have terminated with respect to all of the founders, (b) the time at which all outstanding shares of Class B common stock automatically convert to Class A common stock, and (c) immediately prior to a change of control. The conversion of our Class B common stock to Class A common stock is provided for in our restated certificate of incorporation.

**Founder Voting Agreement**

Our founders have entered into a Voting Agreement, dated December 4, 2020 ("Founder Voting Agreement"), under which each founder and his affiliated and certain other entities have agreed, upon the terms set forth in the Founder Voting Agreement, to vote their shares for the election of each founder to our board of directors, and to vote against their removal. Pursuant to the Founder Voting Agreement, each founder granted a voting proxy to the other founders to vote such shares in the manner described in the preceding sentence to be effective upon death or disability, and if there are two remaining founders who are not disabled, such voting proxy will be apportioned between such founders based on their relative voting power. The Founder Voting Agreement will be in effect until: (i) with respect to each founder, upon the conversion of such founder's shares to Class A common stock in connection with his death or disability (which will occur automatically upon the nine-month anniversary of any such death or disability), and (ii) with respect to all founders, the time at which all outstanding shares of Class B common stock automatically convert to Class A common stock. The conversion of our Class B common stock to Class A common stock is provided for in our restated certificate of incorporation.

**Leadership Development, Belonging and Compensation Committee Interlocks and Insider Participation**

During 2023, Ms. Ahrendts and Messrs. Chenault and Lin served as members of our leadership development, belonging and compensation committee. None of the members of the leadership development, belonging and compensation committee is currently, or has been at any time, one of our executive officers or employees. None of our executive officers currently serves, or has served during the last year, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving as a member of our board of directors or on our leadership development, belonging and compensation committee.

**Airbnb Code of Ethics and Related Policies**

We have adopted a written code of ethics that applies to all of our directors, officers, and employees, including those officers responsible for financial reporting. The full text of our code of ethics is posted on our website at https://investors.airbnb.com under "Governance." Any substantive amendment to, or waiver of, a provision of the code of ethics that applies to our directors or our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions will be disclosed on our website. Information contained on, or that can be accessed through, our website does not constitute part of this proxy statement.

Table of Contents

In addition to our code of ethics, we currently maintain related policies, including our conflict of interest policy; whistleblower policy; anti-bribery and corruption policy; insider trading policy; and global harassment, bullying, discrimination & retaliation prevention policy.

**Company Policies Regarding Hedging and Pledging**

Executive officers, members of the board of directors, employees and independent contractors may not directly or indirectly engage in transactions intended to hedge or offset the market value of Airbnb stock owned by them. In addition, pledging of Airbnb stock by executive officers and members of the board of directors as collateral for loans and investments is prohibited absent approval by the board of directors, and such pledge shall not exceed 5% of the outstanding shares of Company securities held by such officer or director and such loan shall not exceed an aggregate amount of $50 million.

**Communications with our Board of Directors**

Stockholders wishing to communicate with our board of directors should send correspondence to the attention of our Secretary, Airbnb, Inc., 888 Brannan Street, San Francisco, California 94103, and should include with the correspondence evidence that the sender of the communication is one of our stockholders. Satisfactory evidence would include, for example, contemporaneous correspondence from a brokerage firm indicating the identity of the stockholder and the number of shares held. Our Secretary or Assistant Secretary will review correspondence confirmed to be from stockholders in conjunction with the Chairperson of the board of directors, who will decide whether or not to forward the correspondence or a summary of the correspondence to the full board of directors or a committee thereof. Our Secretary or Assistant Secretary and the Chairperson of our board of directors will review all stockholder correspondence, but the decision to relay that correspondence to the full board of directors or a committee thereof will rest entirely within the discretion of the Chairperson.

**Our Executive Officers**

The following table sets forth the names, ages and positions of our current executive officers as of April 19, 2024:

| Name | Age | Position |
|---|---|---|
| Brian Chesky* | 42 | Chief Executive Officer, Co-Founder, and Chairman of the Board |
| Nathan Blecharczyk* | 40 | Chief Strategy Officer, Chairman of Airbnb China, Co-Founder, and Director |
| Elinor Mertz | 47 | Chief Financial Officer |
| Aristotle Balogh | 60 | Chief Technology Officer |

\*      Messrs. Chesky and Blecharczyk are members of our board of directors. See "Proposal No. 1—Election of Directors—Director Biographies" for more information about Messrs. Chesky and Blecharczyk.

**Elinor Mertz.** Ms. Mertz has served as the Company's Chief Financial Officer since March 2024. Ms. Mertz previously served as the Company's Vice President of Finance since January 2019, where she was responsible for strategic finance and analytics, corporate planning, and investor relations and as Head of Global Financial Planning & Analysis from February 2013 to January 2019. Prior to joining Airbnb in 2013, she served as Vice President, Finance & Investor Relations at Netflix, Inc., where she held various finance roles from 2006 to 2013. Ms. Mertz has served on the boards of DoorDash, Inc., a publicly-held food-delivery and local logistics platform, since July 2022, and Faire Wholesale, Inc., a privately-held eCommerce company, since 2022. She holds a Bachelor of Arts in Science, Technology & Society and an Master of Arts in History from Stanford University, a Master of Business Administration from the Stanford Graduate School of Business, and a Master of International Affairs from Columbia University.

**Aristotle Balogh.** Mr. Balogh has served as our Chief Technology Officer since November 2018. Prior to joining Airbnb, Mr. Balogh was Vice President of Engineering at Alphabet Inc., a publicly-held global technology company, from June 2011 to November 2018, where he was responsible for the data and serving systems behind Google Search. Prior to that, from February 2008 to July 2010,

20

Table of Contents

Mr. Balogh served as Executive Vice President and Chief Technology Officer of Yahoo! Inc., a digital information platform. Mr. Balogh received a Bachelor of Science in Electrical Engineering and Computer Science and a Master of Science in Engineering in Electrical and Computer Engineering from Johns Hopkins University.

21

Table of Contents

### PROPOSAL NO. 2—RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Our audit, risk and compliance committee has appointed PricewaterhouseCoopers LLP ("PwC") as our independent registered public accounting firm for the fiscal year ending December 31, 2024. Although ratification of our appointment of PwC is not required, we value the opinions of our stockholders and believe it is good corporate governance that stockholders ratify the appointment of PwC. PwC also served as our independent registered public accounting firm for the fiscal year ended December 31, 2023. PwC has served as our independent auditor since 2011. Neither the accounting firm nor any of its members has any direct or indirect financial interest in or any connection with us in any capacity other than as our auditors, providing audit and non-audit related services.

If the appointment of PwC is not ratified by the stockholders, the audit, risk and compliance committee will consider this fact when it appoints the independent auditors for the fiscal year ending December 31, 2025. Even if the appointment of PwC is ratified, the audit, risk and compliance committee retains the discretion to appoint a different independent auditor at any time if it determines that such a change is in the best interest of the Company.

Representatives of PwC are expected to be present at the Annual Meeting, will have an opportunity to make a statement if they desire to do so, and will be available to respond to questions.

#### Recommendation of Board of Directors

***Our board of directors recommends a vote "FOR" the ratification of the appointment by the audit, risk and compliance committee of PwC as our independent registered public accounting firm for the fiscal year ending December 31, 2024.***

#### Principal Accountant Fees and Services

The following table summarizes the fees of PwC, our independent registered public accounting firm, related to each of the last two fiscal years.

| Fee Category | 2023 (Thousands) | | 2022 | |
|---|---|---|---|---|
| Audit Fees(1) | $ | 12,385 | $ | 12,151 |
| Audit-Related Fees | | 135 | | — |
| Tax Fees(2) | | 599 | | 768 |
| All Other Fees(3) | | 329 | | 261 |
| Total Fees | $ | 13,448 | $ | 13,180 |

(1) Consists of fees incurred for professional services rendered in connection with the audit of our consolidated financial statements, reviews of our quarterly consolidated financial statements, statutory audits of our domestic and international subsidiaries, issuances of consents and similar matters.

(2) Consists of fees for professional services for tax compliance, tax advice and tax planning. These services include assistance regarding federal, state and international tax compliance, assistance with tax reporting requirements and audit compliance, value-added tax compliance, mergers and acquisitions tax compliance, and tax advice on international, federal and state tax matters.

(3) Consists of fees for permitted products and services other than those that meet the criteria above.

#### Pre-Approval Policies and Procedures

The audit, risk and compliance committee has adopted a pre-approval policy that sets forth procedures and conditions pursuant to which audit and non-audit services to be performed by the independent auditor may be pre-approved. The audit, risk and compliance committee pre-approved all services provided by PwC for 2023 in accordance with this policy.

#### Report of the Audit, Risk and Compliance Committee

*The material in this report is being furnished and shall not be deemed "filed" with the Securities and Exchange Commission (the "SEC") for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liability of that section, nor shall the*

22

Table of Contents

*material in this section be deemed to be "soliciting material" or incorporated by reference in any registration statement or other document filed with the SEC under the Securities Act of 1933, as amended, or the Exchange Act, except as otherwise expressly stated in such filing.*

The Audit, Risk and Compliance Committee of the Board of Directors of Airbnb, Inc. (the "Company") operates under a written charter adopted by the Board of Directors. The primary role of the Audit, Risk and Compliance Committee is to assist the Board of Directors in fulfilling its oversight responsibilities by reviewing the financial information proposed to be provided to stockholders and others, the adequacy of the system of internal control over financial reporting and disclosure controls and procedures established by management and the Board of Directors, and the audit process and our independent auditor's qualifications, independence and performance.

Management is responsible for establishing and maintaining our system of internal controls and preparing our financial statements. Our independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC"), is responsible for performing an audit of our financial statements in accordance with generally accepted auditing standards and issuing an opinion on the financial statements. The Audit, Risk and Compliance Committee has met and held discussions with management and PwC, and has also met separately with PwC, without management present, to review the adequacy of our internal controls, financial reporting practices and audit process.

The Audit, Risk and Compliance Committee has reviewed and discussed our audited consolidated financial statements for the year ended December 31, 2023 with management and PwC. As part of this review, the Audit, Risk and Compliance Committee discussed with PwC the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the SEC.

The Audit, Risk and Compliance Committee has received the written disclosures and the letter from PwC required by applicable requirements of the Public Company Accounting Oversight Board regarding PwC's communications with the Audit, Risk and Compliance Committee concerning independence, and has discussed with PwC its independence.

Based on the above-mentioned reviews and discussions with management and PwC, the Audit, Risk and Compliance Committee recommended to the Board of Directors that the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2023 as filed with the SEC.

*Audit, Risk and Compliance Committee*

Alfred Lin (Chair)
Amrita Ahuja
Jeffrey Jordan

**Vote Required**

Approval of Proposal No. 2 requires the affirmative vote of the holders of a majority in voting power of the votes cast (excluding abstentions and broker non-votes). Abstentions will have no effect and we do not expect any broker non-votes on this proposal.

Table of Contents

**PROPOSAL NO. 3—APPROVAL, ON AN ADVISORY (NON-BINDING) BASIS, OF THE COMPENSATION OF OUR NAMED EXECUTIVE OFFICERS ("SAY-ON-PAY VOTE")**

**Background**

As required by Section 14A(a)(1) of the Exchange Act and related rules of the SEC, the below resolution provides our stockholders an opportunity to vote to approve, on an advisory (non-binding) basis, the compensation of our named executive officers as disclosed in this proxy statement pursuant to the SEC's compensation disclosure rules. This proposal, commonly known as a "say-on-pay" proposal and vote, is not intended to address any specific item of compensation, but rather the overall compensation of our named executive officers and the philosophy, policies and practices described in this proxy statement.

After considering the voting results of the advisory vote on the frequency of our Say-On-Pay Vote at the 2021 annual meeting, our board of directors has determined to hold our Say-on-Pay Vote every year.

We encourage our stockholders to review the "Compensation Discussion and Analysis" and "Executive Compensation Tables" sections of this proxy statement for additional detail regarding the compensation of our named executive officers.

As an advisory approval, this proposal is not binding upon us, our board of directors or its leadership development, belonging and compensation committee, which is responsible for the design and administration of our executive compensation program. However, the board of directors and the leadership development, belonging and compensation committee value the opinions of our stockholders expressed through your vote on this proposal and continually consider stockholder feedback and the results of Say-on-Pay Votes when making future compensation decisions. Accordingly, we ask our stockholders to vote "FOR" the following resolution at the Annual Meeting:

"RESOLVED, that the stockholders of Airbnb, Inc. approve, on an advisory basis, the 2023 compensation of Airbnb, Inc.'s named executive officers as described in the Compensation Discussion and Analysis and disclosed in the Summary Compensation Table and related compensation tables and narrative disclosure set forth in Airbnb, Inc.'s Proxy Statement for the 2024 Annual Meeting of Stockholders."

**Recommendation of Board of Directors**

***Our board of directors recommends a vote "FOR" the resolution to approve, on an advisory (non-binding) basis, the compensation of our named executive officers, as disclosed in the Compensation Discussion and Analysis of this proxy statement, the accompanying compensation tables and related narrative disclosure of this proxy statement.***

**Vote Required**

Approval of Proposal No. 3 requires the affirmative vote of the holders of a majority in voting power of the votes cast (excluding abstentions and broker non-votes). Abstentions and broker non-votes will have no effect on this proposal.

Table of Contents

**COMPENSATION DISCUSSION AND ANALYSIS**

**Overview**

This section explains the guiding principles and practices upon which our executive compensation program is based and the compensation paid to our "named executive officers" in 2023.

For 2023, our named executive officers were:

- Brian Chesky, Co-Founder and Chief Executive Officer;

- Dave Stephenson, Former Chief Financial Officer and Head of Employee Experience (currently serving as our Chief Business Officer and Head of Employee Experience);

- Nathan Blecharczyk, Co-Founder, Chief Strategy Officer and Chairman of Airbnb China;

- Aristotle Balogh, Chief Technology Officer; and

- Catherine Powell, Former Global Head of Hosting.

**Executive Summary**

***Business Context***

Airbnb had a record year in 2023. Our results demonstrated that we continue to drive growth and profitability at scale. Revenue of $9.9 billion and Gross Booking Value of $73 billion for 2023 were our highest ever. Net income was $4.8 billion—making 2023 our most profitable full year. Our Adjusted EBITDA was $3.7 billion while Free Cash Flow was $3.8 billion, growing 13% year over year.[1] Furthermore, we repurchased $2.3 billion of our Class A common stock during 2023–including this amount, we repurchased a total of $3.8 billion of our Class A common stock since we announced our first share repurchase program in 2022, through December 31, 2023. During 2023, guest demand on our platform remained strong across all geographic regions as guests continued to cross borders and return to cities on Airbnb. We also continued to see strong supply growth in 2023 with nearly 1.2 million more listings than we had at the beginning of the year. We ended 2023 with over 7.7 million active listings. Supply growth was driven by continued efforts to support our global community of Hosts, including the introduction of tools to help Hosts price more competitively and create their best listing.

We spent the past three years perfecting our core service with the introduction of more than 430 new features and upgrades. Furthermore, throughout 2023, we continued to implement our international expansion playbook consisting of product market fit, raising awareness and driving traffic in several countries as we invest in under-penetrated markets.

> (1) Adjusted EBITDA and Free Cash Flow are defined and reconciled from generally accepted accounting principles in the United States of America (GAAP) on pages 54-56 of our Annual Report on Form 10-K for the year ended December 31, 2023. More information regarding Gross Booking Value can also be found on page 54 of our Annual Report on Form 10-K for the year ended December 31, 2023.

***Named Executive Changes***

In December 2023, we announced the following changes to the Company's executive officers:

- Catherine Powell resigned from the Company effective June 30, 2024. Ms. Powell remained employed as the Company's Global Head of Hosting through December 31, 2023 and will serve in a transitionary role through June 30, 2024.

- Dave Stephenson was appointed as the Company's Chief Business Officer effective January 1, 2024. Between January 1, 2024 and March 1, 2024, Mr. Stephenson served as the Company's Chief Financial Officer, Chief Business Officer and Head of Employee Experience. On March 1, 2024, Mr. Stephenson ceased serving in the capacity of Chief Financial Officer, but continues to serve as our Chief Business Officer and Head of Employee Experience.

- Elinor Mertz was appointed as the Company's Chief Financial Officer effective March 1, 2024. Ms. Mertz previously served as the Company's Vice President of Finance where she was responsible for strategic finance and analytics, corporate planning, and investor relations.

25

Table of Contents

*Executive Compensation Highlights*

We have established a set of guiding principles for our compensation program, intended to ensure a strong link to our strategy and culture, which guided the decisions that were made in 2023, as summarized below:

- No increases to annual base salaries or target bonus levels for our named executive officers for 2023. Mr. Chesky continued to receive a $1 base salary and did not participate in our cash incentive plan.

- Our 2023 short-term cash incentive plan (the "Bonus Plan") is tied directly to our most critical operational and strategic priorities for the year. At the beginning of the year, we established five key Company priorities for the year. Within each priority we established specific objective goals that map directly to our long-term stakeholder commitments to Hosts, guests, the communities within which we operate, employees, and shareholders. For 2023, bonus payouts were capped at 120% of target. Based on an assessment of the objective goals set at the beginning of the year, our leadership development, belonging and compensation committee determined a bonus payout of equal to 96% of target for each of our named executive officers other than Mr. Chesky (who is not eligible to participate in the Bonus Plan). See "Cash Incentive Compensation" section for more detail.

- We continued to emphasize equity compensation for our named executive officers, which we believe demonstrates a longer-term, ownership orientation. Annual equity grant levels for the named executive officers remained consistent with last year. During 2023, we made annual equity grants in the form of time-based RSUs and stock options. The leadership development, belonging and compensation committee also considered leadership over and progress against diversity, equity and inclusion priorities when sizing the 2023 annual equity grants. See "Equity Compensation" section for more detail.

- In preparing for the initial public offering of our common stock, in November 2020, our board of directors awarded Mr. Chesky a performance-based RSU award intended to cover ten years of compensation. The award may be earned, if at all, based on our 60 trading day trailing average closing stock price exceeding progressively higher stock price hurdles, ranging from $125 to $485, over a 10-year period. In order to earn all of the tranches, the stock price will have to be over 7x the price at IPO and 13x the price at the time of grant. In 2023, no new tranches were earned or vested. The shares subject to tranche 1, which vested in November 2021, were delivered to Mr. Chesky in November 2023, per the terms of the award. In designing the compensation program for Mr. Chesky, our board of directors was cognizant of Mr. Chesky's intention to donate the net proceeds from the award to community, philanthropic and charitable causes. See "CEO Multi-Year Equity Award" section for more detail.

**Executive Compensation Philosophy and Objectives**

We believe that for us to be successful we must hire and retain executives that can continue to drive global growth in our business, operate with a holistic perspective in the service of all stakeholders, and create a highly creative, inclusive environment. Our executive compensation programs are designed to motivate, reward, attract, and retain high-caliber leaders and seek to align compensation with our stakeholder priorities and Company performance. Our leadership development, belonging and compensation committee continued to apply a number of principles to guide our compensation program design and decisions:

- **Long-term alignment.** Performance measurement, incentive goals, and individual performance assessments all clearly align with and support our long-term vision and alignment with stakeholders. They encourage a long-term timeframe, while acknowledging the competitive talent market realities.

- **Ownership.** We believe in the power of an owner's mindset. Compensation programs encourage employees and executives to think and act like owners of their work and careers, their responsibility to all stakeholders, and Airbnb.

26

Table of Contents

- **Alignment across stakeholders.** Our program design strives to balance interests and ensure alignment across all stakeholders. We are committed to directly tying short-term cash incentives to our performance against near-term stakeholder priorities. We believe this approach will lead to sustained value for all stakeholders over the long term.

- **Performance culture.** Our pay programs support a culture of accountability and performance through the use of stretch Company-based metrics in the Bonus Plan and differentiated annual equity awards based on executive performance and contribution.

- **Pay equity.** We are committed to the principle of pay equity and seek to be a leader on this front.

- **Competitiveness.** We are fortunate to have a mission that is attractive to a talented and diverse array of leaders. We want executives to come and stay with Airbnb because of our mission. However, we recognize that compensation needs to be compelling and competitive to attract and retain the talent necessary to meet our objectives.

- **Transparency.** We will continue to provide a level of clarity and transparency about our compensation programs, frameworks and outcomes that reinforces our commitment to pay equity, empowers our employees, and fosters belonging.

## Compensation and Governance Practices

For 2023, we continued to adhere to a number of policies and practices, listed below, to align our compensation program with these principles and establish strong compensation governance:

### What We Do

| Practice | Description |
|---|---|
| Link Between Pay and Stakeholder Priorities | Performance measures for our Bonus Plan extend beyond traditional financial and operational goals. We directly tie pay outcomes to our most critical priorities, with the objective of creating alignment and accountability to all stakeholders. Consistent with a long-term commitment to all stakeholders, Mr. Chesky intends to donate the net proceeds from his multi-year equity award to community, philanthropic and charitable causes. |
| Emphasis on Equity-Based Compensation | We believe that sustained, long-term stock price performance requires that we effectively serve all stakeholders. As such, we seek to prioritize equity-based compensation and provide a significant portion of compensation in the form of stock options and RSUs. In addition, the direct compensation provided to Mr. Chesky is entirely equity-based. |
| Longer-Term Delivery | Equity compensation is structured to vest over a minimum period of four years, subject to limited exceptions. Stock options have a maximum 10-year term. The multi-year equity award for Mr. Chesky may vest over a 10-year performance period and the underlying shares are not delivered until two years following vesting. |
| Independent Compensation Consultant | Our leadership development, belonging and compensation committee engages an independent compensation consulting firm that provides us with no other services. |
| Clawback Policy | As required by SEC rules and Nasdaq listing standards, we have adopted a clawback policy that requires us to recover certain erroneously paid incentive compensation received by our Section 16 officers in the event of an accounting restatement. |
| Stock Ownership Policy | We have adopted a stock ownership policy that requires our CEO to hold shares of Company common stock equal to ten times his base salary and each of our other executive officers to hold shares of Company common stock equal to five times their base salary. Our policy also includes holding requirements if the minimum level of ownership is not met. |

### What We Don't Do

| Practice | Description |
|---|---|
| No Hedging of Company Stock; Pledging of Company Stock Restricted | Executive officers, members of the board of directors, employees and independent contractors may not directly or indirectly engage in transactions intended to hedge or offset the market value of Airbnb stock owned by them. In addition, pledging of Airbnb stock by executive officers and members of the board of directors as |

Table of Contents

| Practice | Description |
|---|---|
| | collateral for loans and investments is prohibited absent approval by the board of directors and any such pledge shall not exceed 5% of the outstanding shares of Company securities held by such officer or director and such loan shall not exceed an aggregate amount of $50 million. |
| Limited Tax Gross-ups | We do not provide tax gross-ups to our executive officers, other than nominal amounts provided to all employees in connection with Airbnb travel credits, wellbeing allowances under our Live and Work Anywhere Allowance and Educate Anywhere Allowance or in limited circumstances, such as in connection with relocations. |
| No "Single Trigger" Change in Control Provisions | Equity awards do not accelerate in connection with a change in control, unless the awards are not assumed or substituted or in connection with certain qualifying terminations in connection with a change in control pursuant to our Severance and Change in Control Agreements with our named executive officers. |
| No Special Benefit Plans for Executives | We do not have any special benefit or retirement plans that are exclusive to the executive population. |
| No Excessive Perquisites | We do not provide excessive perquisites for executives. |

## Determination of Compensation

**Role of the board of directors and leadership development, belonging and compensation committee.** The leadership development, belonging and compensation committee oversees our executive compensation program, including executive salaries, payouts under our Bonus Plan, the size and structure of equity awards, and any executive perquisites. Our board of directors is responsible for determining the compensation of our Chief Executive Officer based on the evaluation and recommendation of the leadership development, belonging and compensation committee.

**Role of compensation consultant.** The leadership development, belonging and compensation committee has the authority to engage its own advisors to assist in carrying out its responsibilities. In 2023, Semler Brossy provided guidance regarding the amount and types of compensation that we provide to our executives, how our compensation practices compare to the compensation practices of other companies, including with respect to a peer group of companies developed in consultation with Semler Brossy, and other compensation-related matters. Semler Brossy reports directly to the leadership development, belonging and compensation committee, although Semler Brossy may meet with members of management for the purpose of gathering information on proposals that management may make to the board of directors and the leadership development, belonging and compensation committee. Our leadership development, belonging and compensation committee has evaluated Semler Brossy's independence pursuant to the requirements of Nasdaq and SEC rules and has determined that Semler Brossy does not have any conflicts of interest in advising the leadership development, belonging and compensation committee. Semler Brossy does not provide any services to us other than the services relating to executive and director compensation.

**Role of management.** In setting compensation for 2023, Mr. Chesky and Mr. Stephenson worked closely with the board of directors and the leadership development, belonging and compensation committee, in managing our executive compensation program and attended board of directors meetings. Our Chief Executive Officer made recommendations to the board of directors and the leadership development, belonging and compensation committee regarding compensation for our executive officers (other than himself) because of his daily involvement with our executive team. No executive officer participated directly in the final deliberations or determinations regarding their own compensation package.

**Use of comparative market data.** For 2023, the leadership development, belonging and compensation committee assessed the competitiveness of each element of the executive officers' total direct compensation, against the executive pay peer group, as discussed below.

While the review of competitive data, the leadership development, belonging and compensation committee did not establish compensation levels solely based on a review of competitive data, it believes such data is a meaningful input to our compensation policies and practices in order to attract and retain qualified executive officers. The leadership development, belonging and compensation committee also

28

Table of Contents

considered a number of other factors, including: Company performance relative to our stakeholder priorities, each executive's impact and criticality to our strategy and mission, relative scope of responsibility and potential, individual performance and demonstrated leadership, internal equity pay considerations and progress against diversity, equity and inclusion priorities.

In developing this peer group, the leadership development, belonging and compensation committee took into account a number of factors, including:

- Actual experience in the talent market (companies from which we source and to which we potentially lose executive talent);

- Scale and complexity (using revenue and valuation);

- Geography (for example, preference for companies with significant presence in the San Francisco Bay Area); and

- Company business characteristics (for example, comparably sized high-growth technology companies, technology-oriented gig economy companies, marketplace platforms, global operations, and other high growth indicators).

After considering the above factors, our leadership development, belonging and compensation committee used the following primary peer group for 2023 compensation decisions, which was the same peer group used for 2022 compensation decisions:

**Primary Peer Group for 2023 Pay Decisions**

| | |
|---|---|
| Adobe | Pinterest |
| Booking Holdings | Salesforce |
| DoorDash | ServiceNow |
| eBay | Block (formerly Square) |
| Expedia Group | X (formerly twitter) |
| Intuit | Uber |
| Lyft | Workday |
| Netflix | Zoom Video Communications |
| PayPal Holdings | |

As a secondary reference, the leadership development, belonging and compensation committee also reviewed a broader peer group that includes the primary peers above in addition to Alphabet, Amazon, Apple, Meta Platforms (formerly Facebook), and Microsoft. These five technology bellwether companies are clear and demonstrated talent competitors and we believe it is important to also review their compensation practices. However, the leadership development, belonging and compensation committee did not include these five companies in the primary peer group given their outsized scale.

**Annual Say-on-Pay Vote.** We hold our advisory vote on executive compensation (commonly known as a "say-on-pay" vote) every year. The leadership development, belonging and compensation committee considers stakeholder concerns, including the say-on-pay vote at our 2023 Annual Meeting of Stockholders, at which 99.1% of votes cast approved the proposal, and annually reevaluates our compensation practices to determine how they might be improved.

## Elements of Our Executive Compensation Program

For 2023, the primary elements of our named executive officers' compensation and a brief description of each are:

| Element | Description |
|---|---|
| Base Salary | Base salary attracts and retains talented executives, recognizes individual roles and responsibilities and provides stable income. |
| Short-Term Cash Incentive Compensation | Annual performance bonuses directly ties pay to key strategic priorities, which we believe will lead to sustained value for all stakeholders over the long term. |
| Equity-Based Long-Term Incentive Compensation | Equity compensation, provided in the form of stock options and RSUs, reinforces the importance of a long-term, ownership orientation, creates alignment with our stakeholders, and promotes retention. Equity-based compensation is the most significant portion of compensation for our executives, as illustrated below. |

29

Table of Contents





100% of our CEO's compensation and approximately 94% of our other named executive officers' compensation is at-risk. Note that Mr. Chesky does not receive any compensation outside of the Multi-Year Award (as defined and described below), which is comprised solely of performance-based RSUs.

In addition, our named executive officers are eligible to participate in our health and welfare programs and our 401(k) plan on the same basis as our other employees. We also provide certain limited severance benefits, limited perquisites, and other benefits, which aid in attracting and retaining executive talent. Each of these elements of compensation for 2023 is described further below.

### Base Salary

The base salary of each named executive officer, other than Mr. Chesky, is intended to align with the scope and complexity of their roles, their relative capabilities, and competitive market realities. The leadership development, belonging and compensation committee reviews the base salaries of our executive officers annually and may adjust them to reflect market conditions or other factors.

At the beginning of 2023, it was determined by the leadership development, belonging and compensation committee to not increase the base salaries for our continuing named executive officers. The base salaries of our named executive officers were set as follows:

| Named Executive Officer | 2023 Base Salary ($) |
| --- | --- |
| Brian Chesky | 1 |
| Dave Stephenson | 600,000 |
| Nathan Blecharczyk | 400,000 |
| Aristotle Balogh | 600,000 |
| Catherine Powell | 600,000 |

As discussed in the "CEO Multi-Year Equity Award" section below, Mr. Chesky requested, and the board of directors approved, a base salary of $1 per year upon the approval of his equity award in November 2020.

### Cash Incentive Compensation

**Approach to Short-Term Cash Incentives**

Airbnb's Bonus Plan has been designed to attract and retain key talent and reward executives based on performance against key strategic priorities. Our philosophy is to cover performance beyond Company financial performance and include broader stakeholder priorities.

Upon Mr. Chesky's request and in light of his holdings of our common stock, our board of directors determined that Mr. Chesky would not participate in the Bonus Plan, and it is intended that he will not be a participant in the Bonus Plan going forward. All of our other named executive officers participated in the Bonus Plan.

Table of Contents

Target bonus levels for our named executive officers remained the same in 2023. The 2023 target bonuses for our named executive officers as a percentage of base salary were as follows:

| Named Executive Officer | 2023 Target Bonus as a Percentage of Base Salary (%) |
|---|---|
| Brian Chesky | N/A |
| Dave Stephenson | 75 |
| Nathan Blecharczyk | 60 |
| Aristotle Balogh | 75 |
| Catherine Powell | 75 |

Payouts for 2023 were determined based on the product of: (i) the named executive officer's annual base salary; (ii) his or her target annual bonus percentage; and (iii) a Company performance multiplier.

**2023 Short-Term Cash Incentive Plan**

Our Bonus Plan is designed to attract and retain key talent, reward executives based on performance against key strategic priorities and align with our focus on continued long-term value creation for all of our stakeholders.

The leadership development, belonging and compensation committee used the same structure for all bonus participants, including our participating named executive officers, to focus the Company on a common set of performance objectives. The 2023 Bonus Plan allows above target payouts and were capped at 120% of target. The Bonus Plan covers performance beyond Company financial performance and includes broader stakeholder priorities. The 2023 Bonus Plan focused on five 2023 Company priorities:

- **Business Performance**: Delivering the business plan and make hosting mainstream

- **Product Roadmap**: Innovating through future product releases

- **Operations**: Delivering world-class service

- **Technology**: Continuing to make foundation improvements in our technology infrastructure

- **Other Foundation**: Delivering other priorities to support our multi-stakeholder approach

At the beginning of the year, the leadership development, belonging and compensation committee established weighted weightings for each priority and specific, objective metrics within each that reflected a combination of annual goals and other strategic priorities that needed to be accomplished during the year. In total, there were over 20 specific metrics, each of which maps to longer-term commitments across our five key stakeholders: Hosts, guests, the communities within which we operate, employees, and shareholders.

| Company Priority | Examples of Metrics Considered | Weighting | Weighted Achievement |
|---|---|---|---|
| Business Performance | • Deliver business plan<br>• Make hosting mainstream | 30.0% | 28.7% |
| The Roadmap | • Deliver future product releases | 20.0% | 18.3% |
| Operations | • Improve the quality and consistency of community support interactions and reduce variable costs | 15.0% | 14.6% |
| Technology | • Make efficient use of our infrastructure | 15.0% | 15.0% |
| Other Foundation | • Fixed cost management<br>• Deliver employee experience goals<br>• Deliver other public actions to serve stakeholders | 20.0% | 19.2% |

Performance on the five priorities is tracked semi-annually and paid out after the end of the year. The formulaic assessment of performance resulted in a payout of 96% of target.

Table of Contents

**2023 Bonus Payout**

| Named Executive Officer | Target Annual Bonus ($) | 2023 Percentage Achievement (%) | 2023 Bonus Payout ($) |
|---|---|---|---|
| Dave Stephenson | $    450,000 | 96% | $    432,000 |
| Nathan Blecharczyk | $    240,000 | 96% | $    230,400 |
| Aristotle Balogh | $    450,000 | 96% | $    432,000 |
| Catherine Powell | $    450,000 | 96% | $    432,000 |

*Equity Compensation*

Equity compensation reinforces the importance of a long-term, ownership orientation, creates alignment with our stakeholders, and promotes retention. Equity-based compensation is the most significant portion of compensation for our named executive officers. We grant a mix of stock options and RSUs to our executives. For our ongoing annual awards, the named executive officers (other than Mr. Chesky) receive 50% stock options and 50% RSUs. Stock options only provide value to executives when the stock price increases. We believe that stock price growth will only happen in a meaningful and sustained way if we are successful in creating value across all of our core stakeholders. The 10-year term of our options further promotes a long-term orientation. Our stock options generally vest over four years with monthly vesting over the four-year period, subject to continued service.

Our RSUs generally have a service-based vesting condition. The vesting period for these awards is typically four years with quarterly vesting over the four-year period, subject to continued service.

*2023 Annual Equity Grants*

In 2023, we granted each named executive officer other than Mr. Chesky an annual equity award (the "2023 Annual Equity Grants"). The size of such grants were set by our leadership development, belonging and compensation committee following consideration of a number of factors set forth in the subsection titled " —Determination of Compensation" above, as well as our Chief Executive Officer's recommendations. The 2023 Annual Equity Grants were made in March 2023, consistent with the timing of grants made to our broader employee population.

The 2023 RSU grants have a service-based vesting condition that is satisfied as to 1/16th of the RSUs on each quarterly anniversary of February 19, 2023, in each case, subject to the executive's continued service with us through each applicable vesting date. The 2023 option awards have an exercise price of $122.41 and vest in 48 substantially equal monthly installments beginning on the first monthly anniversary of February 19, 2023, in each case, subject to the executive's continued service with us through each applicable vesting date.

The number of shares subject to RSU and option awards granted to our named executive officers as part of the 2023 Annual Equity Grants were as follows:

| Named Executive Officer | Number of RSUs | Number of Options |
|---|---|---|
| Dave Stephenson | 34,720 | 86,799 |
| Nathan Blecharczyk | 24,508 | 61,270 |
| Aristotle Balogh | 36,762 | 91,905 |
| Catherine Powell | 30,635 | 76,587 |

*Additional Equity Grants*

On December 4, 2023, the leadership development, belonging and compensation committee also approved an additional grant of 4,040 RSUs to Mr. Stephenson. This additional award reflected Mr. Stephenson's promotion to the Chief Business Officer role. The service-based vesting condition is satisfied as to 1/16th of the RSUs on each quarterly anniversary of November 19, 2023, subject to Mr. Stephenson's continued service with us.

*CEO Multi-Year Equity Award*

Mr. Chesky's 2023 compensation reflects the compensation program that was implemented by the board of directors in November 2020. At that time, our board of directors, in consultation with its

Table of Contents

compensation consultant, Semler Brossy, designed a new compensation program for Mr. Chesky, whom it considered critical to retain and incentivize in light of his sustained and unparalleled leadership since the inception of Airbnb. Under the program, the board of directors reduced Mr. Chesky's base salary from $110,000 to $1 and set his target bonus at $0, per Mr. Chesky's preference. In addition, in November 2020, the board of directors granted Mr. Chesky the multi-year equity award, comprising 12 million RSUs (the "Multi-Year Award").

*CEO Compensation Design Objectives:*

- Align with our vision of a 21st century company that is committed to the long-term interests of all stakeholders.

- Provide flexibility to the changing needs and priorities of our business and stakeholders.

- Require high levels of performance to achieve meaningful value while not encouraging short-term gains through risk-taking.

- Incentivize long-term performance beyond typical market pay constructs.

- Promote transparency with simple design and full disclosure.

- Implement a structure that is equitable and justifiable to Mr. Chesky and all of our stakeholders

*Multi-Year Award Performance Update*

In 2023, no new tranches of the Multi-Year Award were earned or vested. However, per the terms of the award, the shares subject to tranche 1, which became earned and vested in 2021, were delivered to Mr. Chesky on November 10, 2023. Outside of shares held to cover taxes, the shares subject to tranche 2, which vested in November 2022, will not be delivered to Mr. Chesky until November 2024. The Multi-Year Award is structured so that meaningful value may only be realized upon the achievement of sustained and significant high-performance levels. The award is divided into ten tranches that are eligible to vest based on the achievement of stock price goals measured based on the average of our stock price over a 60 trading day trailing average during the performance period. Each tranche will vest on the later of the applicable Vesting Eligibility Date set forth in the table below, or, starting on the first anniversary of the date of grant, the date such average stock price exceeds the stock price hurdle, subject to Mr. Chesky's continued employment as our Chief Executive Officer.

*Significant Stretch Hurdles*

The Multi-Year Award is structured so that meaningful value may only be realized upon the achievement of sustained and significant high-performance levels. In order to earn all of the tranches, the stock price will have to be over 7x the price at IPO and 13x the price at the time of grant.

| Tranche | Vesting Eligibility Date | Number of RSUs | Stock Price Hurdle |
|---------|--------------------------|----------------|--------------------|
| 1 | November 10, 2021 | 1,200,000 | $ 125.00 |
| 2 | November 10, 2022 | 1,200,000 | $ 165.00 |
| 3 | November 10, 2023 | 1,200,000 | $ 205.00 |
| 4 | November 10, 2024 | 1,200,000 | $ 245.00 |
| 5 | November 10, 2025 | 1,200,000 | $ 285.00 |
| 6 | November 10, 2026 | 1,200,000 | $ 325.00 |
| 7 | November 10, 2027 | 1,200,000 | $ 365.00 |
| 8 | November 10, 2028 | 1,200,000 | $ 405.00 |
| 9 | November 10, 2029 | 1,200,000 | $ 445.00 |
| 10 | November 10, 2030 | 1,200,000 | $ 485.00 |

*Commitment to Stakeholders*

In designing the compensation program for Mr. Chesky, our board of directors was cognizant of Mr. Chesky's intention to contribute shares of our common stock worth over $100 million to support

Table of Contents

the Host Endowment Fund and to donate the net proceeds from the Multi-Year Award to community, philanthropic and charitable causes.

### *Perquisites and Other Benefits*

We do not view perquisites or other personal benefits as a significant component of our executive compensation program. Accordingly, with the exception of the benefits below, we did not generally provide perquisites to our executive officers in 2023.

As a result of Mr. Chesky's and Mr. Blecharczyk's high profiles as the Chief Executive Officer, Co-Founder of Airbnb and Chief Strategy Officer, Co-Founder of Airbnb, respectively, and the global footprint of the business, we maintain an executive protection security program pursuant to which we pay for costs related to security for Messrs. Chesky and Blecharczyk. Security is provided at their respective personal residences, during business travel and during some personal travel. Security includes the use of a leased vehicle and driver, who is also a member of the security detail. Although the overarching purpose of the program is business related, some aspects of the program provide direct and indirect benefits to Messrs. Chesky and Blecharczyk. The costs of this program attributable to security at their respective personal residence or during personal travel are reported in our "2023 Summary Compensation Table" below as "All Other Compensation" for Messrs. Chesky and Blecharczyk. We engaged a third party consulting firm to perform annual risk assessments for Messrs. Chesky and Blecharczyk. Security costs in 2023 were consistent with those assessments.

All employees, including our named executive officers, are provided an employee travel coupon up to $500 at the beginning of each calendar quarter plus an additional travel coupon on certain employment-based milestones (including an additional travel coupon of $2,000 on their fifth anniversary of employment with us), as well as an additional amount intended to serve as a tax gross-up on the value of the travel coupon.

We may also pay filing fees incurred by our executives under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 on their behalf from time to time.

*Tax Gross-Ups.* We do not make gross-up payments to cover our named executive officers' personal income taxes that may pertain to any of the compensation or perquisites paid or provided by our Company, other than nominal amounts provided to all employees in connection with the employee travel coupon, work-from-home reimbursements and wellbeing allowances (as described below), and other limited benefits, or in limited circumstances, such as in connection with relocations.

### *Health and Welfare and Retirement Benefits*

*Health/Welfare Plans.* All of our full-time employees, including our named executive officers, are eligible to participate in our health and welfare plans, including:

- medical, dental, and vision benefits;

- medical and dependent care flexible spending accounts;

- short-term and long-term disability insurance;

- life and accidental death and disability insurance; and

- family and caregiving benefits, including support for fertility, adoption and surrogacy.

We also provide all employees with limited work-from-home reimbursements and wellbeing allowances under our Live and Work Anywhere Allowance (of up to $350 in reimbursements per quarter towards eligible expenses) and Educate Anywhere Allowance (of up to $1,000 in reimbursements annually towards eligible expenses).

*401(k) Plan.* We currently maintain a 401(k) retirement savings plan for our U.S. employees, including our named executive officers, who satisfy certain eligibility requirements. The Internal Revenue Code allows eligible employees to defer a portion of their compensation, within prescribed limits, on a pre-tax basis through contributions to the 401(k) plan. Currently, we match contributions made by participants in the 401(k) plan up to a specified percentage of the employee contributions, and these matching contributions are fully vested as of the date on which the contribution is made. We believe that providing a vehicle for tax-deferred retirement savings through our 401(k) plan, and

34

Table of Contents

making fully vested matching contributions, adds to the overall desirability of our executive compensation package and further incentivizes our employees, including our named executive officers, in accordance with our compensation policies.

*Severance Benefits*

Each of Messrs. Chesky, Stephenson, Blecharczyk and Balogh are party to Change in Control and Severance Agreements, which provide for certain severance benefits and payments both outside of and in connection with a change in control. In addition, in connection with her planned departure with the Company, Ms. Powell entered into a Retention Agreement in December 2023, which provides for certain severance benefits and payments and which superseded the Change in Control and Severance Agreement she was previously party to. A description of the Retention Agreement as well as information on the estimated payments and benefits that our named executive officers would have been eligible to receive as of December 31, 2023, is set forth in the subsection titled " —Potential Payments Upon Termination or Change in Control" below.

### Company Policies Regarding Hedging and Pledging

Executive officers, members of the board of directors, employees and independent contractors may not directly or indirectly engage in transactions intended to hedge or offset the market value of Airbnb stock owned by them. In addition, pledging of Airbnb stock by executive officers and members of the board of directors as collateral for loans and investments is prohibited absent approval by the board of directors, and such pledge shall not exceed 5% of the outstanding shares of Company securities held by such officer or director and such loan shall not exceed an aggregate amount of $50 million.

### Clawback Policy

We have adopted a compensation recovery policy that requires the recovery of certain erroneously paid incentive compensation received by our Section 16 officers in the event of an accounting restatement, as required by new SEC rules and Nasdaq Listing Standards implemented pursuant to the Dodd-Frank Act.

### Executive Stock Ownership Policy

We have also adopted a stock ownership policy that applies to our executive officers (including our Chief Executive Officer) and certain other key employees. Employees covered by the policy are required to hold a number of shares of common stock equal to: (i) for our Chief Executive Officer, ten times his annual base salary and (ii) for each other executive officer and key employee, five times their annual base salary. Under the policy, until a covered employee has reached the minimum ownership guideline, 50% of the shares acquired pursuant to Company equity awards (net of taxes) must be held by such employee.

### Tax and Accounting Considerations

As a general matter, our board of directors reviews and considers the various tax and accounting implications of compensation programs we utilize.

Deductibility of Executive Compensation. Section 162(m) of the Code denies a publicly-traded corporation a federal income tax deduction for remuneration in excess of $1 million per year per person paid to executives designated in Section 162(m) of the Code, including, but not limited to, its chief executive officer, chief financial officer, and the next three highly compensated executive officers. However, we believe that maintaining the discretion to provide compensation that is non-deductible allows us to provide compensation tailored to the needs of our Company and our named executive officers and is an important part of our responsibilities and benefits our stockholders.

Accounting for Stock-Based Compensation. We follow Financial Accounting Standard Board Accounting Standards Codification Topic 718, Compensation—Stock Compensation ("ASC Topic 718") for our stock-based compensation awards. ASC Topic 718 requires companies to measure the compensation expense for all share-based awards made to employees and directors, including stock options and RSUs, based on the grant-date fair value of these awards. This calculation is performed for accounting purposes and reported in the compensation tables below, even though our executive officers may never realize any value from their awards.

Table of Contents

**Report of the Leadership Development, Belonging and Compensation Committee**

*The material in this report is being furnished and shall not be deemed "filed" with the Securities and Exchange Commission (the "SEC") for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liability of that section, nor shall the material in this section be deemed to be "soliciting material" or incorporated by reference in any registration statement or other document filed with the SEC under the Securities Act of 1933, as amended, or the Exchange Act, except as otherwise expressly stated in such filing.*

The Leadership Development, Belonging and Compensation Committee of the Board of Directors of Airbnb, Inc. (the "Company") has reviewed and discussed the Compensation Discussion and Analysis with management, and based on the review and discussions, the Leadership Development, Belonging and Compensation Committee recommended to the Board of Directors that the Compensation Discussion and Analysis be included in this Proxy Statement for the 2024 Annual Meeting of Stockholders and incorporated by reference in the Company's Annual Report on Form 10-K for the year ended December 31, 2023.

***Leadership Development, Belonging and Compensation Committee***

Angela Ahrendts (Chair)
Alfred Lin
Kenneth Chenault

**EXECUTIVE COMPENSATION TABLES**

*2023 Summary Compensation Table*

The following table contains information about the compensation earned by each of our named executive officers during the fiscal years presented.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)(1) | Option Awards ($) (1) | Non-Equity Incentive Plan Compensation ($)(2) | All Other Compensation ($)(3) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Brian Chesky | 2023 | 1 | — | — | — | — | 295,124 | 295,125 |
| *President and Chief Executive Officer* | 2022 | 1 | — | — | — | — | 311,232 | 311,233 |
| | 2021 | 1 | — | — | — | — | 132,151 | 132,152 |
| Dave Stephenson | 2023 | 600,000 | — | 4,633,983 | 5,332,236 | 432,000 | 8,884 | 11,007,103 |
| *Former Chief Financial Officer and* | 2022 | 600,000 | — | 4,071,961 | 4,971,652 | 436,500 | 6,682 | 10,086,795 |
| *Current Chief Business Officer and* | | | | | | | | |
| *Head of Employee Experience* | | | | | | | | |
| | 2021 | 600,000 | 18,000 | 3,928,816 | 4,966,861 | 432,000 | 7,102 | 9,952,779 |
| Nathan Blecharczyk | 2023 | 400,000 | — | 2,889,738 | 3,763,939 | 230,400 | 200,382 | 7,484,459 |
| *Co-Founder, Chief Strategy Officer and* | 2022 | 400,000 | — | 3,054,096 | 3,728,698 | 232,800 | 250,250 | 7,665,844 |
| *Chairman of Airbnb China* | | | | | | | | |
| | 2021 | 400,000 | 9,600 | 2,946,564 | 3,725,195 | 230,400 | 298,861 | 7,610,620 |
| Aristotle Balogh | 2023 | 600,000 | — | 4,334,607 | 5,645,908 | 432,000 | 17,468 | 11,029,983 |
| *Chief Technology Officer* | 2022 | 600,000 | — | 4,326,469 | 5,282,309 | 436,500 | 13,058 | 10,658,336 |
| | 2021 | 600,000 | 18,000 | 4,174,331 | 5,277,302 | 432,000 | 12,756 | 10,514,389 |
| Catherine Powell | 2023 | 600,000 | — | 3,612,173 | 4,704,893 | 432,000 | 14,062 | 9,363,128 |
| *Former Global Head of Hosting* | 2022 | 600,000 | — | 3,817,453 | 4,660,914 | 436,500 | 13,270 | 9,528,137 |
| | 2021 | 600,000 | 218,000 | 3,683,302 | 4,656,420 | 432,000 | 12,274 | 9,601,996 |

(1)   For 2023, amounts reflect the grant-date fair value of stock awards and option awards granted during 2023 computed in accordance with ASC Topic 718. The fair value of the awards on the grant date may not reflect the actual amounts paid to or realized by the named executive officer. See Note 12 to our consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2023 for the assumptions used in calculating these values.

(2)   For 2023, amounts reflect payouts under the 2023 Bonus Plan. See the description of the 2023 Bonus Plan under "Cash Incentive Compensation – 2023 Short-Term Incentive Plan" above.

(3)   The following table provides the amounts of other compensation, paid to, or on behalf of, named executive officers during 2023 included in the "All Other Compensation" column.

| Name | 401(k) Matching Contributions ($) | Travel Coupons ($) | Travel Coupons- Gross-Up ($) | Miscellaneous (a) ($) | Total ($) |
|---|---|---|---|---|---|
| Brian Chesky | — | — | — | 295,124 | 295,124 |
| Dave Stephenson | 4,038 | 2,000 | 1,190 | 1,656 | 8,884 |
| Nathan Blecharczyk | — | 2,000 | 1,571 | 196,811 | 200,382 |
| Aristotle Balogh | 9,900 | 4,000(b) | 3,034 | 534 | 17,468 |
| Catherine Powell | 9,900 | 2,000 | 1,571 | 591 | 14,062 |

(a)   Represents (i) for Messrs. Chesky and Blecharczyk, personal security costs incurred in 2023 and paid on his behalf by the Company, including the cost of a leased vehicle, driver and security detail, in each case, attributable to security at his personal residence or during personal travel (Mr. Chesky: $295,124 and Mr. Blecharczyk: $196,220); (ii) for each named executive officer other than Mr. Chesky, the following wellbeing allowances: Mr. Stephenson: $1,050; Mr. Blecharczyk: $350; Mr. Balogh: $350; and Ms. Powell: $350, and (iii) for each named executive officer other than Mr. Chesky, the following tax gross up payments related to wellbeing allowances: Mr. Stephenson: $606; Mr. Blecharczyk: $241; Mr. Balogh: $184; and Ms. Powell: $241.

(b)   Represents an additional $2,000 travel coupon issued to Mr. Balogh in connection with his five year anniversary at the Company in accordance with our policy.

Table of Contents

### Grants of Plan-Based Awards in 2023

The following table provides information relating to grants of plan-based awards made to our named executive officers during 2023.

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards(1) | | | All Other Stock Awards: Number of Shares of Stock or Units (#) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price Per Share of Option Awards ($/Share) | Grant-Date Fair Value of Stock and Option Awards ($)(2) |
|---|---|---|---|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | | | | |
| Brian Chesky | — | — | — | — | — | — | — | — |
| Dave Stephenson | | — | 450,000 | 540,000 | | | | |
| | 3/27/2023(3) | | | | | 86,799 | 122.41 | 5,332,236 |
| | 3/27/2023(4) | | | | 34,720 | | | 4,093,835 |
| | 12/4/2023(5) | | | | 4,040 | | | 540,148 |
| Nathan Blecharczyk | | — | 240,000 | 288,000 | | | | |
| | 3/27/2023(3) | | | | | 61,270 | 122.41 | 3,763,939 |
| | 3/27/2023(4) | | | | 24,508 | | | 2,889,738 |
| Aristotle Balogh | | — | 450,000 | 540,000 | | | | |
| | 3/27/2023(3) | | | | | 91,905 | 122.41 | 5,645,908 |
| | 3/27/2023(4) | | | | 36,762 | | | 4,334,607 |
| Catherine Powell | | — | 450,000 | 540,000 | | | | |
| | 3/27/2023(3) | | | | | 76,587 | 122.41 | 4,704,893 |
| | 3/27/2023(4) | | | | 30,635 | | | 3,612,173 |

(1)   Represents potential payouts under the 2023 Bonus Plan. Target and maximum amounts assume full achievement of all goals. There is no threshold payout under the plan. For additional detail on the 2023 Bonus Plan, see "Cash Incentive Compensation—2023 Short-Term Incentive Plan" above.

(2)   The amounts shown represent grant-date fair value of stock awards and option awards granted during 2023 computed in accordance with ASC Topic 718. See Note 12 to our consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2023 for the assumptions used in calculating these values.

(3)   The option vests in 48 substantially equal installments on each monthly anniversary of February 19, 2023, subject to continued service.

(4)   The RSUs vest as to 1/16th of the total number of RSUs on each quarterly anniversary of February 19, 2023, subject to continued service.

(5)   The RSUs vest as to 1/16th of the total number of RSUs on each quarterly anniversary of November 19, 2023, subject to continued service.

Table of Contents

### Outstanding Equity Awards at Year-End Table

The following table summarizes the number of shares of common stock underlying outstanding equity incentive plan awards for each named executive officer as of December 31, 2023.

| Name | Vesting Commencement Date | Option Awards | | Option Exercise Price ($) | Option Expiration Date | Stock Awards | | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#)(2) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)(1)(2) |
|---|---|---|---|---|---|---|---|---|---|
| | | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | | | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($)(1) | | |
| Brian Chesky | 11/10/2020 | — | — | — | | — | — | 9,600,000 | 1,306,944,000 |
| Dave Stephenson | 2/19/2020(3) | | | | | 6,224 | 847,335 | | |
| | 2/25/2020(4) | 180,514 | 10,372 | 40.18 | 8/8/2030 | | | | |
| | 11/19/2020(5) | | | | | 6,982 | 950,529 | | |
| | 2/25/2021(4) | 35,789 | 14,737 | 194.39 | 3/19/2031 | | | | |
| | 2/19/2021(5) | | | | | 6,316 | 859,860 | | |
| | 2/19/2022(4) | 27,939 | 33,019 | 167 | 3/19/2032 | | | | |
| | 2/19/2022(5) | | | | | 13,716 | 1,867,296 | | |
| | 2/19/2023(4) | 18,083 | 68,716 | 122.41 | 3/27/2033 | | | | |
| | 2/19/2023(5) | | | | | 28,210 | 3,840,509 | | |
| | 11/19/2023(5) | | | | | 4,040 | 550,006 | | |
| Nathan Blecharczyk | 2/25/2020(6) | 108,885 | 7,778 | 40.18 | 11/10/2030 | | | | |
| | 11/25/2020(4) | 325,793 | 127,991 | 40.18 | 11/10/2030 | | | | |
| | 2/19/2020(7) | | | | | 4,667 | 635,365 | | |
| | 11/19/2020(5) | | | | | 55,851 | 7,603,555 | | |
| | 2/25/2021(4) | 26,842 | 11,053 | 194.39 | 3/19/2031 | | | | |
| | 2/19/2021(5) | | | | | 4,737 | 644,895 | | |
| | 2/19/2022(4) | 20,954 | 24,764 | 167 | 3/19/2032 | | | | |
| | 2/19/2022(5) | | | | | 10,287 | 1,400,472 | | |
| | 2/19/2023(4) | 12,764 | 48,506 | 122.41 | 3/27/2033 | | | | |
| | 2/19/2023(5) | | | | | 19,913 | 2,710,956 | | |
| Aristotle Balogh | 5/25/2019 | 228,570 | | 59.91 | 11/13/2028 | | | | |
| | 2/19/2020(3) | | | | | 7,000 | 952,980 | | |
| | 2/25/2020(4) | 188,328 | 11,668 | 40.18 | 8/8/2030 | | | | |
| | 2/25/2021(4) | 38,026 | 15,658 | 194.39 | 3/19/2031 | | | | |
| | 2/19/2021(5) | | | | | 6,711 | 913,636 | | |
| | 2/19/2022(4) | 29,684 | 35,083 | 167 | 3/19/2032 | | | | |
| | 2/19/2022(5) | | | | | 14,573 | 1,983,968 | | |
| | 2/19/2023(4) | 19,146 | 72,759 | 122.41 | 3/27/2033 | | | | |
| | 2/19/2023(5) | | | | | 29,870 | 4,066,502 | | |
| Catherine Powell | 1/29/2020(8) | 149,050 | 2,528 | 59.53 | 2/19/2030 | | | | |
| | 2/19/2020(9) | | | | | 1,896 | 258,121 | | |
| | 2/19/2020(3) | | | | | 5,056 | 688,324 | | |
| | 2/25/2020(4) | 180,194 | 8,426 | 40.18 | 8/8/2030 | | | | |
| | 2/25/2021(4) | 33,552 | 13,816 | 194.39 | 3/19/2031 | | | | |
| | 2/19/2021(5) | | | | | 5,922 | 806,221 | | |
| | 2/19/2022(4) | 26,192 | 30,956 | 167 | 3/19/2032 | | | | |
| | 2/19/2022(5) | | | | | 12,859 | 1,750,624 | | |
| | 2/19/2023(4) | 15,955 | 60,632 | 122.41 | 3/27/2033 | | | | |
| | 2/19/2023(5) | | | | | 24,891 | 3,388,661 | | |

(1)    Amounts are calculated by multiplying the number of shares shown in the table by $136.14, the closing per share price of our Class A common stock as of December 29, 2023.

Table of Contents

(2)     Represents the Multi-Year Award based on the number of shares subject to the eight tranches that remain eligible to vest. The Multi-Year Award is divided into ten tranches that are eligible to vest based on the achievement of stock price goals measured based on the average of our stock price over a 60 trading day trailing average during a ten-year performance period. Each tranche will vest on the later of the specified vesting eligibility date, or, starting on the first anniversary of the date of grant, the date such average stock price exceeds the applicable stock price hurdle, subject to Mr. Chesky's continued employment as our Chief Executive Officer. During 2021, the first two tranches of the Multi-Year Award were earned based on the Company's achievement of the stock price hurdles in accordance with the terms of the Multi-Year Award, and each such tranche vested on November 10, 2021 and November 10, 2022, respectively. During 2023, no additional tranches of the Multi-Year Award were earned. Other than an amount necessary to cover taxes, shares underlying the vested RSUs will not be issued until two years after the RSUs vest. For additional detail on the vesting of the Multi-Year Award, see "CEO Multi-Year Equity Award" above.

(3)     The service-based vesting condition of the RSUs is satisfied as to 1/16th of the RSUs on each quarterly anniversary of the vesting commencement date, subject to continued service. The liquidity-based vesting condition was satisfied upon our initial public offering.

(4)     The option vests in 48 substantially equal installments on each monthly anniversary of the vesting commencement date, in each case, subject to continued service.

(5)     The RSUs vest as to 1/16th of the total number of RSUs on each quarterly anniversary of the vesting commencement date, subject to continued service.

(6)     The option vests in 48 substantially equal installments on each monthly anniversary of the vesting commencement date, in each case, subject to continued employment.

(7)     The RSUs vest as to 1/16th of the total number of RSUs on each quarterly anniversary of the vesting commencement date, subject to continued employment.

(8)     The option vests as to 40% of the shares subject to the option on the first anniversary of the vesting commencement date, and as to 1/36th of the remaining shares subject to the option on each monthly anniversary thereafter, subject to continued service.

(9)     The service-based vesting condition of the RSUs was satisfied as to 1/4th of the RSUs on February 25, 2021, and as to 1/16th of the RSUs on each quarterly anniversary of the vesting commencement date thereafter, subject to continued service. The liquidity-based vesting condition was satisfied upon our initial public offering.

### *Option Exercises and Stock Vested*

The following table summarizes the stock options that were exercised and the RSUs that vested during 2023.

| | Option Awards | | Stock Awards | |
| Name | Number of Shares Acquired on Exercise | Value Realized Upon Exercise (1) | Number of Shares Acquired on Vesting | Value Realized Upon Vesting (2) |
|---|---|---|---|---|
| Brian Chesky | 9,192,588 | $      942,484,793 | — | — |
| Dave Stephenson | 25,000 | $        2,133,000 | 67,386 | $        8,470,961 |
| Nathan Blecharczyk | 1,972,860 | $      202,270,628 | 87,473 | $      10,827,929 |
| Aristotle Balogh | 80,000 | $        7,598,694 | 51,500 | $        6,353,824 |
| Catherine Powell | 13,600 | $        1,459,052 | 45,891 | $        5,686,702 |

(1)     Represents the difference between the fair market value of our stock underlying the options at exercise and the exercise price of the option.

(2)     Reflects the product of the number of shares of stock vested multiplied by the closing price of our common stock on the vesting date.

### Pension Benefits

We do not maintain any defined benefit pension plans.

### Nonqualified Deferred Compensation for Fiscal Year 2023

The following table provides information concerning the portions of the Multi-Year Award that were earned and vested but are subject to deferral under the applicable RSU award agreement. The RSUs were previously reported as compensation for 2020 based on their fair value as of the grant date in the Summary Compensation Table and have also been reported in the Option Exercises and Stock Vested Tables in 2022 and 2021 based on their fair value as of the vesting date. We do not maintain any other deferred compensation arrangements.

Table of Contents

| Name | Executive Contributions in Last FY ($) | Registrant Contributions in Last FY($) | Aggregate Earnings (Losses) in Last FY ($) (1) | Aggregate Withdrawals/ Distributions ($) (2) | Aggregate Balance at Last FYE ($) (3) |
|---|---|---|---|---|---|
| Brian Chesky | — | — | 95,682,649 | 135,629,229 | 156,470,603 |
| *Vested but Unissued RSUs* | | | | | |

(1)     Represents the change in value of shares of our Class A common stock subject to the vested RSUs based on the change in the closing per share price from December 30, 2022 to December 29, 2023, for the 1,149,336 RSUs subject to the second tranche of the Multi-Year Award that vested in 2022 and the change in the closing per share price from December 30, 2022 to November 10, 2023, for the 1,147,941 RSUs subject to the first tranche of the Multi-Year Award that vested in 2021 and was settled on November 10, 2023.

(2)     Represents the value of the 1,147,941 shares of our Class A common stock subject to the first tranche of the Multi-Year Award that were delivered to Mr. Chesky on November 10, 2023, based on the closing price per share on such date.

(3)     Represents the aggregate value of all vested RSUs for which settlement has been deferred based on $136.14, the closing per share price of our Class A common stock on December 29, 2023.

## Potential Payments Upon Termination or Change in Control

### Change in Control and Severance Agreements

The leadership development, belonging and compensation committee approved Change in Control and Severance Agreements for each of our named executive officers. These agreements remained in place during 2023 for each of our named executive officers other than Ms. Powell, whose agreement was superseded by her Retention Agreement entered into in December 2023, as discussed in further detail below. The agreements provide that in the event of the named executive officer's termination without "cause" (as defined below) outside of the Change in Control Period (as defined below): (i) the named executive officer will be entitled to receive a cash amount equal to their annual base salary, payable in a single lump-sum payment, less applicable withholdings; and (ii) if the executive elects to receive continued healthcare coverage under COBRA, the Company will directly pay, or reimburse the named executive officer for the premium of continued healthcare coverage for the named executive officer and the executive's covered dependents through the earlier of the annual anniversary of the date of termination and the date the named executive officer and the executive's dependents become eligible for coverage under another employer's plans. In addition, any outstanding equity awards held by the named executive officer that vest solely based on continued services will become vested with respect to the number of shares that would have vested during the six months following the date of termination had the executive's employment continued.

In the event of the named executive officer's termination without "cause" or resignation for "good reason" (as defined below), within the period three months prior to and ending 12 months following a "change in control" of the Company (as defined in each applicable agreement) (the "Change in Control Period"): (i) the named executive officer will be entitled to receive a cash amount equal to their annual base salary plus target annual bonus, payable in a single lump-sum payment, less applicable withholdings); and (ii) if the executive elects to receive continued healthcare coverage under COBRA, the Company will directly pay, or reimburse the named executive officer for the premium of continued healthcare coverage for the named executive officer and the executive's covered dependents through the earlier of the annual anniversary of the date of termination and the date the named executive officer and the executive's dependents become eligible for coverage under another employer's plans. In addition, any outstanding equity awards held by the named executive officer that vest solely based on continued services will become fully vested. Equity awards that have performance-vesting conditions will be governed by the terms of their award agreements.

"Cause" as defined in the Change in Control and Severance Agreements means the executive's (i) conviction of, or entering a plea of guilty or no contest to or for, any felony (other than as a result of vicarious liability) or any crime involving moral turpitude, (ii) commission of an act of harassment or discrimination (as defined by the Company's anti-harassment, discrimination, and retaliation policy or any successor policy), sexual assault, fraud, embezzlement or material misappropriation, (iii) material breach of fiduciary duty against the Company which has had or will have an adverse effect on the Company's business, (iv) gross negligence or willful misconduct in the performance of the executive's employment obligations and duties that has had or will have a material adverse

41

Table of Contents

effect on the Company's business, (v) material breach of any material written agreement between the executive and the Company or any material written policy of the Company, (vi) continued failure or refusal to perform material duties required of the executive under executive's employment agreement or offer letter, or as instructed by the individual to whom executive directly reports, and (vii) any other misconduct which is, or could reasonably be expected to be, injurious to the financial condition or business reputation of the Company; and in the case of clauses (iv), (v), (vi) or (vii), only after there has been delivered to the executive a written demand to cure such breach with reasonable detail regarding the nature of the breach and, if such breach is capable of cure, such breach has not been cured within thirty (30) days from the date on which the executive received the written demand. Notwithstanding the foregoing, Cause shall not be deemed to exist under subclause (v), (vi) or (vii) during any Change in Control Period unless the act, or failure to act, giving rise to Cause is willfully taken, or not taken, with intent to harm the Company or any of its affiliates.

"Good Reason" as defined in the Change in Control and Severance Agreements means the occurrence of any of the following without the executive's written consent: (i) a material diminution in the executive's authority, duties or responsibilities as in effect immediately prior to such reduction (excluding any interim responsibilities); (ii) a material reduction in the executive's annual base salary; (iii) the relocation of the executive's place of work to a location that increases the executive's one-way commute by more than fifty (50) miles; or (iv) the Company's material breach of a material agreement between the executive and the Company; provided, that no resignation for Good Reason shall be effective unless and until (1) the executive has first provided the Company with written notice specifically identifying the acts or omissions constituting the grounds for "Good Reason" within thirty (30) days after the occurrence thereof, (2) the Company has not cured such acts or omissions that are capable of cure within thirty (30) days of its actual receipt of such notice, and (3) the effective date of the executive's termination for Good Reason occurs no later than sixty (60) days after the initial existence of the facts or circumstances constituting Good Reason.

All such severance payments and benefits under the Change in Control and Severance Agreements will be subject to the named executive officer's execution of a general release of claims against us.

*Catherine Powell Retention Agreement*

In connection with her planned departure with the Company on June 30, 2024 (the "Planned Departure Date"), Ms. Powell entered into a Retention Agreement with the Company (the "Retention Agreement") on December 4, 2023, which sets forth the terms of her transition services and severance payments and benefits. Pursuant to the Retention Agreement, Ms. Powell will continue to be paid her current annual base salary through the Planned Departure Date, and her outstanding equity awards will continue to vest in accordance with their terms, in each case, subject to her continued employment with the Company. Provided that Ms. Powell remains employed with the Company through the Planned Departure Date, her employment is terminated by the Company without "cause" (as defined below) or Ms. Powell resigns for "good reason" (as defined below), and she timely delivers an executed release of claims to the Company following her departure date, Ms. Powell will be entitled to receive the following payments and benefits: (i) 12 months of base salary in a single lump sum, (ii) lump sum payment equal to 15 months of COBRA premiums, (iii) each outstanding equity award held by Ms. Powell will become vested and exercisable, as applicable, as to the number of shares that would have vested in the 6-month period following her departure had she remained employed through such date, and (iv) the stock options granted to Ms. Powell after December 10, 2020 that are vested as of the Planned Departure Date, after giving effect to the accelerated vesting described in clause (iii), will be amended to remain exercisable until the first anniversary of the Planned Departure Date to exercise the vested options. In the event Ms. Powell's employment is terminated by the Company without "cause" or she resigns for "good reason" prior to the Planned Departure Date, then the foregoing payments will be increased by the base salary, any amounts owed under the Company's 2023 Bonus Plan (to the extent unpaid), and any benefits and vesting of equity awards she would have received had she remained employed through the Planned Departure Date.

"Cause" as defined in the Retention Agreement has the meaning set forth in the Change in Control and Severance Agreements, as described above.

Table of Contents

"Good Reason" as defined in the Retention Agreement means the occurrence of any of the following: (A) the Company's material breach of the Retention Agreement; or (B) the Company's failure to make a timely payment pursuant to the Retention Agreement; provided that no resignation for Good Reason shall be effective unless and until (x) Ms. Powell has first provided the Company with written notice specifically identifying the acts or omissions constituting the grounds for Good Reason within 30 days after the occurrence thereof, (y) the Company has not cured such acts or omissions that are capable of cure within 30 days of its actual receipt of such notice, and (z) the effective date of Ms. Powell's termination for Good Reason occurs no later than 60 days after initial existence of the facts or circumstance constituting Good Reason.

*Equity Plans*

In addition to the severance benefits provided under the Change in Control and Severance Agreements and Ms. Powell's Retention Agreement, each as described above, under our 2008 Equity Incentive Plan, our 2018 Equity Incentive Plan and our 2020 Incentive Award Plan, in the event of a change in control of the Company where outstanding awards are not assumed or substituted, all awards, other than the Multi-Year Award, will vest in full. The vesting of the Multi-Year Award converts to a service-based award based on the price per share to be received by securityholders in connection with the change in control and the vesting date applicable to each stock hurdle achieved. The converted service-based award fully accelerates if not assumed or substituted or upon a termination without "cause" or due to a "constructive termination" (each as defined in Mr. Chesky's offer letter) within 12 months following the change in control. Outside of a change in control, in the event Mr. Chesky's employment is terminated without cause or due to a constructive termination, the Multi-Year Award will remain outstanding and eligible to vest for six months following the date of termination.

The following table provides information concerning the estimated payments and benefits that would be provided in the circumstances described above for each of our named executive officers. Except where otherwise noted, payments and benefits are estimated assuming that the triggering event took place on December 31, 2023, and the price per share of our Class A common stock is the closing price as of December 29, 2023 ($136.14). There can be no assurance that a triggering event would produce the same or similar results as those estimated below if such event occurs on any other date.

| | UPON QUALIFYING TERMINATION— OUTSIDE OF CHANGE IN CONTROL PERIOD | | | | UPON QUALIFYING TERMINATION— DURING CHANGE IN CONTROL PERIOD | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Cash Severance ($)(1) | Continuation Of Medical Benefits ($) | Value Of Accelerated Vesting ($)(2) | Total ($) | Cash Severance ($)(1) | Continuation Of Medical Benefits ($) | Value Of Accelerated Vesting ($)(2)(3) | Total ($) |
| Brian Chesky | 1 | 11,791 | — | 11,972 | 1 | 11,791 | — | 11,972 |
| Dave Stephenson | 600,000 | 35,712 | 3,885,310 | 4,521,022 | 1,050,000 | 35,712 | 10,854,304 | 11,940,016 |
| Nathan Blecharczyk | 400,000 | 35,712 | 12,973,927 | 13,409,639 | 640,000 | 35,712 | 26,689,624 | 27,365,336 |
| Aristotle Balogh | 600,000 | 35,712 | 3,662,306 | 4,298,018 | 1,050,000 | 35,712 | 10,035,728 | 11,121,440 |
| Catherine Powell | 1,350,000 | 54,994 | 8,726,658 | 10,131,652 | 1,350,000 | 54,994 | 8,726,658 | 10,131,652 |

(1)    For each named executive officer other than Ms. Powell, the severance amount related to base salary was determined based on the base salaries in effect on December 31, 2023 and the severance amount related to target annual bonus was determined based on the target bonuses as of December 31, 2023. For Ms. Powell, given that a termination occurring on December 31, 2023 would be prior to the Planned Departure Date, Ms. Powell would be entitled to receive: (x) $600,000, plus (y) the salary she would have been entitled to had she remained employed through the Planned Departure Date, plus (z) the value of her bonus under the 2023 Bonus Plan.

(2)    The value of accelerated options is calculated by multiplying (i) any positive excess of $136.14, the closing price per share of our Class A common stock on December 29, 2023, over the applicable exercise price, and the value of accelerated RSUs is calculated by multiplying the number of RSUs accelerated by $136.14, the closing price per share of our Class A common stock on December 29, 2023.

(3)    The amounts set forth in this column also represent the value of the acceleration of equity awards in the event of a change in control of the Company where outstanding awards are not assumed or substituted, where all awards, other than the Multi-Year Award, will vest in full. In such case, the vesting of the Multi-Year Award converts to a service-based award based on the price per share to be received by securityholders in connection with the change in control and the vesting date applicable to each stock hurdle achieved. Given that the closing price per share of our Class A common

43

Table of Contents

stock on December 29, 2023 was $136.14 and the next tranche of the Multi-Year Award requires attaining a stock price hurdle of $205.00 to be earned, there is no value reflected in the table above with respect to equity acceleration for Mr. Chesky.

**CEO Pay Ratio**

As required by Section 953(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and Item 402(u) of Regulation S-K, we are providing information about the relationship of the annual total compensation of our employees and the annual total compensation of our Chief Executive Officer.

The following table sets forth the ratio of our Chief Executive Officer Brian Chesky's total compensation to that of the Company's median employee for the year ended December 31, 2023.

| | |
|---|---|
| Chief Executive Officer total annual compensation | $ 295,125 |
| Median Employee total annual compensation | $ 243,757 |
| Ratio of Chief Executive Officer to Median Employee total annual compensation | 1.2 to 1 |

This pay ratio is a reasonable estimate calculated in a manner consistent with Item 402(u) of Regulation S-K. The Company chose December 31, 2021 as the date for establishing the employee population used in identifying the median employee and 2021 as the measurement period. We captured all full time, part-time and temporary employees globally as of December 31, 2021.

We identified the median employee using the annualized base salary and annualized bonus target as of December 31, 2021, in addition to the aggregate fair market value of all equity awarded in 2021. The annual total compensation of the median employee and the annual total compensation of the CEO were calculated in accordance with the requirements of Item 402(c)(2)(x) of Regulation S-K. Under SEC rules, the median employee is only required to be identified once every three years if there has been no change in our employee population or compensation arrangements or in the median employee's circumstances that we reasonably believe would significantly affect our pay ratio disclosure. However, our 2021 median employee experienced a change in circumstances, and consistent with SEC rules, for 2023, we chose to use a substitute employee who was immediately adjacent to the initial median employee and had substantially similar compensation to that of the initial median employee based on the compensation measure we had used to select the initial median employee.

The SEC's rules for identifying the median compensated employee and calculating the pay ratio based on that employee's annual total compensation allow companies to adopt a variety of methodologies, to apply certain exclusions, and to make reasonable estimates and assumptions that reflect their employee populations and compensation practices. As a result, the pay ratio reported by other companies may not be comparable to the pay ratio reported above, as other companies have different employee populations and compensation practices and may utilize different methodologies, exclusions, estimates and assumptions in calculating their own pay ratios.

Pursuant to SEC rules, the CEO pay ratio does not include the November 2020 equity award to Mr. Chesky that was intended to take the place of ten years of our CEO's compensation. See "CEO Multi-Year Equity Award" section for more detail.

Table of Contents

**Pay Versus Performance Table**

In accordance with the rules adopted by the SEC pursuant to the Dodd-Frank Act of 2010, we provide the following disclosure regarding executive compensation for our Chief Executive Officer and other (non-CEO) named executive officers ("NEOs") and Company performance for the fiscal years listed below.

The amounts below shown for Compensation Actually Paid do not represent the value of cash and shares of the Company's common stock received by NEOs during the year, but rather is an amount calculated in accordance with SEC rules and includes, among other things, year-over-year changes in the value of unvested equity-based awards. As a result of the calculation methodology required by the SEC, Compensation Actually Paid amounts below differ from compensation actually earned, realized or received by the individuals.

| | | | | | | | | Company |
| | | | | | | | | Selected |
| | | | | | | Value of Initial Fixed $100 | | Measure: |
| | | | | | | Investment Based on: | | Stock |
| | Summary | Compensation | Average Summary Compensation | Average Compensation | Company Total | Peer Group Total | | Price |
| | Compensation Table Total for | Actually Paid to CEO | Table Total for Non-CEO | Actually Paid to Non-CEO | Shareholder Return | Shareholder Return | Net Income (Loss) | Measure |
| Year | CEO ($)(1) | ($)(2)(3) | NEOs ($)(1) | NEOs ($)(2) | ($)(4) | ($)(4) | (Thousands) ($) | ($)(5) |
|---|---|---|---|---|---|---|---|---|
| 2023 | 295,125 | 303,463,125 | 9,721,168 | 19,646,568 | 94.08 | 159.77 | 4,791,795 | 128.87 |
| 2022 | 311,233 | (585,324,767) | 9,484,778 | (20,027,758) | 59.08 | 101.22 | 1,893,105 | 100.59 |
| 2021 | 132,152 | 301,440,152 | 9,419,946 | 19,647,185 | 115.05 | 140.97 | (352,034) | 176.69 |
| 2020 | 120,099,075 | 1,146,063,075 | 17,432,764 | 88,442,213 | 101.44 | 104.79 | (4,584,716) | 147.62 |

(1)    Amounts reported in these columns represent the total compensation as reported in the Summary Compensation Table for our CEO during each applicable fiscal year and the average of the total compensation as reported in the Summary Compensation Table for our remaining NEOs for the relevant fiscal year, which captures the individuals indicated in the table below for each fiscal year:

| Year | CEO | Non-CEO NEOs |
|---|---|---|
| 2023 | Brian Chesky | Dave Stephenson, Nathan Blecharczyk, Aristotle Balogh, and Catherine Powell |
| 2022 | Brian Chesky | Dave Stephenson, Nathan Blecharczyk, Aristotle Balogh, and Catherine Powell |
| 2021 | Brian Chesky | Dave Stephenson, Nathan Blecharczyk, Aristotle Balogh, and Catherine Powell |
| 2020 | Brian Chesky | Dave Stephenson, Joseph Gebbia, Nathan Blecharczyk, and Catherine Powell |

(2)    The calculation of 2023 Compensation Actually Paid reflects certain adjustments to the Total Compensation as reflected in the Summary Compensation Table for the CEO and our remaining NEOs as set forth below:

| Adjustments | CEO | Average Non CEO-NEOs |
|---|---|---|
| Summary Compensation Table Total | 295,125 | 9,721,168 |
| Deduction for Amounts Reported under the "Stock Awards" and "Option Awards" Columns in the Summary Compensation Table for Applicable Fiscal Year | — | (8,729,369) |
| Increase for Year-End Fair Value of Equity Awards Granted in the Fiscal Year that were Outstanding and Unvested as of Fiscal Year —end, Determined as of the Fiscal Year —end | — | 6,543,904 |
| Increase for Vesting Date Fair Value of Equity Awards Granted and Vested in the Fiscal Year, Determined as of Vesting Date | — | 1,831,601 |
| Increase/Deduction for Equity Awards Granted During Prior Fiscal Years that were Outstanding and Unvested as of Applicable Fiscal Year —End, Determined Based on Change in Fair Value from Prior Fiscal Year —End to Applicable Fiscal Year —End | 303,168,000 | 4,503,137 |
| Increase/Deduction for Equity Awards Granted During Prior Fiscal Years that Vested during Applicable Fiscal Year, Determined Based on Change in Fair Value from Prior Fiscal Year —End to Vesting Date | — | 6,123,518 |
| Deduction for Equity Awards Granted During Prior Fiscal Years that Failed to Meet Vesting Conditions during Applicable Fiscal Year, Determined as of Prior Fiscal Year —End | — | (347,391) |
| TOTAL ADJUSTMENTS | 303,168,000 | 9,925,400 |
| **COMPENSATION ACTUALLY PAID** | **303,463,125** | **19,646,568** |

Fair value or change in fair value, as applicable, of equity awards in the Compensation Actually Paid columns is calculated in accordance with ASC Topic 718 and was determined by reference to (i) for solely service-vesting RSU awards, the

45

Table of Contents

closing price per share on the applicable year-end date(s) or, in the case of vesting dates, the closing price per share on the applicable vesting date(s); (ii) for Mr. Chesky's Multi-Year Award, using a Monte Carlo simulation model as of the applicable year-end date(s), which utilizes multiple input variables, including expected volatility of our stock price and other assumptions appropriate for determining fair value; and (iii) for stock options, a Black Scholes value as of the applicable year-end or vesting date(s). For all awards, fair value is determined based on the same methodology as used to determine grant-date fair value. For additional information on the assumptions used to calculate the valuation of the awards, see the Note 12 to our consolidated financial statements in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023 and prior fiscal years.

(3)    The Compensation Actually Paid to Mr. Chesky largely reflects the change in the fair value, as calculated in accordance with ASC Topic 718, of the Multi-Year Award granted to Mr. Chesky in November 2020, as detailed in footnote (2) above. The Compensation Actually Paid to Mr. Chesky for 2020 reflects the fair value of this award as of December 31, 2020, which is substantially larger than the value of the award as of the grant date due to the substantial increase in the fair value of our Class A common stock from the grant date ($35.81), which was prior to our IPO, through December 31, 2020 ($146.80), representing an increase of 310%. As of December 31, 2020, no portion of the Multi-Year Award had been earned.

As disclosed in the "CEO Multi-Year Equity Award" section in our Compensation Discussion and Analysis, the Multi Year Award is intended to cover ten years of compensation and may be earned, if at all, based on our 60 trading day trailing average closing stock price exceeding progressively higher stock price hurdles, ranging from $125 to $485, over a 10-year period. In order to earn all of the tranches, the stock price will have to be over 7x the price at IPO and 13x the price at the time of grant. Outside of shares held to cover taxes, vested shares are not delivered to Mr. Chesky for two years following the vesting date. As of December 31, 2023, only two of the 10 tranches have been earned and vested, and per the terms of the award, other than an amount necessary to cover taxes, shares underlying the vested RSUs subject to the second tranche had not been issued yet. In designing the compensation program for Mr. Chesky, our board of directors was cognizant of Mr. Chesky's intention to donate the net proceeds from the award to community, philanthropic and charitable causes.

(4)    Represents the cumulative total shareholder return (TSR) on our Class A common stock and the cumulative TSR on the S&P 500 Information Technology Index (the "Peer Group TSR"), which is the same peer group used for the Stock Return Performance Graph included in our Annual Report on Form 10-K, through December 31, 2020, 2021, 2022 and 2023. The table assumes $100 was invested at the market close on December 10, 2020, which was the first day our Class A common stock began trading. The cumulative TSR on our Class A common stock for fiscal year 2020 through 2022 have been corrected to reflect the investment of $100 at the market close on December 10, 2020. Data for the Peer Group TSR assumes reinvestment of dividends.

(5)    The Multi-Year Award granted to Mr. Chesky in November 2020 is divided into ten tranches that are eligible to vest based on the achievement of stock price goals measured based on the average of our stock price over a 60 trading day trailing average during a ten-year performance period. The Company does not utilize any other financial performance measures, as defined under SEC rules, in any significant way in its executive compensation programs, and as such has determined to utilize the 60 trading day trailing average closing stock price of our Class A common stock as of the end of each fiscal year (the "Stock Price Measure"), as the most important financial performance measure used by us to link compensation actually paid to our NEOs for the fiscal year ended December 31, 2023 to our performance. See "CEO Multi-Year Equity Award" section for more detail. For 2020, the Stock Price Measure represents the average price from our full trading history at the time, as we were not yet publicly traded for 60 trading days.

Table of Contents

**Relationship Between Financial Performance Measures and Compensation Actually Paid**

The following graphs sets forth the relationship between Compensation Actually Paid to our CEO and the average of Compensation Actually Paid to our remaining NEOs with (i) our cumulative TSR, (ii) our net income (loss), and (iii) the Stock Price Measure, in each case, over four most recently completed fiscal years. Also shown in the graph below is the relationship between our cumulative TSR to the Peer Group TSR for the same period.

Our executive compensation program emphasizes equity compensation, which we believe demonstrates a longer-term, ownership orientation. As a result of this emphasis, Compensation Actually Paid to our CEO and the average of Compensation Actually Paid to our Non-CEO NEOs is significantly impacted by our TSR performance.

Changes to our net income from 2020 through 2023 do not directly align with our outcomes on Compensation Actually Paid as net income is not used as a financial measure under our executive compensation programs and due to the stronger sensitivity of Compensation Actually Paid to our Stock Price Measure and TSR performance.

***Description of Relationship Between CEO and Average NEO Compensation Actually Paid and Our TSR***

The following chart sets forth the relationship between Compensation Actually Paid to our CEO, the average of Compensation Actually Paid to our other NEOs, each as set forth in the table above, and our cumulative TSR over the period from 2020 through 2023.



47

Table of Contents

***Description of Relationship Between CEO and Average NEO Compensation Actually Paid and Net Income***

The following chart sets forth the relationship between Compensation Actually Paid to our CEO, the average of Compensation Actually Paid to our other NEOs, and our net income during years 2020 through 2023, each as set forth in the table above.



***Description of Relationship Between CEO and Average NEO Compensation Actually Paid and Stock Price Measure***

The following chart sets forth the relationship between Compensation Actually Paid to our CEO, the average of Compensation Actually Paid to our other NEOs, and the Stock Price Measure during years 2020 through 2023, each as set forth in the table above.



48

Table of Contents

*Description of Relationship Between Our TSR and Peer Group Index TSR*

The following chart compares our cumulative TSR over the four-year period from 2020 through 2023 to that of the S&P 500 Information Technology Index over the same time period.



*Pay Versus Performance Tabular List*

We believe that the Stock Price Measure represents the most important financial performance measure used by us to link compensation actually paid to our NEOs for the fiscal year ended December 31, 2023 to our performance.

For additional details regarding this financial performance measure, please see the sections titled "Equity Compensation" and "CEO Multi-Year Equity Award" of our Compensation Discussion and Analysis.

Table of Contents

### Compensation Risk Assessment

Management has conducted a risk assessment of our compensation plans and practices and concluded that our compensation programs do not create risks that are reasonably likely to have a material adverse effect on the Company. The objective of the assessment was to identify any compensation plans or practices that may encourage employees to take unnecessary risk that could threaten the Company. No such plans or practices were identified. The leadership development, belonging and compensation committee has reviewed and agrees with management's conclusion.

**Director Compensation**

### Non-Employee Director Compensation Policy

Directors who are not employees of the Company are eligible to receive compensation pursuant to our amended and restated non-employee director compensation policy ("Non-Employee Director Compensation Policy").

In 2023, under our Non-Employee Director Compensation Policy, our non-employee directors were entitled to the following cash retainers, which unless noted otherwise are paid once per year following the conclusion of each fiscal year:

- Each non-employee director receives an annual cash retainer in the amount of $50,000 per year, which is paid in quarterly installments following the end of each fiscal quarter.

- The lead independent director receives an additional cash retainer of $40,000 per year, and the Chairperson of the board of directors receives an additional cash retainer of $50,000 per year.

- The Chairperson of the audit, risk and compliance committee receives an additional annual cash retainer in the amount of $40,000 per year for such Chairperson's service on the audit, risk and compliance committee. Each non-Chairperson member of the audit, risk and compliance committee receives an additional annual cash retainer in the amount of $17,500 per year for such member's service on the audit, risk and compliance committee.

- The Chairperson of the leadership development, belonging and compensation committee receives an additional annual cash retainer in the amount of $37,500 per year for such Chairperson's service on the leadership development, belonging and compensation committee. Each non-Chairperson member of the leadership development, belonging and compensation committee receives an additional annual cash retainer in the amount of $15,000 per year for such member's service on the leadership development, belonging and compensation committee.

- The Chairperson of the nominating and corporate governance committee receives an additional annual cash retainer in the amount of $30,000 per year for such Chairperson's service on the nominating and corporate governance committee. Each non-Chairperson member of the nominating and corporate governance committee receives an additional annual cash retainer in the amount of $10,000 per year for such member's service on the nominating and corporate governance committee.

- The Chairperson of the stakeholder committee receives an additional annual cash retainer in the amount of $37,500 per year for such Chairperson's service on the stakeholder committee. Each non-Chairperson member of the stakeholder committee receives an additional annual cash retainer in the amount of $12,500 per year for such member's service on the stakeholder committee.

Under our Non-Employee Director Compensation Policy, in the event a non-employee director is appointed to the board of directors on a date other than May 25, he or she will receive an initial award of RSUs covering a number of shares of the Class A common stock valued at $300,000 based
on the Company's then-current per share fair market value, multiplied by a fraction, the numerator

Table of Contents

of which is the number of days from and including his or her appointment until the next May 25, and the denominator of which is 365. The initial RSU award will vest in full on the May 25 following the date of grant, subject to continued service on the board of directors. In addition, on each May 25, each non-employee director will automatically be granted an annual award of RSUs covering a number of shares of the Class A common stock valued at $300,000 based on the Company's then-current per share fair market value, which annual award will vest in full on the first anniversary of the grant date, subject to continued service on the board of directors. All RSUs granted under our Non-Employee Director Compensation Policy vest in full in the event of a change in control of the Company. In addition, non-employee directors may elect to receive their annual cash fees in the form of RSUs, which award will be granted and vest in the same manner as the initial RSU award, if such election is made in connection with the director's initial appointment to the board of directors, or else the annual RSU award.

### Non-Employee Director Stock Ownership Policy

We have also adopted a stock ownership policy for our non-employee directors, which requires each non-employee director to hold shares of our common stock equal to five times the annual cash retainer for service on the board.

### Director Compensation Table for 2023

The following table contains information concerning the compensation of our non-employee directors in 2023.

| Name | Fees Earned or Paid in Cash ($)(1) | Stock Awards ($)(2) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Angela Ahrendts | 124,623 | 299,999 | — | 424,622 |
| Amrita Ahuja | 67,500 | 299,999 | — | 367,499 |
| Kenneth Chenault | 115,000 | 299,999 | — | 414,999 |
| Joseph Gebbia | 62,500 | 299,999 | 26,664(3) | 389,163 |
| Belinda Johnson (4) | — | — | — | — |
| Jeffrey Jordan | 97,500 | 299,999 | — | 397,499 |
| Alfred Lin | 105,000 | 299,999 | — | 404,999 |
| James Manyika (5) | 62,808 | 214,521 | — | 277,329 |

(1) Amounts reflect the cash retainers earned by the directors for their service during 2023 pursuant to our Non-Employee Director Compensation Policy in effect for 2023. In addition, each of our directors elected to receive RSUs in lieu of cash compensation under our Non-Employee Director Compensation Policy for 2023. Amounts for such directors reflect the cash fees forgone at the election of the director to receive the following RSU awards, which were granted in May 2023: Ms. Ahrendts: 1,193 RSUs, Ms. Ahuja: 646 RSUs, Mr. Chenault: 1,101 RSUs, Mr. Gebbia: 598 RSUs, Mr. Jordan: 933 RSUs, Mr. Lin: 1,005 RSUs and Mr. Manyika: 438 RSUs. Such amounts were determined by dividing the applicable amount of the cash fees by the fair market value of a share of our Class A common stock as of the date of grant.

(2) Amounts reflect the grant-date fair value of stock awards granted during 2023 computed in accordance with ASC Topic 718, rather than the amounts paid to or realized by the named individual. During 2023 each non-employee director other than Ms. Johnson and Mr. Manyika received an annual grant of 2,873 RSUs on May 25, 2023 with a grant date fair value of $299,999. Mr. Manyika received an annual grant of 1,497 RSUs on September 7, 2023 with a grant date fair value of $214,475, in connection with his appointment on such date. Ms. Johnson did not receive an annual grant during 2023. See Note 12 to our consolidated financial statements in our Annual Report on Form 10-K for the year ended December 31, 2023 for the assumptions used in calculating these values.

(3) Relates to Mr. Gebbia's advisory service fees pursuant to his advisor agreement. On August 23, 2022, we entered into an advisor agreement with Mr. Gebbia that provides for the payment of $3,333 per month in exchange for his advice and other services reasonably requested by the Company's management from time to time, along with continued service-based vesting of certain RSUs and stock options granted to him during his employment with us.

(4) Ms. Johnson's term on the board of directors expired on June 1, 2023.

(5) Mr. Manyika was appointed to the board of directors effective September 7, 2023.

51

Table of Contents

The table below shows the aggregate numbers of option awards (exercisable and unexercisable) and unvested stock awards held as of December 31, 2023 by each non-employee director.

| Name | Options Outstanding at Fiscal Year End | RSUs Outstanding at Fiscal Year End |
|---|---|---|
| Angela Ahrendts | 15,798 | 4,066 |
| Amrita Ahuja | — | 3,519 |
| Kenneth Chenault | 16,692 | 3,974 |
| Joseph Gebbia | 286,752 | 59,322 |
| Belinda Johnson | 843,878 | — |
| Jeffrey Jordan | — | 3,806 |
| Alfred Lin | — | 3,878 |
| James Manyika | — | 1,935 |

Table of Contents

## EQUITY COMPENSATION PLAN INFORMATION

The following table provides certain information as of December 31, 2023, with respect to all of our equity compensation plans in effect on that date.

| Plan Category | (a) Number of Securities to be Issued Upon Exercise of Outstanding Options and Rights | (b) Weighted-Average Exercise Price of Outstanding Options and Rights(1) | | (c) Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders (2) | 37,417,674(3) | $ | 71.90 | 147,841,138(4) |
| Equity compensation plans not approved by security holders (5) | 24,641(6) | $ | 22.76 | — |
| Total | 37,442,315 | $ | 71.73 | 147,841,138 |

(1)    Represents the weighted-average exercise price of outstanding options. Because RSUs do not have an exercise price, the weighted-average exercise price does not take into account outstanding RSUs.

(2)    Consists of the 2008 Equity Incentive Plan (the "2008 Plan"), the 2018 Equity Incentive Plan (the "2018 Plan"), the 2020 Incentive Award Plan (the "2020 Plan"), and the Employee Stock Purchase Plan (the "ESPP").

(3)    Consists of 7,128,498 shares of common stock underlying outstanding options and 30,289,176 shares of common stock underlying outstanding RSUs. Does not include up to a maximum of 1,533,913 shares that may be purchased in the current offering periods under the ESPP, based on enrollment as of December 31, 2023.

(4)    Consists of 134,369,457 shares of common stock available for issuance under the 2020 Plan and 14,471,681 shares of common stock available for issuance under the ESPP (of which up to a maximum of 1,533,913 shares may be purchased in the current offering periods under the ESPP, based on enrollment as of December 31, 2023).

(5)    Consists of the Hotel Tonight, Inc. 2011 Equity Incentive Plan (the "Hotel Tonight Plan"). The Hotel Tonight Plan was approved by Hotel Tonight's shareholders prior to its acquisition by the Company. The material features of the Hotel Tonight Plan are more fully described below.

(6)    Consists of shares of common stock underlying outstanding options.

The number of shares reserved for issuance or transfer pursuant to awards under the 2020 Plan will be increased by (i) the number of shares represented by awards outstanding under our 2008 Plan, Hotel Tonight Plan, or 2018 Plan that become available for issuance under the counting provisions of the 2020 Plan following its effective date and (ii) an annual increase on the first day of each year beginning in 2022 and ending in 2030, equal to the lesser of (A) 5% of the shares of all series of our common stock outstanding on the last day of the immediately preceding year and (B) such smaller number of shares of stock as determined by our board of directors.

The number of shares authorized for sale under the ESPP is subject to an annual increase on the first day of each year beginning in 2022 and ending in 2030, equal to the lesser of (A) 1% of the shares of common stock outstanding (on an as converted basis) on the last day of the immediately preceding year and (B) such number of shares of common stock as determined by our board of directors.

### Hotel Tonight, Inc. 2011 Equity Incentive Plan

In connection with our acquisition of Hotel Tonight, Inc., in April 2019, we assumed the outstanding stock options and restricted stock units under the Hotel Tonight Plan. In connection with the effectiveness of our 2020 Plan, no further awards were or will be granted under the Hotel Tonight Plan. However, all outstanding awards will continue to be governed by their existing terms.

*Administration*. Our board of directors has the authority to administer the Hotel Tonight Plan and the awards granted under it. The administrator has the authority to construe and interpret the Hotel Tonight Plan and to prescribe, amend and rescind rules and regulations relating to the Hotel Tonight Plan.

*Adjustments of Awards*. In the event that a stock dividend, stock split, spin-off, combination or exchange of shares, recapitalization, merger, consolidation, distribution to stockholders other than a normal cash dividend, or other change in the company's corporate or capital structure results in (i) the outstanding shares of common stock, or any securities exchanged therefor or received in

Table of Contents

their place, being exchanged for a different number or kind of securities of the company or any other company or (ii) new, different or additional securities of the company or any other company being received by the holders of shares of common stock, then the administrator will make proportional adjustments in the maximum number and kind of securities available for issuance under the Hotel Tonight Plan, the maximum number and kind of securities issuable as incentive stock options, and the number and kind of securities that are subject to any outstanding award and per share price of such securities.

*Change in Control.* In the event of a change in control in which the successor or acquiring company does not assume or substitute outstanding awards, then the vesting, and as applicable, exercisability, of such awards will accelerate in full. The administrator may also provide for the termination of outstanding awards upon a change in control in exchange for a cash payment in the amount of the acquisition price less any exercise or purchase price.

*Amendment and Termination.* Our board of directors may amend or terminate the Hotel Tonight Plan at any time, subject to stockholder approval as required by applicable law. In connection with the effectiveness of our 2020 Plan, no further awards are granted under the Hotel Tonight Plan.

54

Table of Contents

**PROPOSAL NO. 4—APPROVAL OF AMENDMENT AND RESTATEMENT OF OUR RESTATED CERTIFICATE OF INCORPORATION (THE "CHARTER") TO PROVIDE FOR THE EXCULPATION OF OFFICERS**

**Background**

Article NINTH of our Charter currently provides that a director of the Company shall not be personally liable to the Company or its stockholders for monetary damages for breach of fiduciary duty to the fullest extent permitted by law. Effective August 1, 2022, the State of Delaware, which is the Company's state of incorporation, amended Section 102(b)(7) of the Delaware General Corporation Law (the "DGCL") to authorize exculpation of officers of Delaware corporations. Specifically, the amendments extend the opportunity for Delaware corporations to exculpate their officers, in addition to their directors, for personal liability for breach of the duty of care in certain circumstances. This provision would only permit exculpation of officers for direct claims, as opposed to derivative claims made by stockholders on behalf of the Company, and would not exculpate officers from liability for breach of the duty of loyalty, acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law, or any transaction in which the officer derived an improper personal benefit. The rationale for limiting the scope of liability is to strike a balance between stockholders' interest in accountability and their interest in the Company being able to attract and retain quality officers to work on its behalf.

The board of directors believes it is necessary to provide protection to officers to the fullest extent permitted by law in order to attract and retain top talent. Similar protection has long been afforded to directors. Accordingly, the board of directors has determined that the proposal to amend and restate the Charter in order to extend exculpation to officers is fair and in the best interests of the Company and our stockholders, pursuant to Section 102(b)(7) of the DGCL.

This description of the proposed amendment and restatement of the Charter (the "Restated Certificate of Incorporation") is a summary and is qualified in its entirety by the full text of the Restated Certificate of Incorporation, which is attached to this proxy statement as Appendix A and is marked to show the proposed changes described above. If this Proposal 4 is approved, we intend to file a corresponding Restated Certificate of Incorporation, reflecting the approved amendment, with the Delaware Secretary of State as soon as practicable following the Annual Meeting. If our stockholders do not approve the Restated Certificate of Incorporation, then the proposed changes shown in Appendix A will not be adopted.

*Recommendation of Board of Directors*

***Our board of directors recommends a vote "FOR" the amendment and restatement of our Charter to provide for the exculpation of officers.***

*Vote Required*

Approval of Proposal No. 4 requires the affirmative vote of the holders of a majority of the voting power of the outstanding shares of stock of the Company entitled to vote at the Annual Meeting. Abstentions and broker non-votes will have the same effect as a vote against this proposal.

Table of Contents

### PROPOSAL NO. 5—STOCKHOLDER PROPOSAL FOR POLITICAL DISCLOSURE

**Background**

We have been advised that the New York State Common Retirement Fund, with an address of 110 State Street, 14th Floor, Albany, NY 12236, intends to present the following proposal for consideration at the Annual Meeting. The number of Airbnb securities that the proponent owns will be provided to stockholders promptly upon request. In accordance with federal securities laws, the resolution and supporting statement are quoted verbatim below. We are not responsible for the content of the proponent's proposal or supporting statement.

### Airbnb, Inc. Political Disclosure Shareholder Proposal

Resolved, that the shareholders of Airbnb, Inc. ("Airbnb" or "Company") hereby request that the Company provide a report, updated semiannually, disclosing the Company's:

1. Policies and procedures for making, with corporate funds or assets, contributions and expenditures (direct or indirect) to (a) participate or intervene in any campaign on behalf of (or in opposition to) any candidate for public office, or (b) influence the general public, or any segment thereof, with respect to an election or referendum.

2. Monetary and non-monetary contributions and expenditures (direct and indirect) used in the manner described in section 1 above, including:

  a.  The identity of the recipient as well as the amount paid to each; and

  b.  The title(s) of the person(s) in the Company responsible for decision-making.

The report shall be presented to the board of directors or relevant board committee and posted on the Company's website within 12 months from the date of the annual meeting. This proposal does not encompass lobbying spending.

**Supporting Statement**

As long-term shareholders of Airbnb, we support transparency and accountability in corporate electoral spending. This includes any activity considered intervention in a political campaign under the Internal Revenue Code, such as direct and indirect contributions to political candidates, parties, or organizations, and independent expenditures or electioneering communications on behalf of federal, state, or local candidates.

A company's reputation, value, and bottom line can be adversely impacted by political spending. The risk is especially serious when giving to trade associations, Super PACs, 527 committees, and "social welfare" organizations – groups that routinely pass money to or spend on behalf of candidates and political causes that a company might not otherwise wish to support.

When the Conference Board released its 2021 "Under a Microscope" report[1] it detailed these risks, and recommended the process suggested in this proposal. The organization also said, "a new era of stakeholder scrutiny, social media, and political polarization has propelled corporate political activity – and the risks that come with it – into the spotlight. Political activity can pose increasingly significant risks for companies, including the perception that political contributions – and other forms of activity – are at odds with core company values."

Publicly available records show Airbnb has contributed at least $2.4 million in corporate funds since the 2010 election cycle.

This proposal asks Airbnb to disclose all of its electoral spending, including payments to trade associations and other tax-exempt organizations which may be used for electoral purposes – and are not otherwise public. This would bring our Company in line with a growing number of leading companies, including Intuit Inc., PayPal Holdings, Inc., and ServiceNow, Inc., which present this information on their websites.

_____

[1] https://www.conference-board.org/topics/corporate-political-activity/Under-a-Microscope-A-New-Era-of-Scrutiny-for-Corporate-Political-Activity

Table of Contents

Without knowing the recipients of our company's political dollars, we cannot sufficiently assess whether our company's election-related spending aligns or conflicts with its business strategy, corporate priorities, or other areas of concern. We urge your support for this critical governance reform.

**Recommendation of Board of Directors**

**Our board of directors recommends a vote "AGAINST" the stockholder proposal regarding political disclosure.**

The board of directors has carefully considered the proposal and concluded that its adoption is unnecessary in light of the existing public disclosures regarding our political contributions and expenditures.

**Information regarding the Company's political contributions and expenditures is already publicly disclosed.**

Airbnb actively complies with all relevant disclosure laws as it relates to political expenditures, and, as a result, information regarding our political contributions and expenditures is already publicly available, where required. In the United States, federal election laws and the election laws of all 50 states require either the contributor or the recipient campaign or committee to publicly file reports disclosing political contributions. In addition, political organizations that are not subject to federal and state election laws are required to publicly disclose to the U.S. Internal Revenue Service (the "IRS") the contributions they receive, and following such disclosure to the IRS, the IRS makes those disclosures available on its website. Several groups, including OpenSecrets and the National Institute on Money in State Politics, aggregate these political contributions disclosures from various sources and post them on a public website, making it easy and convenient for interested stockholders to find this data.

**Payments to certain groups, such as trade associations, do not necessarily reflect our political or policy positions.**

The proposal's supporting statement suggests the proponent is concerned about payments to trade associations and other tax-exempt organizations which could be used for electoral purposes. The Internal Revenue Code prohibits these types of entities from having political activities as their primary purpose. Rather, trade association memberships provide benefits to members by providing access to business, technical and industry expertise and by advancing commercial interests. Trade associations are independent organizations representing a variety of members, and these entities may take political or policy positions we do not share, and that are not directly attributable to the membership dues we pay. As a result, requiring Airbnb to disclose payments to trade associations could be misleading, by characterizing dues to such organizations as political contributions. After careful consideration of the proposal, the existing public disclosures regarding our political contributions and expenditures, the extensive federal, state and local laws and regulations governing such contributions and related disclosures and the potential that the additional information requested by the proposal could be misleading, our board of directors has concluded that its adoption is unnecessary.

For these reasons, the board of directors unanimously urges stockholders to vote "**AGAINST**" the stockholder proposal.

**Vote Required**

Approval of Proposal No. 5 requires the affirmative vote of the holders of a majority in voting power of the votes cast (excluding abstentions and broker non-votes). Abstentions and broker non-votes will have no effect on this proposal.

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

The following includes a summary of transactions since January 1, 2023 and any currently proposed transactions to which we were or are expected to be a participant in which (i) the amount involved exceeded or will exceed $120,000, and (ii) any of our directors, executive officers, or holders of more than 5% of our capital stock, or any affiliate or member of the immediate family of the foregoing persons, had or will have a direct or indirect material interest, other than compensation and other arrangements that are described under the sections titled "Compensation Discussion and Analysis" and "Executive Compensation Tables."

### Investors' Rights Agreement

We are party to an Amended and Restated Investors' Rights Agreement, dated as of April 17, 2020 ("Investors' Rights Agreement"), with certain holders of our capital stock and warrants. The Investors' Rights Agreement provides, among other things, that certain holders of our capital stock and warrants have the right to request that we file a registration statement, and/or request that their shares be covered by a registration statement that we are otherwise filing, subject to certain exceptions.

### Nominating Agreement

We and Messrs. Blecharczyk, Chesky, and Gebbia, referred to in this proxy statement as our founders, have entered into a Nominating Agreement, dated November 27, 2020, under which we and the founders are required, upon the terms set forth in the Nominating Agreement, to (i) include our founders in the slate of nominees nominated by our board of directors for the applicable class of directors for election by our stockholders, and (ii) include such nomination of our founders in our proxy statement. In addition, we must use reasonable efforts to, and the founders must take all necessary action to, recommend in favor of each founder's election as a director, and to solicit proxies or consents in favor of their election. The obligations with respect to each founder will terminate upon the earliest to occur of (1) such founder's resignation from our board of directors, (2) such founder's death or disability, (3) such founder's removal from our board of directors for cause, (4) the expiration of such founder's term if such founder has given notice of his intention not to stand for re-election, and (5) the date upon which the number of shares of our common stock beneficially owned by such founder falls below ten percent of the number of shares of common stock beneficially owned by such founder as of September 30, 2020. The Nominating Agreement will remain in effect until the earliest of (a) the date on which our and the founders' obligations have terminated with respect to all of the founders, (b) the time at which all outstanding shares of Class B common stock automatically convert to Class A common stock, and (c) immediately prior to a change of control. The conversion of our Class B common stock to Class A common stock is provided for in our restated certificate of incorporation.

### Indemnification Agreements

We have entered into indemnification agreements with each of our current directors and officers. Our restated certificate of incorporation and our amended and restated bylaws provide that we will indemnify our directors and officers to the fullest extent permitted by applicable law.

### Employment Arrangement with an Immediate Family Member of Our Director

Alison Jordan, the daughter of Jeffrey Jordan, a member of our board of directors, has served as a Strategic Partnerships Coordinator from July 2017 to May 2020 and a Policy Program and Partnerships Manager since May 2020. Ms. Jordan's compensation was based on reference to external market practice of similar positions or internal pay equity when compared to the compensation paid to employees in similar positions who were not related to our director, Mr. Jordan. Ms. Jordan's equity awards were granted on the same general terms and conditions as applicable to employees in similar positions who were not related to our director, Mr. Jordan. Mr. Jordan plays no personal role in determining his daughter's compensation or reviewing his daughter's performance. Mr. Jordan does not receive a direct or indirect benefit from his daughter's position with us.

Table of Contents

**Asset Purchase Agreement**

On April 21, 2022, we entered into an agreement to transfer to a newly-formed company ("Newco"), of which Mr. Gebbia is a majority investor, certain tangible personal property and intellectual property. In consideration for the asset transfer, we received a simple agreement for future equity in Newco in the amount of approximately $2.5 million, which subsequently converted into an equity interest. We also assigned one short-term lease for workspace for Newco's continued use until the lease expired in January 2023. The transaction with Newco, including the real estate arrangements, was approved by our audit, risk and compliance committee, in accordance with our related party transaction policy.

**Policies and Procedures for Related Party Transactions**

Our board of directors has adopted a written related party transaction policy setting forth the policies and procedures for the review and approval or ratification of related party transactions. This policy covers, with certain exceptions set forth in Item 404 of Regulation S-K under the Securities Act, any transaction, arrangement, or relationship, or any series of similar transactions, arrangements, or relationships in which we were or are to be a participant, where the amount involved exceeds $120,000 and a related party had or will have a direct or indirect material interest, including without limitation purchases of goods or services by or from the related party or entities in which the related party has a material interest, indebtedness, guarantees of indebtedness, and employment by us of a related party. In reviewing and approving any such transactions, the Chair of our audit, risk and compliance committee is tasked to consider all relevant facts and circumstances, including but not limited to whether the transaction is on terms comparable to those that could be obtained in an arm's length transaction with an unrelated third party and the extent of the related party's interest in the transaction. All such approved transactions must be ratified by the audit, risk and compliance committee, taking into account the foregoing considerations, during the meetings held at least once during each fiscal quarter. Unless noted otherwise, all of the transactions described in this section occurred prior to the adoption of this policy.

Table of Contents

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth certain information with respect to the beneficial ownership of our common stock as of March 15, 2024 for:

- each of our named executive officers;

- each of our executive officers;

- each of our directors;

- all of our executive officers and directors as a group; and

- each person known by us to be the beneficial owner of more than five percent of any class of our voting securities.

We have determined beneficial ownership in accordance with the rules of the SEC, and thus it represents sole or shared voting or investment power with respect to our securities. Unless otherwise indicated below, to our knowledge, the persons and entities named in the table have sole voting and sole investment power with respect to all shares that they beneficially owned as of March 15, 2024, subject to community property laws where applicable. We have deemed shares of our common stock subject to stock options or warrants that are currently exercisable or will be exercisable within 60 days of March 15, 2024 or issuable pursuant to RSUs which are subject to vesting and settlement conditions expected to occur within 60 days of March 15, 2024 to be outstanding and to be beneficially owned by the person holding the stock option, warrant, or RSU for the purpose of computing the percentage ownership of that person. We did not deem these shares subject to stock options, warrants, or RSUs outstanding for the purpose of computing the percentage ownership of any other person or entity.

We have based percentage ownership of our common stock on 443,392,133 shares of our Class A common stock outstanding, 193,343,397 shares of our Class B common stock outstanding, and 9,200,000 shares of Class H common stock outstanding as of March 15, 2024. There were no shares of Class C common stock outstanding as of March 15, 2024. Percentage of voting power represents voting power with respect to all shares of our Class A common stock and Class B common stock, as a single class. Each holder of our Class A common stock is entitled to one vote per share and each holder of our Class B common stock is entitled to twenty votes per share on all matters submitted to a vote of the stockholders. The holders of our voting stock, consisting of Class A and Class B common stock, generally vote together as a single class on all matters submitted to a vote of our stockholders, unless otherwise required by Delaware law or our restated certificate of incorporation. Each outstanding share of Class B common stock is convertible at any time at the option of the holder into one share of Class A common stock.

60

Table of Contents

Unless otherwise indicated, the address of each beneficial owner listed in the table below is c/o Airbnb, Inc., 888 Brannan Street, San Francisco, California 94103. The information provided in the table is based on our records, information filed with the SEC and information provided to us, except where otherwise noted.

| | Shares Beneficially Owned at March 15, 2023 | | | | | | % of Voting Power |
| | Class A | | Class B | | Class H | | |
| Name of Beneficial Owner | Shares | % | Shares | % | Shares | % | |
|---|---|---|---|---|---|---|---|
| *Executive Officers and Directors:* | | | | | | | |
| Brian Chesky(1) | 3,813,560 | * | 63,207,427 | 32.7% | — | — | 29.4% |
| Nathan Blecharczyk(2) | 679,534 | * | 62,064,853 | 32.1% | — | — | 28.8% |
| Joseph Gebbia(3) | 215,449 | * | 45,571,045 | 23.6% | — | — | 21.1% |
| Elinor Mertz(4) | 586,336 | * | — | — | — | — | * |
| Aristotle Balogh(5) | 394,012 | * | — | — | — | — | * |
| Amrita Ahuja(6) | 4,717 | * | — | — | — | — | * |
| Angela Ahrendts(7) | 36,921 | * | — | — | — | — | * |
| Kenneth Chenault(8) | 44,316 | * | — | — | — | — | * |
| Jeffrey Jordan(9) | 120,297 | * | — | — | — | — | * |
| Alfred Lin(10) | 451,095 | * | — | — | — | — | * |
| James Manyika | — | * | — | — | — | — | * |
| David Stephenson(11) | 247,711 | * | — | — | — | — | * |
| All current executive officers and directors as a group (11 persons)(12) | 6,346,237 | 1.4% | 170,843,325 | 88.4% | — | — | 79.4% |
| *5% Stockholders:* | | | | | | | |
| Entities Affiliated with Sequoia Capital(13) | 515,016 | * | 22,189,682 | 11.5% | — | — | 10.3% |
| BlackRock, Inc.(14) | 26,580,286 | 6.0% | — | — | — | — | * |
| FMR LLC(15) | 22,792,474 | 5.1% | — | — | — | — | * |
| The Vanguard Group(16) | 33,533,296 | 7.6% | — | — | — | — | * |
| Airbnb Host Endowment LLC(17) | — | — | — | — | 9,200,000 | 100.0% | — |

\*     Represents less than 1%.

(1)     Consists of: (i) 3,451,193 shares of Class A common stock held of record by Brian Chesky; (ii) 175,313 shares of Class A common stock held of record by the Brian Chesky Revocable Trust (iii) 137,054 shares of Class A common stock held of record by Brian Chesky and Robert Joseph St. Aubin, Trustees of the Brian Chesky Legacy Trust B created under Agreement dated as of July 26, 2016 and Instrument dated as of May 26, 2023; (iv) 50,000 shares of Class A common stock held of record by Brian Chesky and Robert Joseph St. Aubin, Trustees of Allison's 2019 Trust created under Agreement dated as of February 15, 2019; (v) 57,032,561 shares of Class B common stock held of record by the Brian Chesky Revocable Trust; (vi) 68,854 shares of Class B common stock held of record by Brian Chesky and Robert Joseph St. Aubin, Trustees of Allison's 2019 Trust created under Agreement dated as of February 15, 2019; (vii) 149,852 shares of Class B common stock held of record by Brian Chesky and Robert Joseph St. Aubin, Trustees of the Brian Chesky Legacy Trust B created under Agreement dated as of July 26, 2016 and Instrument dated as of May 26, 2023; (viii) 63,655 shares of Class B common stock held of record by Brian Chesky and Robert Joseph St. Aubin, Trustees of the Brian Chesky Legacy Trust created under Agreement dated as of July 26, 2016; (ix) 15,266 shares of Class B common stock held of record by Deborah Chesky and Robert Joseph St. Aubin, Trustees of Allison's Trust created under Agreement dated as of July 26, 2016; (x) 251,886 shares of Class B common stock held by Brian Chesky and Robert Joseph St. Aubin, Trustees of Allison's 2019 Trust A created under Agreement dated as of July 31, 2019; (xi) 346,116 shares of Class B common stock held by Brian Chesky, Trustee of the Brian Chesky 2021 Grantor Retained Annuity Trust B created under Agreement dated as of May 28, 2021; (xii) 279,237 shares of Class B common stock held by Brian Chesky, Trustee of the Brian Chesky 2022 Grantor Retained Annuity Trust A created under Agreement dated as of May 26, 2022; (xiii) 2,500,000 shares of Class B common stock held by Brian Chesky, Trustee of the Brian Chesky 2024 Grantor Retained Annuity Trust A created under Agreement dated as of February 23, 2024; and (xiv) 2,500,000 shares of Class B common stock held by Brian Chesky, Trustee of the Brian Chesky 2024 Grantor Retained Annuity Trust B created under Agreement dated as of February 23, 2024. Mr. Chesky does not have voting or dispositive power over shares in the trust referenced in clause (ix) of this footnote. All of the shares identified in this footnote are subject to the Founder Voting Agreement.

(2)     Consists of: (i) 110,222 shares of Class A common stock held of record by Mr. Blecharczyk; (ii) 7,681 shares of Class A common stock held by the Blecharczyk Revocable Trust; (iii) 45,036,126 shares of Class B common stock held by the Blecharczyk Revocable Trust; (iv) 12,068,507 shares of Class B common stock held by Nathan Blecharczyk, as Trustee of the Nathan Blecharczyk 2020 GRAT; and (v) 561,631 shares of Class A common stock subject to stock options that are exercisable within 60 days of March 15, 2024. Also includes 786,446 shares of Class B common stock held of record by Gioacchino Curiale, as Trustee of the Blecharczyk 2015 Irrevocable Trust and 4,173,774 shares of Class B common stock held by Gioacchino Curiale, as Trustee of the Nathan Blecharczyk 2015 GRAT Remainder Trust; Mr. Blecharczyk does not have voting or dispositive power over the shares held by these two trusts. All of the shares identified in this footnote are subject to the Founder Voting Agreement.

61

Table of Contents

(3)     Consists of: (i) 10,125 shares of Class A common stock held of record by Mr. Gebbia, (ii) 21 shares of Class A common stock held of record by The Sycamore Trust, for which Mr. Gebbia is a trustee; (iii) 39,478,645 shares of Class B common stock held of record by The Sycamore Trust, for which Mr. Gebbia is a trustee; (iv) 92,400 shares of Class B common stock held of record by Ulderico LLC; (v) 1,000,000 shares of Class B common stock held of record by Guernica LLC; (vi) 2,000,000 shares of Class B common stock held of record by Guernica 2, LLC; (vii) 3,000,000 shares of Class B common stock held of record by Guernica 3, LLC; and (viii) 205,303 shares of Class A common stock subject to stock options held by Mr. Gebbia that are exercisable within 60 days of March 15, 2024. Mr. Gebbia is the owner of each of Ulderico LLC, Guernica LLC, Guernica 2, LLC, Guernica 3, LLC. All of the shares identified in this footnote are subject to the Founder Voting Agreement.

(4)     Consists of: (i) 434,000 shares of Class A common stock held of record by Elinor Mertz and (ii) 152,336 shares of Class A common stock subject to stock options held by Ms. Mertz that are exercisable within 60 days of March 15, 2024.

(5)     Consists of: (i) 99,036 shares of Class A common stock held of record by Aristotle Balogh; and (ii) 294,976 shares of Class A common stock subject to stock options held by Mr. Balogh that are exercisable within 60 days of March 15, 2024.

(6)     Consists of: (i) 4,117 shares of Class A common stock held of record by Amrita Ahuja; and (ii) 600 shares of Class A common stock held in trust for the benefit of Ms. Ahuja.

(7)     Consists of: (i) 21,123 shares of Class A common stock held of record by Angela Ahrendts; and (ii) 15,798 shares of Class A common stock subject to stock options held by Ms. Ahrendts that are exercisable within 60 days of March 15, 2024.

(8)     Consists of: (i) 27,624 shares of Class A common stock held of record by Kenneth Chenault; and (ii) 16,692 shares of Class A common stock subject to a stock option held by Mr. Chenault that is exercisable within 60 days of March 15, 2024.

(9)     Consists of: (i) 8,651 shares of Class A common stock held of record by Jeffrey Jordan; and (ii) 111,646 shares of Class A common stock held by the Jordan Family Trust.

(10)    Consists of: (i) 8,775 shares of Class A common stock held of record by Alfred Lin; and (ii) 442,320 shares of Class A common stock held by an estate planning vehicle. Mr. Lin does not have beneficial ownership of the shares held by the entities affiliated with Sequoia Capital identified in footnote 13.

(11)    Consists of: (i) 33,492 shares of Class A common stock held of record by David Stephenson and (ii) 214,219 shares of Class A common stock subject to stock options held by Mr. Stephenson that are exercisable within 60 days of March 15, 2024.

(12)    Consists of: (i) 5,099,501 shares of Class A common stock held; (ii) 170,843,325 shares of Class B common stock held; and (iii) 1,246,736 shares of Class A common stock subject to stock options that are exercisable within 60 days of March 15, 2024.

(13)    Based on our records and a Form 4 filed with the SEC on February 23, 2024. Consists of: (i) 46,744 shares of Class A common stock held of record by Sequoia Capital Fund Parallel, LLC, (ii) 2,972,812 shares of Class B common stock held of record by Sequoia Capital Fund Parallel, LLC, (iii) 468,272 shares of Class A common stock held of record by Sequoia Capital Fund, L.P., and (iv) 19,216,870 shares of Class B common stock held of record by Sequoia Capital Fund, L.P. SC US (TTGP), Ltd. is the general partner of Sequoia Capital Fund Management, L.P., which is the general partner of Sequoia Capital Fund, LP ("SCF") and the manager of Sequoia Capital Fund Parallel, LLC ("SCFP"). As a result, SC US (TTGP), Ltd. may be deemed to share voting and dispositive power with respect to the shares held by SCF. The address for each of these entities is 2800 Sand Hill Road, Suite 101, Menlo Park, California 94025.

(14)    Based on a Schedule 13G filed with the SEC on January 29, 2024 that reported, in the aggregate, sole voting power over 24,023,521 shares of Class A common stock and sole dispositive power over 26,580,286 shares of Class A common stock. The address for BlackRock, Inc. is 50 Hudson Yards, New York, NY 10001.

(15)    Based a Schedule 13G/A filed with the SEC on February 9, 2024. Consists of 22,792,474 shares of Class A common stock held by FMR LLC and Abigail. P. Johnson, a Director and the Chairman and Chief Executive Officer of FMR LLC. Members of the Johnson family, including Abigail P. Johnson, are the predominant owners, directly or through trusts, of Series B voting common shares of FMR LLC, representing 49% of the voting power of FMR LLC. The Johnson family group and all other Series B shareholders have entered into a shareholders' voting agreement under which all Series B voting common shares will be voted in accordance with the majority vote of Series B voting common shares. Accordingly, through their ownership of voting common shares and the execution of the shareholders' voting agreement, members of the Johnson family may be deemed, under the Investment Company Act of 1940, to form a controlling group with respect to FMR LLC. This footnote reflects the securities beneficially owned, or that may be deemed to be beneficially owned, by FMR LLC, certain of its subsidiaries and affiliates, and other companies (collectively, the "FMR Reporters"). This footnote does not reflect securities, if any, beneficially owned by certain other companies whose beneficial ownership of securities is disaggregated from that of the FMR Reporters in accordance with Securities and Exchange Commission Release No. 34-39538 (January 12, 1998). The address for FMR LLC is 245 Summer Street, Boston, MA 02110. The address for Abigail P. Johnson is 245 Summer Street, Boston, MA 02210.

(16)    Based on a Schedule 13G/A filed with the SEC on February 13, 2024. Consists of 33,533,296 aggregate shares of Class A common stock held by The Vanguard Group over which The Vanguard Group has beneficial ownership, which consists of 565,385 shares of Class A common stock over which The Vanguard Group has shared voting power, 31,706,309 shares of Class A common stock over which The Vanguard Group has sole dispositive power, and 1,826,987 shares of Class A common stock over which The Vanguard Group has shared dispositive power. The Vanguard Group's clients, including investment companies registered under the Investment Company Act of 1940 and other managed accounts, have the

62

Table of Contents

right to receive or the power to direct the receipt of dividends from, or the proceeds from the sale of, the securities reported in this footnote and in the Schedule 13G/A filed with the SEC on February 13, 2024. The address for The Vanguard Group is 100 Vanguard Blvd., Malvern, PA 19355.

(17)   Consists of 9,200,000 shares of Class H common stock issued by us to our wholly-owned subsidiary on November 10, 2020. Each share of Class H common stock is entitled to no votes and will convert into a share of Class A common stock on a share-for-share basis upon the sale of such share of Class H common stock to any person or entity that is not our subsidiary.

Table of Contents

## OTHER MATTERS

**Delinquent Section 16(a) Reports**

Section 16(a) of the Exchange Act requires our directors and executive officers, and persons who beneficially own more than ten percent of a registered class of our equity securities, to file with the SEC reports of beneficial ownership and reports of changes in beneficial ownership of such securities on Forms 3, 4 and 5. Based solely on a review of the copies of such forms filed electronically with the SEC, and on written representations from certain reporting persons, we believe that during fiscal year 2023 and through the date of the filing of our Proxy Statement, our directors, executive officers and ten-percent stockholders complied with all applicable Section 16(a) filing requirements other than (i) one Form 4 filing for each of Nathan Blecharczyk, Aristotle Balogh, David Bernstein, Catherine Powell, and Dave Stephenson that were each filed on April 3, 2023 relating to awards of RSUs and stock options that were granted on March 27, 2023, and a Form 4 for David Bernstein that was filed on May 1, 2023 for an award of RSUs granted on April 19, 2023.

**Annual Report on Form 10-K**

A copy of our Annual Report on Form 10-K for the fiscal year ended December 31, 2023, including financial statements and schedules thereto but not including exhibits, as filed with the SEC, will be sent to any stockholder of record as of April 8, 2024 without charge upon written request addressed to:

Airbnb, Inc.
Investor Relations
888 Brannan Street
San Francisco, California 94103

Exhibits to the Annual Report on Form 10-K are available upon payment of a reasonable fee, which is limited to our expenses in furnishing the requested exhibit. You also may access this proxy statement and our Annual Report on Form 10-K on the SEC's website at www.sec.gov and on our website at https://investors.airbnb.com.

**Other Business**

Neither we nor our board of directors intend to propose any matters of business at the Annual Meeting other than the proposals described in this proxy statement. Neither we nor our board of directors are aware of any matters to be proposed by others at the Annual Meeting.

By Order of the Board of Directors,

Brian Chesky
Chairperson of the Board of Directors
Chief Executive Officer

64

Table of Contents

**Appendix A: Proposed Amendment and Restatement of the Company's Certificate of Incorporation**

*Explanatory Note*

The following Restated Certification of Incorporation of Airbnb, Inc. is marked to reflect the proposed amendments to include officer exculpation (Proposal 4), reflected in ARTICLE NINTH below.

If our stockholders do not approve the Restated Certificate of Incorporation, then the proposed changes shown in this Appendix A will not be adopted.

---

### RESTATED CERTIFICATE OF INCORPORATION
### OF
### AIRBNB, INC.

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

Airbnb, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "*General Corporation Law*"),

**DOES HEREBY CERTIFY:**

**1.** That the name of this corporation is Airbnb, Inc. and that this corporation was originally incorporated pursuant to the General Corporation Law on June 27, 2008 under the name Airbed & Breakfast, Inc.

**2.** That the Board of Directors duly adopted resolutions proposing to amend and restate the Certificate of Incorporation of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its stockholders, and authorizing the appropriate officers of this corporation to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows:

**RESOLVED**, that the Certificate of Incorporation of this corporation be amended and restated in its entirety to read as follows:

**FIRST:** The name of this corporation is Airbnb, Inc. (the "*Corporation*").

**SECOND:** The address of the registered office of the Corporation in the State of Delaware is 251 Little Falls Drive, Wilmington, County of New Castle, Delaware 19808. The name of its registered agent at that address is the Corporation Service Company.

**THIRD:** The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors in accordance with Section 141 of the General Corporation Law. The Corporation shall be managed with the goal of considering the interests of the Corporation's stakeholders for the long-term benefit of the Corporation.

**FOURTH:** The total number of shares of all classes of stock which the Corporation is authorized to issue is 4,746,000,000 comprised of (i) 4,736,000,000 shares of Common Stock, $0.0001 par value per share (the "*Common Stock*"), of which (a) 2,000,000,000 shares shall be a series designated as Class A Common Stock (the "*Class A Common Stock*"), (b) 710,000,000 shares shall be a series designated as Class B Common Stock (the "*Class B Common Stock*"), (c) 2,000,000,000 shares shall be a series designated as Class C Common Stock (the "*Class C Common Stock*"), and (d) 26,000,000 shares shall be a series designated as Class H Common Stock (the "*Class H Common Stock*"), and (ii) 10,000,000 shares of Preferred Stock, $0.0001 par value per share (the "*Preferred Stock*").

A-1

Table of Contents

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class or series of capital stock of the Corporation. All references in this Restated Certificate of Incorporation (this "***Restated Certificate of Incorporation***") to a "certificate" or "certificates" representing shares of the Corporation's capital stock include a notice or notices of issuance of uncertificated shares.

A.    COMMON STOCK

The Common Stock shall have such terms, rights, powers and privileges, and the qualifications, limitations and restrictions with respect thereto, as stated or expressed herein. Unless otherwise indicated, references to "Sections" or "Subsections" in this Part A of this Article Fourth refer to sections and subsections of Part A of this Article Fourth.

1.  General. The voting, dividend and liquidation rights of the holders of the Common Stock are subject to and qualified by the rights, powers and privileges of the holders of any series of Preferred Stock outstanding at any time.

2.  Voting.

2.1 Except as required by law, each share of Class A Common Stock shall entitle the holder to one (l) vote for each share of Class A Common Stock held, each share of Class B Common Stock shall entitle the holder to twenty (20) votes for each share of Class B Common Stock held, each share of Class C Common Stock shall entitle the holder to no votes for each share of Class C Common Stock held, and each share of Class H Common Stock shall entitle the holder to no votes for each share of Class H Common Stock held, in each case, on any matter submitted to the stockholders of the Corporation for a vote or approval.

2.2 Unless required by law, there shall be no cumulative voting. The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by (in addition to any vote of the holders of one or more series of Preferred Stock entitled to vote thereon) the affirmative vote of the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation entitled to vote thereon, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

2.3 Except as otherwise required by law, holders of Common Stock shall not be entitled to vote on any amendment to this Restated Certificate of Incorporation (including any certificate of designation relating to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Restated Certificate of Incorporation (including any certificate of designation relating to any series of Preferred Stock) or pursuant to the General Corporation Law.

3.  Conversion.

3.1 Conversion of Class B Common Stock.

3.1.1 Right to Convert. At any time, any holder of shares of Class B Common Stock, at the option of such holder, may convert any share of Class B Common Stock held by such holder at any time after the date of issuance of such share, at the office of the Corporation or any transfer agent for such stock, into one (1) share of Class A Common Stock.

3.1.2 Automatic Conversion. Upon the earlier of (a) the date and time, or the occurrence of an event, specified by vote or written consent of the holders of at least eighty percent (80%) of the outstanding shares of Class B Common Stock at the time of such vote or consent, voting as a separate series, and (b) 5:00 p.m. New York City time on the twenty (20) year anniversary of the closing (the "***Effective Time***") of the Corporation's initial public offering of Class A Common Stock in a firm commitment underwritten offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the earlier such date, the "***Class B Mandatory Conversion Time***"), each outstanding share of Class B Common Stock shall automatically convert into one (1) share of Class A Common Stock.

A-2

Table of Contents

3.1.3 <u>Conversion Upon Death or Disability</u>. Each outstanding share of Class B Common Stock held by a Founder (as defined in Section 3.1.4) (or by any of such Founder's Affiliates (as defined in Section 3.1.4)) shall automatically convert into one (1) share of Class A Common Stock at 5:00 p.m. New York City time on the nine (9) month anniversary of the death or Disability of such Founder.

"***Disability***" shall mean permanent and total disability such that the natural person who is the holder of shares of Class B Common Stock is unable to engage in any substantial gainful activity by reason of any medically determinable mental impairment which would reasonably be expected to result in death or which has lasted or would reasonably be expected to last for a continuous period of not less than twelve (12) months as determined by a licensed medical practitioner. In the event of a dispute whether the natural person who is the holder of shares of Class B Common Stock has suffered a Disability, no Disability of the natural person who is the holder of shares of Class B Common Stock shall be deemed to have occurred unless and until an affirmative ruling regarding such Disability has been made by a court of competent jurisdiction, and such ruling has become final and nonappealable.

3.1.4 <u>Transfers to Non-Affiliates</u>. Any share of Class B Common Stock shall automatically convert into one (1) share of Class A Common Stock upon the Transfer (as defined below) of such share by the holder of such Class B Common Stock as of immediately prior to the Effective Time (or in the case of any share of Class B Common Stock issued following the Effective Time, by the holder of such Class B Common Stock as of the time of original issuance of such share) (any such holder, the "***Operative Holder***") or by any of such Operative Holder's Permitted Transferees (as defined below) to a natural person or entity other than (A) the holder of such share of Class B Common Stock on the date of initial issuance of such share by the Corporation (any such holder, the "***Initial Holder***"), (B) an Affiliate of such Initial Holder (each of (A) and (B), a "***Permitted Transferee***" of such Operative Holder) or (C) the Operative Holder; *provided*, *however*, that, with the prior consent of each of the three Founders, any Transfer by a Founder (or such Founder's Affiliates) to one or more of the other Founders (or any such Founder's Affiliates) shall not result in the automatic conversion of such Founder's (or such Founder's Affiliates') shares of Class B Common Stock; *provided further* that following the death or Disability of any Founder, such Founder's consent shall not be required for these purposes.

"***Transfer***" shall mean (i) the direct or indirect sale, transfer, pledge, assignment, gift, contribution, grant of a lien, or other disposal of any share of Class B Common Stock or any beneficial interest in such share or (ii) the deposit of any share of Class B Common Stock into a voting trust or entry into a voting agreement or arrangement with respect to any share of Class B Common Stock or the granting of any proxy or power of attorney with respect thereto. A "***Transfer***" will also be deemed to have occurred with respect to any share of Class B Common Stock beneficially held by an Operative Holder (or by any of such Operative Holder's Permitted Transferees) if there is a transaction or other event such that the Operative Holder (or such Operative Holder's Permitted Transferees, as the case may be) no longer retains sole dispositive power (as among the Operative Holder of such share of Class B Common Stock and such Operative Holder's Permitted Transferees) and exclusive power to vote or direct the voting of such security, including by proxy, voting agreement or otherwise, in each case with respect to such share of Class B Common Stock. Notwithstanding the foregoing none of the following shall be considered a Transfer:

(A) the granting of a revocable proxy to an officer or director of the Corporation at the request of the Board of Directors in connection with actions to be taken at an annual or special meeting of stockholders or any other action of the stockholders permitted by this Restated Certificate of Incorporation;

(B) the pledge of shares of Class B Common Stock or granting a lien with respect thereto by a stockholder that creates a mere security interest in such shares pursuant to a bona fide loan or indebtedness transaction with a financial institution for so long as such stockholder continues to exercise voting control over such shares; *provided*, *however*, that a foreclosure on such shares or other similar action by the pledgee shall constitute a Transfer;

A-3

Table of Contents

(C) the entering into, or reaching an agreement, arrangement or understanding regarding, a support, voting, tender or similar agreement or arrangement (with or without a proxy) in connection with a merger, asset transfer, asset acquisition or similar transaction approved by the Board of Directors;

(D) the entering into a trading plan pursuant to Rule 10b5-1 under the Securities Exchange Act of 1934, as amended, with a broker or other nominee where the holder entering into the plan retains all voting control over the shares; *provided*, *however*, that a Transfer of such shares of Class B Common Stock by such broker or other nominee shall constitute a "Transfer" at the time of such Transfer;

(E) (i) the entering into or amending a voting trust, agreement or arrangement (with or without granting a proxy) to which the Founders and/or the Founders' Affiliates are a party and of which the Corporation is aware as of the Effective Time or (ii) the entering into or amending a voting trust, agreement or arrangement (with or without granting a proxy) between or among the Founders and/or the Founders' Affiliates (with respect to clauses (i) and (ii), in the case of Founders' Affiliates, so long as, as between the Founder and the Founder's Affiliates, the Founder continues to hold exclusive voting control with respect to the applicable shares of Class B Common Stock);

(F) the granting of a proxy by the Founder or the Founder's Affiliates to a natural person or entity designated by the Founder or the Founder's Affiliates and approved, in advance, by a majority of the Independent Directors then in office to exercise dispositive power and/or voting control of shares of Class B Common Stock owned directly or indirectly, beneficially and of record, by the Founder or the Founder's Affiliates; and

(G) the entry into any legally binding contract or other arrangement providing for the Transfer of any share of Class B Common Stock during the period between (i) the entry into such contract or other arrangement and (ii) the settlement of such Transfer; *provided* that (x) such settlement period not exceed 180 days (or such longer period approved by the Independent Directors) and (y) the settlement of such Transfer, if such settlement occurs, occurs within such 180-day settlement period (or such longer period as may be approved by the Independent Directors).

"**Affiliate**" shall mean, (i) in the case of a holder who is a natural person or an entity held solely by a natural person or a trust created by a natural person, (A) (I) such natural person and (II) any spouse, registered domestic partner, descendant (including any adopted descendant), parent, parent of the spouse or domestic partner of such natural person or any lineal descendants of any of the foregoing (including any adopted descendant) (each a "**Family Member**" and, more than one such Family Member, "**Family Members**"), (B) any custodian, trustee (including a trustee of a voting trust), executor or other fiduciary for the account of (I) such natural person or any one or more Family Members of such natural person or (II) any trust contemplated by clause (C), (C) any trust of which such natural person and/or any one or more Family Members of such natural person and/or any organization that is tax-exempt under Section 501(c)(3) of the Internal Revenue Code are current beneficiaries, (D) an entity in which all of the beneficial and economic interests are held, directly or indirectly, by any one or more of such natural person, any one or more Family Members of such natural person, or any natural person, entity, or trust referred to in clause (B) or (C), or (E) an organization that is tax-exempt under Section 501(c)(3) of the Internal Revenue Code so long as the transfer, assignment, sale or other disposition to such organization does not involve any payment of cash, securities, property or other consideration to such natural person; *provided* that, in the case of each of clauses (A), (B), (C), (D) and (E), such natural person holds exclusive voting control with respect to such shares of Class B common stock; (ii) in the case of an institutional, private equity, hedge, venture capital or other private investment fund, any partner, limited partner, retired partner, member or retired member of such holder, any affiliated fund, any fund which is controlled by or under common control with one or more general partners of such holder, any fund that is managed and governed by the same management company as such holder, any fund that controls such holder or any fund that is controlled by, under common control with, managed or advised by the same management company or registered investment advisor that controls, is under common control with, manages or advises the fund that controls such holder; and (iii) in the case of a mutual fund, pension fund, other pooled investment vehicle or an institutional client, to another mutual

A-4

Table of Contents

fund, pension fund, other pooled investment vehicle or an institutional client in connection with a merger, fund reorganization or otherwise for regulatory or fund management purposes.

"*Founder*" shall mean any of Brian Chesky, Nathan Blecharczyk and Joseph Gebbia, each as a natural living person, and "*Founders*" shall mean all of them.

"*Independent Directors*" means members of the Board of Directors that are not a Founder or an officer or other employee of the Corporation or its subsidiaries (*provided* that a director shall not be considered an officer or employee of the Corporation solely due to such director's position as a member of the Board of Directors or the board of directors or similar governing body of one or more subsidiaries of the Corporation).

3.1.5 <u>Mechanics of Conversion</u>. In the event of an optional conversion pursuant to Section 3.1.1, before any holder of Class B Common Stock shall be entitled voluntarily to convert the same into shares of Class A Common Stock, such holder shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or any transfer agent for such stock, and shall give written notice to the Corporation at such office that such holder elects to convert the same and shall state therein the name or names in which such holder wishes the certificate or certificates for shares of Class A Common Stock to be issued. The Corporation shall, as soon as practicable thereafter, issue and deliver at such office to such holder, or to the nominee or nominees of such holder, a certificate or certificates for the number of shares of Class A Common Stock to which such holder shall be entitled as aforesaid. Such optional conversion shall be deemed to have been made immediately prior to the close of business on the date of surrender of the shares of Class B Common Stock to be converted, and the person or persons entitled to receive the shares of Class A Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Class A Common Stock on such date. If the conversion is in connection with the automatic conversion provisions set forth in <u>Section 3.1.2</u>, <u>Section 3.1.3</u> or <u>Section 3.1.4</u>, such conversion shall be deemed to have been made (i) in the case of <u>Section 3.1.2</u>, at the Class B Mandatory Conversion Time, (ii) in the case of <u>Section 3.1.3</u>, at 5:00 p.m. New York City time on the nine (9) month anniversary of the of death or Disability of the applicable Founder, or (iii) in the case of <u>Section 3.1.4</u>, on the applicable date of Transfer, the persons entitled to receive shares of Class A Common Stock issuable upon such conversion shall be treated for all purposes as the record holders of such shares of Class A Common Stock as of the applicable date, and, until presented for transfer, certificates previously evidencing shares of Class B Common Stock shall represent the number of shares of Class A Common Stock into which such shares were automatically converted. Shares of Class B Common Stock converted pursuant to <u>Section 3.1.1</u>, <u>Section 3.1.2</u>, <u>Section 3.1.3</u> or <u>Section 3.1.4</u> shall be automatically retired and cancelled and may not be reissued, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Class B Common Stock accordingly.

3.1.6 <u>Policies and Procedures</u>. The Board of Directors, or a committee thereof, may, from time to time, establish such policies and procedures, not in violation of applicable law or this Restated Certificate of Incorporation, relating to the conversion of shares of Class B Common Stock into shares of Class A Common Stock as it may deem necessary or advisable. The Corporation may, from time to time, require that a holder of shares of Class B Common Stock furnish affidavits or other proof to the Corporation as it deems necessary to verify the ownership of shares of Class B Common Stock and to confirm that a conversion to shares of Class A Common Stock has not occurred. In addition, the Corporation may, from time to time, require that any Founder furnish affidavits or other proof to the Corporation as it deems reasonably necessary to verify such Founder's (or such Founder's Affiliates') ownership of shares of Class B Common Stock, including as of the Effective Time. Without limiting the discretion of the Board of Directors (or a committee of the Board of Directors), the Board of Directors (or such committee) may determine (and such determination shall be conclusive) that a holder of shares of Class B Common Stock has failed to furnish sufficient evidence to the Corporation (in the manner and time frame provided in the request) to enable the Corporation to determine that no conversion of shares of Class B Common Stock into shares of Class A Common Stock in accordance with this <u>Section 3.1</u> has occurred with respect to such holder of shares of Class B Common Stock (and its Affiliates), and therefore such shares of Class B Common Stock, to the extent not previously converted, shall be converted into

A-5

Table of Contents

shares of Class A Common Stock and such conversion shall thereupon be registered on the books and records of the Corporation. A determination by the Board of Directors (or such committee of the Board of Directors), acting reasonably and in good faith, that shares of Class B Common Stock have been converted into shares of Class A Common Stock pursuant to this Article Third shall be conclusive.

3.1.7 <u>No Further Issuance</u>. Except for the issuance of shares of Class B Common Stock issuable in respect of Rights outstanding immediately prior to the Effective Time, a dividend payable in accordance with Section 6 of Article Fourth, or a reclassification, subdivision or combination in accordance with Section 8 of Article Fourth, the Corporation shall not at any time after the Effective Time issue any additional shares of Class B Common Stock.

"***Rights***" means any option, warrant, restricted stock unit, restricted stock award, performance stock award, phantom stock, equity award, conversion right or contractual right of any kind to acquire or obligation of the Corporation to issue shares of the Corporation's authorized but unissued capital stock.

3.2 <u>Conversion of Class H Common Stock</u>.

3.2.1 Automatic Conversion. Upon the transfer, assignment, sale or other disposition of Class H Common Stock to a person that is not a Subsidiary (as defined below) of the Corporation, each share of Class H Common Stock so transferred, assigned, sold or otherwise disposed of shall automatically convert into one (1) share of Class A Common Stock. A "***Subsidiary***" of any person shall mean (i) a corporation more than 50% of the combined voting power of the outstanding capital stock then empowered to vote generally for the election of directors (or persons performing similar functions) of which is owned, directly or indirectly, by such person or by one or more other Subsidiaries of such person or by such person and one or more Subsidiaries thereof, or (ii) any other person (other than a corporation) in which such person, or one or more other Subsidiaries of such person or such person and one or more other Subsidiaries thereof, directly or indirectly, has at least a majority ownership and power to direct the policies, management and affairs thereof.

3.2.2 <u>Mechanics of Conversion</u>. Upon the occurrence of an automatic conversion of the Class H Common Stock pursuant to <u>Section 3.2.1</u>, such conversion shall be deemed to have been made on the applicable date of Transfer of the Class H Common Stock, the persons entitled to receive shares of Class A Common Stock issuable upon such conversion shall be treated for all purposes as the record holders of such shares of Class A Common Stock as of the applicable date, and, until presented for transfer, certificates previously evidencing shares of Class H Common Stock shall represent the number of shares of Class A Common Stock into which such shares were automatically converted. Shares of Class H Common Stock converted pursuant to <u>Section 3.2.1</u> shall be automatically retired and cancelled and may not be reissued, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Class H Common Stock accordingly.

4. <u>Notices</u>. Except as otherwise provided herein, any notice required or permitted by the provisions of this Part A of Article Fourth to be given to a holder of shares of Common Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation for such holder, given by the holder to the Corporation for the purpose of notice or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission. If no such address appears or is given, notice shall be deemed given at the place where the principal executive office of the Corporation is located.

5. <u>Redemption</u>. The Common Stock is not redeemable at the option of the holder thereof and the Corporation shall have no obligation to redeem the Common Stock; *provided*, *however*, that the Corporation may at any time or from time to time redeem out of funds legally available therefor, at a redemption price per share equal to the par value of the share of Class H Common Stock being redeemed, any outstanding share of Class H Common Stock on the terms and conditions set forth in the notice of redemption delivered to the holder of Class H Common Stock by the Corporation.

Table of Contents

6. <u>Dividends</u>. Subject to the rights, powers and preferences applicable to any series of Preferred Stock, if any, outstanding at any time, the holders of each series of Common Stock shall be entitled to receive, on a per share basis, the same form and amount of dividends and other distributions of cash, property or shares of stock of the Corporation as may be declared by the Board of Directors from time to time with respect to shares of any other series of Common Stock out of assets or funds of the Corporation legally available therefor; *provided*, *however*, that in the event that such dividend is paid in the form of shares of a series of Common Stock that differs from the series of Common Stock held by any holder or rights to acquire a series of Common Stock that differs from a series of Common Stock held by any holder, as applicable, such holder shall receive the series of Common Stock or rights to acquire the series of Common Stock corresponding to the series of Common Stock held by such holder, as the case may be.

7. <u>Liquidation, Dissolution, etc</u>. In the event of a voluntary or involuntary liquidation, dissolution, distribution of assets or winding up of the Corporation, the holders of each series of Common Stock shall be entitled to share equally, on a per share basis, in all assets of the Corporation of whatever kind available for distribution to the holders of Common Stock.

8. <u>Subdivision or Combination</u>. If the Corporation in any manner subdivides, combines or reclassifies the outstanding shares of Class A Common Stock, Class B Common Stock, Class C Common Stock or Class H Common Stock, the outstanding shares of the other such series shall, concurrently therewith, be subdivided, combined or reclassified in the same proportion and manner such that the same proportionate equity ownership between the holders of outstanding Class A Common Stock, Class B Common Stock, Class C Common Stock and Class H Common Stock on the record date for such subdivision, combination or reclassification is preserved, unless different treatment of the shares of each such series is approved by (i) the holders of a majority of the outstanding Class A Common Stock, (ii) the holders of a majority of the outstanding Class B Common Stock, (iii) the holders of a majority of the outstanding Class C Common Stock, and (iv) the holders of a majority of the outstanding Class H Common Stock, each of (i) through (iv) voting as separate series.

9. <u>Treatment in a Merger</u>. The consideration received per share by the holders of each series of Common Stock in any merger, consolidation, reorganization or other business combination shall be identical; *provided*, *however*, that if (i) such consideration consists, in whole or in part, of shares of capital stock of, or other equity interests in, the Corporation or any other corporation, partnership, limited liability company or other entity, and (ii) the powers, designations, preferences and relative, optional or other special rights and qualifications, limitations and restrictions of shares of capital stock or other equity interests received in respect of the shares of Class A Common Stock, Class B Common Stock, Class C Common Stock and Class H Common Stock differ solely to the extent that the powers, designations, preferences and relative, optional or other special rights and qualifications, limitations and restrictions of the Class A Common Stock, the Class B Common Stock, the Class C Common Stock and Class H Common Stock differ as described in this Article Fourth, then the powers, designations, preferences and relative, optional or other special rights and qualifications, limitations and restrictions of such shares of capital stock or other equity interests may differ to the extent that the powers, designations, preferences and relative, optional or other special rights and qualifications, limitations and restrictions of the Class A Common Stock, the Class B Common Stock, the Class C Common Stock and the Class H Common Stock differ as provided herein (including, without limitation, with respect to the voting rights and conversion provisions hereof); and *provided further*, that, if the holders of any series of Common Stock are granted the right to elect to receive one of two or more alternative forms of consideration, the foregoing provisions shall be deemed satisfied if holders of the other series of Common Stock are granted corresponding election rights.

10. <u>Equal Status</u>. Except as expressly provided in this Article Fourth, each of the Class A Common Stock, the Class B Common Stock, the Class C Common Stock and the Class H Common Stock shall have the same rights and privileges and rank equally, share ratably and be identical in all respects as to all matters.

Table of Contents

B.    PREFERRED STOCK

Shares of Preferred Stock may be issued from time to time in one or more series, each of such series to have such terms as stated in the resolution or resolutions providing for the establishment of such series adopted by the Board of Directors of the Corporation as hereinafter provided. Authority is hereby expressly granted to the Board of Directors of the Corporation to issue, from time to time, shares of Preferred Stock in one or more series, and, in connection with the establishment of any such series, by resolution or resolutions to determine and fix the designation of and the number of shares comprising such series, and such voting powers, full or limited, or no voting powers, and such other powers, designations, preferences and relative, participating, optional and other special rights, and the qualifications, limitations and restrictions thereof, if any, including, without limitation, dividend rights, conversion rights, redemption privileges and liquidation preferences, as shall be stated in such resolution or resolutions, all to the fullest extent permitted by the General Corporation Law. Without limiting the generality of the foregoing, the resolution or resolutions providing for the establishment of any series of Preferred Stock may, to the extent permitted by law, provide that such series shall be superior to, rank equally with or be junior to the Preferred Stock of any other series. The powers, preferences and relative, participating, optional and other special rights of each series of Preferred Stock, and the qualifications, limitations or restrictions thereof, if any, may be different from those of any and all other series at any time outstanding. Except as otherwise expressly provided in the resolution or resolutions providing for the establishment of any series of Preferred Stock, no vote of the holders of shares of Preferred Stock or Common Stock shall be a prerequisite to the issuance of any shares of any series of the Preferred Stock so authorized in accordance with this Restated Certificate of Incorporation. The number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by (in addition to any vote of the holders of one or more series of Preferred Stock entitled to vote thereon) the affirmative vote of the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation entitled to vote thereon, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

FIFTH: The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

1. Powers of the Board. In addition to the powers and authority expressly conferred upon them by applicable law or by this Restated Certificate of Incorporation or the Bylaws of the Corporation (as amended and/or restated from time to time, the "***Bylaws***"), the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation.

2. Classification of the Board. Except as may be provided in a resolution or resolutions of the Board of Directors providing for any series of Preferred Stock with respect to any directors elected (or to be elected) by the holders of such series and except as otherwise required by applicable law, the directors shall be divided into three classes, designated as Class I, Class II and Class III, as nearly equal in number as possible. Directors shall be assigned to each class in accordance with a resolution or resolutions adopted by the Board of Directors. Class I directors shall initially serve for a term expiring at the first annual meeting of stockholders following the Effective Time, Class II directors shall initially serve for a term expiring at the second annual meeting of stockholders following the Effective Time and Class III directors shall initially serve for a term expiring at the third annual meeting of stockholders following the Effective Time. At each annual meeting of stockholders commencing with the first annual meeting of stockholders following the Effective Time, the directors of the class to be elected at each annual meeting of stockholders shall be elected for a three-year term. If the total number of such directors is changed, any increase or decrease shall be apportioned among the classes so as to maintain the number of directors in each class as nearly equal as possible, and any such additional director of any class elected to fill a newly created directorship resulting from an increase in such class, in accordance with Section 5 of Article Fifth, shall hold office for a term that shall coincide with the remaining term of that class, but in no case shall a decrease in the total number of directors remove or shorten the term of any incumbent director. Notwithstanding the foregoing provisions of this Section 2 of Article Fifth, each director shall serve until his or her successor is duly elected and qualified or until his or her death, resignation, disqualification, retirement, or removal.

A-8

Table of Contents

3. <u>Number of Directors</u>. Except as may be provided in a resolution or resolutions of the Board of Directors providing for any series of Preferred Stock with respect to any directors elected (or to be elected) by the holders of such series and except as otherwise required by applicable law, the total number of authorized directors constituting the Board of Directors shall be fixed from time to time exclusively by the Board of Directors pursuant to a resolution adopted by the Board of Directors.

4. <u>Removal of Directors</u>. Except as may be provided in a resolution or resolutions of the Board of Directors providing for any series of Preferred Stock with respect to any directors elected (or to be elected) by the holders of such series and except as otherwise required by applicable law, the Board of Directors or any individual director may be removed from office at any time only for cause by the affirmative vote of the holders of a majority of the voting power of the outstanding shares of capital stock of the Corporation then entitled to vote generally in the election of directors.

5. <u>Vacancies and Newly Created Directorships</u>. Except as may be provided in a resolution or resolutions providing for any series of Preferred Stock with respect to any directors elected (or to be elected) by the holders of such series and except as otherwise required by applicable law, any vacancies on the Board of Directors resulting from death, resignation, disqualification, retirement, removal or other causes and any newly created directorships resulting from any increase in the number of directors shall, unless the Board of Directors determines by resolution that any such vacancies or newly created directorships shall be filled by the stockholders, be filled only by the affirmative vote of a majority of the directors then in office, even though less than a quorum of the Board of Directors, and not by the stockholders. Any director elected in accordance with the preceding sentence shall hold office for the remainder of the full term of the director for which the vacancy was created or occurred and until such director's successor shall have been elected and qualified or until such director's death, resignation, disqualification, retirement, or removal.

6. <u>Bylaws</u>. Subject to any additional vote required by this Restated Certificate of Incorporation, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to adopt, repeal, alter, amend or rescind the Bylaws of the Corporation. The affirmative vote of at least a majority of the Board of Directors then in office shall be required in order for the Board of Directors to adopt, repeal, alter, amend or rescind the Corporation's Bylaws. The stockholders shall also have power to adopt, repeal, alter, amend or rescind the Bylaws. In addition to any vote of the holders of any class or series of stock of the Corporation required by applicable law or by this Restated Certificate of Incorporation (including any Preferred Stock outstanding at any time), such adoption, repeal, alteration, amendment or rescission of the Bylaws by the stockholders shall require the affirmative vote of the holders of at least sixty-six and two-third percent (66-2/3%) of the voting power of the then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

7. <u>Elections of Directors</u>. Elections of directors need not be by ballot unless the Bylaws shall so provide.

**SIXTH:** Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board or in the Bylaws.

**SEVENTH:** Except as otherwise required by law, special meetings of the stockholders of the Corporation may be called only by (i) an officer of the Corporation pursuant to a resolution adopted by a majority of the Board of Directors then in office or (ii) the Chairperson of the Board of Directors.

**EIGHTH:** Subject to the rights of the holders of any series of Preferred Stock with respect to actions by the holders of shares of such series, from and after the Voting Threshold Date, (a) no action shall be taken by the stockholders of the Corporation except at a duly called annual or special meeting of stockholders and (b) no action shall be taken by the stockholders of the corporation by written consent. "***Voting Threshold Date***" shall mean shall mean 5:00 p.m. New York City time on the first day falling on or after the date on which the outstanding shares of Class B Common Stock represent less than 50 percent (50%) of the total voting power of the outstanding shares of capital stock of the Corporation then entitled to vote generally in the election of directors.

A-9

Table of Contents

**NINTH:** To the fullest extent permitted by law, a director or an officer of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director or an officer. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or an officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended. Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a director or an officer of the Corporation existing at the time of, or increase the liability of any director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to, such repeal or modification.

**TENTH:** To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law. Any amendment, repeal or modification of the foregoing provisions of this Article Tenth shall not adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification.

**ELEVENTH:** In addition to any other considerations which the Board of Directors, any committee thereof or any individual director lawfully may take into account in determining whether to take or refrain from taking corporate action on any matter, including making or declining to make any recommendation to the stockholders of the Corporation, the Board of Directors, any committee thereof or any individual director may, in his, her, or its discretion, consider the long-term as well as the short-term interests of the Corporation, taking into account and considering, as deemed appropriate, the effects of such action on the Corporation's (a) stockholders and (b) other stakeholders, including hosts, guests, communities, and employees, in the case of (b), as may be identified or revised by the Board of Directors from time to time.

Nothing in this Article Eleventh, elsewhere in this Restated Certificate of Incorporation or in any other governing document, policy or guideline adopted by the Corporation from time to time, shall (a) create any duty owed by any director to any person or entity to consider, or afford any particular weight to, any of the foregoing matters or to limit his or her consideration thereof or (b) other than as vested in the Corporation's stockholders to the extent provided under applicable law, be construed as creating any rights against any director of the Corporation or the Corporation. This Article Eleventh shall be deemed to grant discretionary authority only, to the extent consistent with and permitted by law, and shall not be deemed to confer third-party beneficiary status on any person or entity.

**TWELFTH:** Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if such court does not have subject matter jurisdiction thereof, the federal district court of the State of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for: (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim for or based on a breach of a fiduciary duty owed by any current or former director, officer, other employee, agent or stockholder of the Corporation to the Corporation or the Corporation's stockholders, including without limitation a claim alleging the aiding and abetting of such a breach of fiduciary duty, (iii) any action asserting a claim against the Corporation or any current or former director, officer, employee, agent or stockholder of the Corporation arising pursuant to any provision of the General Corporation Law or the Corporation's Certificate of Incorporation or Bylaws or as to which the General Corporation Law confers jurisdiction on the Court of Chancery of the State of Delaware, or (iv) any action asserting a claim related to or involving the Corporation that is governed by the internal affairs doctrine.

Table of Contents

Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

Any person or entity purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article.

Failure to enforce the foregoing provisions would cause the Corporation irreparable harm, and the Corporation shall be entitled to equitable relief, including injunctive relief and specific performance, to enforce the foregoing provisions.

**THIRTEENTH**: The Corporation reserves the right to amend or repeal any provision contained in this Restated Certificate of Incorporation in the manner prescribed by the laws of the State of Delaware and all rights conferred upon stockholders are granted subject to this reservation; *provided*, *however*, that notwithstanding any other provision of this Restated Certificate of Incorporation, or any provision of law that might otherwise permit a lesser vote or no vote, but in addition to any vote of the holders of any class or series of the stock of the Corporation, and, as applicable, such other approvals of the Board of Directors of the Corporation, as are required by law or by this Restated Certificate of Incorporation, (A) the affirmative vote of the holders of sixty-six and two-third percent (66-2/3%) of the voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to amend or repeal, or adopt any provision of this Restated Certificate of Incorporation inconsistent with, (i) Article Fifth, (ii) Article Seventh, (iii) Article Eighth or (iv) this clause (A) of Article Thirteenth, and (B) for so long as any shares of Class B Common Stock are outstanding, the affirmative vote of the holders at least eighty percent (80%) of the shares of Class B Common Stock outstanding at the time of such vote, voting as a separate series, shall be required to amend or repeal, or adopt any provision of this Restated Certificate of Incorporation inconsistent with, (i) <u>Section 2.1</u> of Clause (A) of Article Fourth (only with respect to the number of votes for each share of Class B Common Stock held), (ii) <u>Section 3.1</u> of Clause (A) of Article Fourth (with the exception of Section 3.1.6) or (iii) this clause (B) of Article Thirteenth.

\*    \*    \*

3. ~~That the foregoing amendment and restatement was approved by the holders of the requisite number of shares of this corporation in accordance with Section 288 of the General Corporation Law.~~

~~4.~~ That this Restated Certificate of Incorporation, which restates and integrates and further amends the provisions of this corporation's Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law.

**IN WITNESS WHEREOF**, this Restated Certificate of Incorporation has been executed by a duly authorized officer of this corporation on this __ ~~14th~~ day of ~~December, 2020~~_____, 2024.

By: /s/ ~~David E. Stephenson~~

~~David E. Stephenson~~ Elinor Mertz
Chief Financial Officer

A-11

Table of Contents

 airbnb

P.O. BOX 8016, CARY, NC 27512-9903

**YOUR VOTE IS IMPORTANT! PLEASE VOTE BY:**



**INTERNET**
Go To: **www.proxypush.com/ABNB**
- Cast your vote online
- **Have your Proxy Card ready**
- Follow the simple instructions to record your vote

**PHONE**  Call **1-866-834-6036**
- Use any touch-tone telephone
- **Have your Proxy Card ready**
- Follow the simple recorded instructions

**MAIL**
- Mark, sign and date your Proxy Card
- Fold and return your Proxy Card in the postage-paid envelope provided

 You must register to attend the meeting online and/or participate at www.proxydocs.com/ABNB

# Airbnb, Inc.
## Annual Meeting of Stockholders

For Stockholders of record as of April 8, 2024

**DATE:**  Wednesday, June 5, 2024
**TIME:**  10:00 AM, PDT
**PLACE:**  Annual Meeting to be held live via the Internet - please visit
www.proxydocs.com/ABNB for more details.

### This proxy is being solicited on behalf of the Board of Directors

The undersigned hereby appoints Brian Chesky, Elinor Mertz and Ronald A. Klain, and each of them, as the true and lawful attorneys of the undersigned, with full power of substitution and revocation, and authorizes them, and each of them, to vote all the shares of capital stock of Airbnb, Inc. which the undersigned is entitled to vote at said meeting and any postponement, continuation or adjournment thereof upon the matters specified and upon such other matters as may be properly brought before the meeting or any postponement, continuation or adjournment thereof, conferring authority upon such true and lawful attorneys to vote in their discretion on such other matters as may properly come before the meeting and any postponement, continuation or adjournment thereof and revoking any proxy heretofore given.

THE SHARES REPRESENTED BY THIS PROXY WILL BE VOTED AS DIRECTED OR, IF NO DIRECTION IS GIVEN, SHARES WILL BE VOTED IDENTICAL TO THE BOARD OF DIRECTORS' RECOMMENDATION. This proxy, when properly executed, will be voted in the manner directed herein. In their discretion, the named proxies are authorized to vote upon such other matters that may properly come before the meeting or any postponement, continuation or adjournment thereof.

You are encouraged to specify your choice by marking the appropriate box on the reverse side of this card but you need not mark any box if you wish to vote in accordance with the Board of Directors' recommendation. The named proxies cannot vote your shares unless you sign (on the reverse side) and return this card.

PLEASE BE SURE TO SIGN AND DATE THIS PROXY CARD AND MARK ON THE REVERSE SIDE

# Airbnb, Inc.
## Annual Meeting of Stockholders

Please make your marks like this: ☒

THE BOARD OF DIRECTORS RECOMMENDS A VOTE:
FOR ON PROPOSALS 1, 2, 3 AND 4
AGAINST ON PROPOSAL 5

| | PROPOSAL | YOUR VOTE | | | BOARD OF DIRECTORS RECOMMENDS |
|---|---|---|---|---|---|
| 1. | To elect Brian Chesky, Angela Ahrendts and Kenneth Chenault as Class I Directors to serve until the 2027 Annual Meeting of Stockholders, and until their respective successors are duly elected and qualified. | FOR | WITHHOLD | | |
| | 1.01 Brian Chesky | ☐ | ☐ | | FOR |
| | 1.02 Angela Ahrendts | ☐ | ☐ | | FOR |
| | 1.03 Kenneth Chenault | ☐ | ☐ | | FOR |
| | | FOR | AGAINST | ABSTAIN | |
| 2. | To ratify the appointment of PricewaterhouseCoopers LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2024. | ☐ | ☐ | ☐ | FOR |
| 3. | To approve, on an advisory (non-binding) basis, the compensation of our named executive officers. | ☐ | ☐ | ☐ | FOR |
| 4. | To approve the amendment and restatement of our Restated Certificate of Incorporation to provide for the exculpation of officers. | ☐ | ☐ | ☐ | FOR |
| 5. | Stockholder proposal regarding political disclosure, if properly presented at the Annual Meeting. | ☐ | ☐ | ☐ | AGAINST |

NOTE: The named proxies are authorized to transact such other business that may properly come before the Annual Meeting or any postponement, continuation or adjournment thereof.

You must register to attend the meeting online and/or participate at www.proxydocs.com/ABNB
Authorized Signatures - Must be completed for your instructions to be executed.
Please sign exactly as your name(s) appears on your account. If held in joint tenancy, all persons should sign. Trustees, administrators, etc., should include title and authority. Corporations should provide full name of corporation and title of authorized officer signing the Proxy/Vote Form.

_____     _____
Signature (and Title if applicable)          Date          Signature (if held jointly)          Date